UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITED STATES,<br><br>                    Defendant,<br>          and<br><br>BHARAT FORGE LIMITED,<br><br>               Defendant-Intervenor. | Court No. 21-00007<br><br>**NON-CONFIDENTIAL VERSION**<br><br><br>Business Proprietary Information Removed from Brackets on Pages 36-44 |

BRIEF OF PLAINTIFFS ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD

Jack A. Levy
Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

Dated:   July 19, 2021

# Table of Contents

Page

STATEMENT PURSUANT TO RULE 56.2 .................................................................. 5

I.    Administrative Determination Under Review ..................................................... 5

II.   Issues Presented ................................................................................................. 5

III.  Statement of Facts.............................................................................................. 7

      A.   Faced with Unfair Trade Competition, Domestic Producers of FEBs Filed an
           Antidumping Petition for Antidumping Duties on Indian FEBs ................................... 7

      B.   Because There Is No Indian Home Market for FEBs, Dumping Is Calculated by
           Comparing U.S. Prices to Constructed Normal Value..................................... 8

      C.   Because Bharat Produces Both FEBs and Other Forgings that Are Not
           Merchandise Under Consideration, Cost Allocation Is a Fundamental Issue................. 9

      D.   Commerce's Preliminary Determination Ignored Substantive Concerns with
           Bharat's Reported Data ................................................................. 10

      E.   Despite Stating an Intent to Verify, Commerce Failed to Conduct Any
           Verification of Factual Information Submitted by Bharat .......................... 11

SUMMARY OF ARGUMENT .............................................................................. 14

ARGUMENT ...................................................................................................... 16

I.    Standard of Review............................................................................................ 16

II.   Commerce Acted Unlawfully by Failing to Verify Data Before Such Data Were
      Used in the Dumping Calculation....................................................................... 17

      A.   Because Commerce Failed to Conduct a Verification and Issue a Verification
           Report, Commerce's *Final Determination* Is Unlawful .............................. 18

      B.   Even if the Unconditional Mandates of the Statute, the SAA, and Commerce's
           Regulations Were to Permit Some Flexibility, Commerce's Alternative
           Procedures Are Not Entitled to Deference Because Commerce Failed to Follow
           Procedural Requirements and Otherwise Jettisoned Established Practice................... 24

      C.   Commerce's Failure to Conduct Verification Did Not Authorize Reliance on
           Bharat's Unverified Information as Facts "Otherwise Available" Pursuant to 19
           U.S.C. § 1677e(a)(2)(D) ............................................................... 28

D.  Commerce Additionally Acted Contrary to Law By Failing to Follow Its Own
    Clearly Articulated Procedures for the Submission of New Factual Information ........ 32

E.  Commerce Further Acted Contrary to Law Because Its Verification "Findings"
    Were Arbitrary and Unsupported by Substantial Evidence ........................................... 35

    1.  Commerce's Finding That Bharat Did Not Underreport Its FEB Processing
        Costs Was Erroneous and Not Supported By Substantial Evidence .................... 36

    2.  Commerce's Finding That Bharat Did Not Underreport Its G&A Expenses
        Was Unreasonable and Not Supported By Substantial Evidence ........................ 42

CONCLUSION .................................................................................................................... 45

# Table of Authorities

Page(s)

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ...................................................................................15

19 U.S.C. § 1677b(e) .............................................................................................8

19 U.S.C. § 1677e(a) .................................................................................17, 28, 31

19 U.S.C. § 1677e(a)(2)(D) ........................................................................... *passim*

19 U.S.C. § 1677f(i)(3)(A) ....................................................................................16

19 U.S.C. § 1677m(d) ...........................................................................................33

19 U.S.C. § 1677m(i) ..................................................................................... *passim*

19 U.S.C. § 1677m(i)(1) ...............................................................................11, 31

19 U.S.C. § 3512(d) ..............................................................................................19


**Regulations**

19 C.F.R. § 351.102(b)(21)(v) ..............................................................................33

19 C.F.R. § 351.301(c)(1)(v) ......................................................................25, 33, 34

19 C.F.R. § 351.301(c)(5) ..............................................................................32, 34

19 C.F.R. § 351.301(d) ..........................................................................................34

19 C.F.R. § 351.302(d) ..........................................................................................32

19 C.F.R. § 351.307 ........................................................................................5, 20, 24

19 C.F.R. § 351.307(b)(1)(d) ................................................................................20

19 C.F.R. § 351.307(b)(1)(i) .................................................................................20

19 C.F.R. § 351.307(c) ...............................................................................17, 20, 23

19 C.F.R. § 351.301(c)(1)(v) ......................................................................25, 33, 34

19 C.F.R. § 351.307(d) ..........................................................................................17

Court Decisions

*Al-Tech Specialty Steel Corp. v. United States*, 745 F.2d 632 (Fed. Cir. 1984) .........................22

*Auer v. Robbins*, 519 U.S. 452 (1997) ...............................................26, 27

*Bomont Industries v. United States*, 733 F. Supp. 1507 (Ct. Int'l Trade 1990) ........................................................................................35

*Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011) ........................................27

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)..........................................................................*passim*

*Christopher v. SmithKline Beecham*, 567 U.S. 142 (2012) ........................................27

*Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ...............................................................44

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........................................ 15-16

*Delarosa v. Peake*, 515 F.3d 1319 (Fed. Cir. 2008) ........................................31

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ........................................17, 44

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305 (Ct. Int'l Trade 2001) ........................................17

*Hyundai Heavy Indus. Co., Ltd. v. United States*, 393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) ........................................................44

*Industrial Quimica Del Nalon, S.A. v. United States*, 729 F. Supp. 103 (Ct. Int'l Trade 1989) ...............................................................22

*Ipsco, Inc. v. United States*, 899 F.2d 1192 (Fed. Cir. 1990) ........................................26

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .............................................................................16

*Micron Tech. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) ........................................ *passim*

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...............................................................16

*Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696 (2007) ........................................20

*New American Keg v. United States*, Slip Op. 21-30, 2021 Ct. Intl. Trade LEXIS 34
(Ct. Int'l Trade Mar. 23, 2021) ...........................................................................24, 27

*NMB Sing. Ltd v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ...........................................16, 44

*Princess Cruises, Inc. v. United States*, 201 F.3d 1352 (Fed. Cir. 2000) ....................................31

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ..........................................26

*Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338 (Ct. Int'l
Trade 1999) ...........................................................................18, 26

*Smith Corona Corp. v. United States*, 771 F. Supp. 389 (Ct. Int'l Trade 1991) ..........................24

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) ............................................................27

*Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322 (Ct. Int'l Trade
2010) ...........................................................................16

*Timken Co. v. United States*, 852 F. Supp. 1122 (Ct. Int'l Trade 1994) ....................................22

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996) ...........................................26, 34

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ....................................................................26

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......................................................15-16

*Wheatland Tube Corp. v. United States*, 841 F. Supp. 1222 (Ct. Int'l Trade
1993) ...........................................................................18, 26

*Vinh Hoan Corp. v. United States*, 49 F. Supp. 3d 1285 (Ct. Int'l Trade
2015) ...........................................................................44

Administrative Determinations

*Brake Rotors From the People's Republic of China: Rescission of Second New Shipper Review
and Final Results and Partial Rescission of First Antidumping Duty Administrative Review*, 64
Fed. Reg. 61,581 (Nov. 12, 1999) ...........................................................................21-22

*Carbon and Alloy Steel Wire Rod from the United Kingdom: Final Affirmative
Determination of Sales at Less Than Fair Value and Final Affirmative Determination of
Critical Circumstances*, 83 Fed. Reg. 13,252 (Mar. 28, 2018) ...........................................21-22

*Certain Biaxial Integral Geogrid Products from the People's Republic of China: Final
Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 3284 (Jan. 11, 2017) ................11

*Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium, Final Determination of
Critical Circumstances, in Part*, 82 Fed. Reg. 16,378 (Apr. 4, 2017) ....................................32-33

*Certain Carbon and Alloy Steel Cut-to-Length Plate From Italy*, 82 Fed. Reg. 16,345 (Apr. 4, 2017) ...................................................................................................................33

*Certain Tool Chests and Cabinets From the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 15,361 (Apr. 10, 2018) ........................................................................................................22

*Forged Steel Fluid End Blocks from India: Final Negative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,003 (Dec. 11, 2020) ............................................... *passim*

*Forged Steel Fluid End Blocks from India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 85 Fed. Reg. 44,517 (July 23, 2020) ........................................................................................................ *passim*

*Forged Steel Fluid End Blocks From the Federal Republic of Germany, India, and Italy: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2,394 (Jan. 15, 2020) ...............7

*Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar From Italy*, 67 Fed. Reg. 3155 (Jan. 23, 2002) ................................................................21

*Polyethylene Terephthalate Resin From Pakistan: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 48,281 (Sep. 24, 2018) ......................................21

Other Administrative Materials

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,295 (May 19, 1997).....................21

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) .......................................... *passim*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

| | | |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS,<br><br>       Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>       Defendant,<br>   and<br><br>BHARAT FORGE LIMITED,<br><br>      Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Court No. 21-00007<br><br>**NON-CONFIDENTIAL<br>VERSION**<br><br><br><br>Business Proprietary Information<br>Removed from Brackets on Pages<br>36-44 |

**BRIEF OF PLAINTIFFS IN SUPPORT OF THEIR RULE 56.2 MOTION
FOR JUDGEMENT ON THE AGENCY RECORD**

Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons (collectively, "Plaintiffs" or "Petitioners") are domestic producers of forged steel fluid end blocks ("FEBs") — a key upstream input for domestic drilling and fracking activity — that petitioned the U.S. Department of Commerce ("Commerce") to impose antidumping duties to remedy injurious dumping of FEBs by producers in India, among other country sources.  Battered for years by unfairly traded imports, Plaintiffs filed these cases with the promise that affirmative relief would remedy injury to the domestic industry and allow Plaintiffs to reinvest in their domestic production activities, save and create American jobs, and help strengthen America's energy independence across the supply chain.

NON-CONFIDENTIAL VERSION

But just months after the petitions were filed, the United States largely shut down because of the COVID-19 pandemic.  And the injury to domestic producers caused by subject imports was further exacerbated when oil prices quickly began trading negative.

Having already grabbed U.S. market share through its unfair trade practices, Bharat Forge Limited ("Bharat") identified the COVID-19 shutdown of government offices in Washington, D.C. as an opportunity to achieve litigation success.  As discussed below, Bharat developed a cunning strategy to understate the true cost of its FEB production by under-allocating costs to FEBs, the merchandise under consideration ("MUC"), and assigning a disproportionately large share of costs to non-MUC.  But this gambit would only pay off if Commerce did something it had never done before: abrogated its statutory directive to verify factual information before using it in an original investigation.

Incredibly, Commerce did not conduct an on-site, or even a virtual, verification.  Nor did Commerce issue any verification report or verification findings.  As a result of Commerce's failure to follow the law, and because Bharat's margin was consequently found to be *de minimis*, Bharat escaped entirely the discipline of an antidumping duty order.  Notwithstanding the importance of fair trade to the U.S. economy, and the ample factual record showing dumped Indian FEB imports, the Petition proved unsuccessful, apparently because of COVID-19's impact on Commerce's operations.  But such operational challenges do not excuse Commerce from acting in accordance with law.  Plaintiffs' appeal seeks to redress Commerce's failures in this regard.

From a practical perspective, the consequences of a failure to verify data were amplified significantly in this particular antidumping investigation.  Most antidumping investigations involve a comparison of the U.S. price of the imported product to the domestic "home market"

price of the foreign like product.  Under such a price-to-price comparison methodology, dumping

exists if the U.S. price is lower than the foreign market prices in the ordinary course of trade.

But because the United States is the only significant market for Indian FEBs, Bharat did not have

usable home market FEB sales available for comparison.  As such, Commerce's dumping

calculation did not involve Indian home market prices for FEBs.  Instead, Commerce compared

U.S. prices to the constructed normal value of FEBs, which is calculated based on FEB

production costs, selling, general, and administrative expenses, and profits.  As a forger like

Bharat can produce multiple types of products, Bharat's processing costs need to be properly

allocated across products in order to accurately measure its costs of production.  Because Bharat

has an incentive to reduce its reported FEB production costs of by allocating such costs *away*

from FEBs to other forged products, detailed review and testing of its allocation methodology

and associated costs is crucial to ensure a fair comparison between the U.S. price and the

constructed normal value of FEBs.  Otherwise, Bharat can readily avoid a finding of dumping by

presenting artificially gerrymandered costs for comparison to low U.S. prices.  That is precisely

what occurred here, with Commerce's failure to verify allowing Bharat to escape scrutiny and

continue dumping with impunity.

Plaintiffs appeal Commerce's failure to verify the factual information submitted by

Bharat and Commerce's reliance on cost information that was incorrect and did not capture the

full measure of Bharat's FEB-related costs.  These errors of law and fact render Commerce's

final determination in *Forged Steel Fluid End Blocks from India: Final Negative Determination

of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,003 (Dec. 11, 2020) ("the challenged

determination") contrary to law and unsupported by substantial evidence.

Plaintiffs hereby request that this Court remand the challenged determination to Commerce with instructions for Commerce to verify factual information as is required by law and otherwise render findings supported by substantial evidence.[1]

---

[1] In accordance with Section (d) of Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden (Rev'd Feb. 17, 2021), this brief cites the Bates numbers corresponding to the confidential version of the joint appendix, but omit "PR" and "CR" style references.

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The administrative determination under review is Commerce's final determination in

*Forged Steel Fluid End Blocks from India: Final Negative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,003 (Dec. 11, 2020) ("*Final Determination*") (Appx083628-083630), and the accompanying unpublished Issues and Decision Memorandum ("Final IDM") (Appx083612-083627).

### II.   Issues Presented

A.  Commerce is required by statute to "verify all information relied upon in making a final determination in an investigation." 19 U.S.C. § 1677m(i).  Insofar as Commerce admits that it did not conduct a verification, did Commerce act unlawfully? (Argument Section II.A)

B.  Commerce's discretion in developing its verification procedures is not unlimited. Commerce must perform an on-site verification and subsequently issue a verification report.  *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ("SAA") at 868 and 19 C.F.R. § 351.307.  When Commerce itself disclaimed any pretense that it conducted a verification or any analogue thereto, and otherwise failed to issue a verification report, is Commerce's *Final Determination* lawful? (Argument Section II.B)

C.  The SAA specifies limited circumstances where Commerce may find that information "cannot be verified" absent an actual verification, none of which were present here.  When Commerce nevertheless declined to conduct a verification,

and found that respondent's data "cannot be verified" solely due to the lack of verification, did Commerce act lawfully?  Relatedly, whereas logic and the plain meaning of the statute prevent defective data from simultaneously being "facts otherwise available," did Commerce act lawfully in citing the lack of verification as a basis for applying "facts otherwise available," only to rely on that exact same unverified data?  (Argument Section II.C)

D.  Commerce issued a questionnaire "in lieu of verification" and in it, instructed Bharat not to submit new factual information except where specifically requested. Did Commerce err as a matter of law by allowing unsolicited new factual information in responses to the questionnaire, denying Plaintiffs an opportunity to rebut, and otherwise relying on data that did not verify? (Argument Section II.D).

E.  To the extent Commerce sought to treat its questionnaire "in lieu of verification" as a valid verification exercise, did Commerce err as a matter of law by failing to support its conclusions with substantial evidence when Bharat's questionnaire responses — most notably, Exhibit D-71 — evidenced that it had significantly understated the processing costs and G&A expenses associated with its FEB production?  Relatedly, where Commerce mischaracterized and failed to address the essence of Plaintiffs' arguments concerning underreported G&A expenses, is Commerce required to address those arguments on remand?  (Argument Section II.E)

### III.  **Statement of Facts**

**A.    Faced with Unfair Trade Competition, Domestic Producers of FEBs Filed an Antidumping Petition for Antidumping Duties on Indian FEBs**

In the face of injurious unfair trade practices, Plaintiffs, along with the Forging Industry Association and the FEB Fair Trade Coalition, filed a Petition with Commerce on December 19, 2019, alleging, *inter alia*, that FEBs from India were being sold in the United States at less than fair value.  *See Forged Steel Fluid End Blocks From the Federal Republic of Germany, India, and Italy: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2,394 (Jan. 15, 2020) (Appx080000-080005).  Commerce initiated an investigation of the imports on January 8, 2020. *See id.* (Appx080000).  Commerce initially selected two mandatory respondents to investigate, Bharat Forge Limited ("Bharat") and Ultra Engineers ("Ultra"), but ultimately determined that Ultra had no in-scope sales to the United States during the period of investigation.  *See generally Forged Steel Fluid End Blocks from India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 85 Fed. Reg. 44,517 (July 23, 2020) ("*Preliminary Determination*") (Appx083300-083302), and accompanying IDM ("Prelim IDM") (Appx083287-083299).On January 22, 2020, Commerce issued its initial antidumping duty questionnaire to Bharat.  *See* Commerce Letter to Bharat (Jan. 22, 2020) (Appx080006-080159). Relevant to this appeal, after obtaining multiple extensions of time, Bharat submitted questionnaire responses concerning their production activities in India, U.S. sales, and their costs to produce FEBs, *i.e.*, the merchandise under consideration ("MUC").  *See* "Submission of Bharat Forge Limited's Section A Response" (Feb. 20, 2020) (Appx080314-081118), "Submission of Bharat Forge Limited's Section C Response" (Mar. 10, 2020) (Appx081131-082308), "Submission of Bharat Forge Limited's Section D Response" (Mar. 13, 2020) (Appx082309-083116).

Plaintiffs identified various deficiencies in Bharat's responses including, *inter alia*, concerns about Bharat's incomplete and inconsistent sales and cost reporting, failure to provide an accurate and complete cost reconciliation, and under-allocation of costs to MUC. *See* "Petitioner's Deficiency Comments Concerning Section A Questionnaire Response of Bharat Forge" (Mar. 5, 2020) (Appx081119-081130); "Petitioner's Deficiency Comments Concerning Section C Questionnaire Response of Bharat Forge" (Apr. 3, 2020) (Appx083121-083139); "Petitioner's Deficiency Comments Concerning Section D Questionnaire Response of Bharat Forge" (Apr. 7, 2020) (Appx083140-083190). Commerce issued multiple rounds of supplemental questionnaires to Bharat to address these and other deficiencies. *See* Commerce Letter to Bharat (Mar. 30, 2020) (Appx083117-083120); Commerce Letter to Bharat (May 4, 2020) (Appx083194-083205); Commerce Letter to Bharat (May 8, 2020) (Appx083206-083219), Commerce Letter to Bharat (June 11, 2020) (Appx083220-083222); Commerce Letter to Bharat (June 19, 2020) (Appx083223-083227); Commerce Letter to Bharat (July 2, 2020) (Appx083284-083286). After being granted extraordinary extensions of time to respond to Commerce's questionnaires, Bharat responded, in part.[2]

## B. Because There Is No Indian Home Market for FEBs, Dumping Is Calculated by Comparing U.S. Prices to Constructed Normal Value

FEBs are primarily used in the production of fluid end modules for hydraulic pumps used in drilling and hydraulic fracturing. As the United States is the only significant market for Indian

---

[2] By the time of Commerce's preliminary determination, Bharat had already received no less than 12 extensions with generous allotments of time. For example, Bharat received 50 days to answer Commerce's initial Section D questionnaire, another 4 days to supply missing Excel spreadsheets, and another 35 days to answer a more extensive supplemental Section D questionnaire to address widespread deficiencies from its initial response. *See* "Petitioners' Comments in Advance of the Preliminary Determination" at 1-2 (Jun. 24, 2020) ("Petitioners' Pre-Prelim Comments") (Appx083228-083229)

FEBs, there are no sales prices for the foreign like product to use in a price-to-price dumping comparison. *See* Final IDM at 14 (Appx083625). Under this scenario, the statute instructs Commerce to calculate dumping using constructed normal value under 19 U.S.C. § 1677b(e), which corresponds to a respondent's cost of manufacture, plus selling, general and administrative expenses, and an amount for profit. As part of Commerce's standard cost questionnaire, Commerce requires foreign producers to report each constituent element of cost and to precisely reconcile costs between their audited financial statements and submitted antidumping cost databases. *See, e.g.*, Commerce Letter to Bharat (Jan. 22, 2020) at Section D (Appx080098-080117). In this case, the constituent elements included items such as raw materials and processing costs (*e.g.*, forging, heat treatment, machining, etc.). *See. e.g.,* Bharat DQR at 5-7, 33-41 (Appx082322-082324, Appx082350-082358).

### C. Because Bharat Produces Both FEBs and Other Forgings that Are Not Merchandise Under Consideration, Cost Allocation Is a Fundamental Issue

Generally, forgers produce products by using a steel ingot that has been melted and poured to specific chemical properties. "Antidumping and Countervailing Duty Petitions" (Dec. 19, 2019) ("Petition") at 11-12 (Appx085926-085927); *see also* Bharat DQR at 5 (Appx082322). Forgers heat this ingot and use a large forging press to form this steel ingot into shape, thereby modifying the physical properties of the forged steel, including its microstructure, grain size, grain flow, strength, ductility, and fatigue resistance. Petition at 12 (Appx085927). From this stage, forgers can machine the forged steel block to impart its final physical characteristics for sale and further processing in the United States. Petition at 12-13 (Appx085927-085928); *see also* Bharat DQR at 6-7 (Appx082323-082324). For FEBs, that may include precision contouring and drilling bore holes for use in the production of a fluid end module. Petition (Appx085927-085928); *see also* Bharat DQR at 6-7 (Appx082323-082324). While the precise

specifications of a forged fluid end block are particular to the customer's drawings, forgers can use the same production assets for FEBs as they use for other forged products that are outside the scope (*i.e.*, forgings that are not merchandise under consideration or "Non-MUC").  *See* Bharat DQR at 24-25, Exhibit D-14 (Appx082341-082342, Appx082616-082666); Bharat Second Supp D QR at 24-25 (Appx083660-083661).

Early in the investigation, Plaintiffs identified for Commerce the need to obtain every constituent element of FEB production costs so that Commerce could properly identify the total reported cost of producing FEBs, add this cost to the total reported cost of producing other forged products, and tie those totals to Bharat's financial statements.  *See, e.g.,* "Deficiency Comments Concerning Section D Questionnaire Response of Bharat Forge" (Apr. 7, 2020) at 1-2, 4-5, 42-43 (Appx083140-083186).   Plaintiffs further urged Commerce to ensure that the allocations between FEBs and Non-MUC were both accurate and consistent with Bharat's books and records.  *See id.* (Appx083140-083186).

## D.   Commerce's Preliminary Determination Ignored Substantive Concerns with Bharat's Reported Data

Without addressing Plaintiffs' pre-preliminary arguments concerning the accuracy of the data supplied by Bharat, *see generally* Petitioners' Pre-Prelim Comments (Appx083228-083283), Commerce calculated a preliminary estimated weighted-average dumping margin that was below *de minimis* for Bharat.  *See Preliminary Determination* (Appx083300-083302), and accompanying Prelim IDM (Appx083287-083299).  Plaintiffs' pre-preliminary comments addressed Bharat's distorted and unreasonable allocation of costs between FEBs and non-MUC, *see* Petitioners' Pre-Prelim Comments at 11-14 (Appx083238-083241), Bharat's failure to develop product-specific costs that account for heat treatment and other CONNUM characteristics, *id.* at 14-18, 20 (Appx083241-083245, Appx083247), divergent cost reporting

10

based on factors other than physical CONNUM characteristics, *id.* at 18-19 (Appx083245-083246), unreported costs, *id.* at 20-22 (Appx083247-083249), an erroneous G&A expense rate, *id.* at 33 (Appx083260), and numerous other failures to reconcile its data, *id.* at 23-27 (Appx083250-083254).

Given Commerce's failure to address these issues, *see generally* Prelim IDM at 6-12 (Appx083292-083298), Plaintiffs filed a post-preliminary submission that encouraged Commerce to review the record, issue a post-preliminary determination that did not rely on Bharat's specious cost allocations, *see* "Petitioners' Comments Following Preliminary Determination" (Aug. 5, 2020) at 3-23 ("Petitioners' Post-Prelim Comments") (Appx083305-083325), and otherwise conduct a full verification of Bharat's responses before using such data in any final determination, *see id.* at 23-25 (Appx083325-083327).  With respect to verification, and consistent with Commerce's stated intention to conduct a verification "{a}s provided in section 782(i)(1) of the Act," *Preliminary Determination*, 85 Fed. Reg. at 44,518 (Appx083301), Plaintiffs proposed instructions and detailed questions to be included in Commerce's verification outline, consistent with Commerce's established on-site verification practice,[3] and specifically cautioned against "giv{ing} Bharat another 'blank check' to again correct its sales and cost databases."  *See* Petitioners' Post-Prelim Comments at 23-26 (Appx083325-083328).

### E.   Despite Stating an Intent to Verify, Commerce Failed to Conduct Any Verification of Factual Information Submitted by Bharat

In the *Preliminary Determination*, Commerce clearly stated its intent to comply with the

---

[3] *See, e.g.*, *Certain Biaxial Integral Geogrid Products from the People's Republic of China*, 82 Fed. Reg. 3284 (Jan. 11, 2017), and accompanying IDM at Comment 3 ("the verification outline listed specific instructions as to what information Taian Modern was expected to provide").

antidumping statute: "{a}s provided in section 782(i)(1) of the Act, Commerce intends to verify the information relied upon in making its final determination concerning the estimated weighted-average dumping margin calculated for Bharat." *Preliminary Determination*, 85 Fed. Reg. at 44,518 (Appx083301).  But on September 3, 2020, Commerce instead issued a "questionnaire in lieu of performing an on-site verification" to Bharat.  *See* Letter from Commerce to Bharat (Sep. 3, 2020) ("Bharat Questionnaire in Lieu of Verification") (Appx083332-083338).  In issuing the questionnaire, Commerce stated: "The purpose of this questionnaire is to probe information that you have already submitted - not to obtain new information." *Id*. at 1 (Appx083332).  Commerce also notified parties that:

> …after an on-site verification, parties do not have an opportunity to submit factual information rebutting information collected by Commerce at verification. Accordingly, Commerce will not accept factual information from other interested parties to rebut your questionnaire responses. Interested parties should address the information submitted in response to this request, in case and rebuttal briefs.

*Id.* at 2 (Appx083333).  Commerce made no other statement about verification or the reasons for issuing a questionnaire instead of the verification procedures that Plaintiffs suggested using in their post-preliminary comments.

Despite analogizing the process related to the questionnaire to a verification, and indicating that "the questions {on this questionnaire} are similar to those that {Commerce} would normally ask during an on-site verification," *id*. at 1 (Appx083332), Commerce ultimately acknowledged that the single questionnaire was not a "verification" as contemplated under the statute.  Specifically, in the *Final Determination*, Commerce stated that "it was unable to conduct on-site verification of the information relied upon in making its final determination in this investigation as provided for in section 782(i) of the Tariff Act of 1930, as amended {19 U.S.C. § 1677m(i)}." *Final Determination* at 80,004 (Appx083629).  Commerce did not provide a rationale for its decision not to conduct a verification or explain how its "questionnaire in lieu

of verification" complied with the requirements of 19 U.S.C. § 1677m(i), the Statement of

Administrative Action, and Commerce's own regulations.  *See id*. (Appx083629).  Notably,

Commerce also did not issue a verification report, as required under both the SAA and its own

regulations.

And by the time case briefs were filed on October 16, 2020, the lack of verification was

already a *fait accompli*.  Commerce betrayed the promises contained in its *Preliminary*

*Determination*, ignored Plaintiffs' post-preliminary request for verification, and instead opted to

merely issue another questionnaire instead of conducting verification in a way that would

comport with governing law.

To make matters worse, Commerce failed to follow its own stated procedures in issuing

the questionnaire.  Commerce first made clear that it would not accept "{u}nsolicited new

factual information…or revisions of previously requested information" from Bharat and thus

would not "accept factual information from other interested parties to rebut {Bharat's}

questionnaire responses."  Bharat Questionnaire in Lieu of Verification at 1-2 (Appx083332-

083333).  But despite this, Commerce chose to accept a revised exhibit from Bharat that

contained unsolicited details concerning 25 previously undisclosed Bharat cost centers without

providing Plaintiffs an opportunity to provide a new factual submission in rebuttal.  *See* IDM at

5-6 (Appx083616-083617).  Commerce also chose to rely on this revised cost exhibit (*i.e.*,

Exhibit D-71) in the *Final Determination*, even though it clearly indicated that Bharat had

underreported its MUC-related costs.  *See generally* "Case Brief of Petitioner" (Oct. 19, 2020)

("Plaintiffs' Administrative CB") at 3, 11-26 (Appx083435, Appx083443-083458).

By failing to address these major issues, and relying on inaccurate and unverified data,

Commerce concluded that Bharat's final estimated weighted-average dumping margin was *de*

*minimis* and accordingly no antidumping duty order was issued for India. *See Final Determination*, 85 Fed. Reg. at 80,004 (Appx083629). As a result, the materially injured domestic FEB industry has not received the relief from dumped FEBs from India promised by the antidumping statute because Commerce acted unlawfully in conducting this investigation and otherwise rendered findings unsupported by substantial record evidence.

This appeal ensued.

## SUMMARY OF ARGUMENT

The major issue in Plaintiffs' appeal presents an issue of law concerning Commerce's failure to verify information relied upon in Commerce's *Final Determination*.

Under *Chevron* step one, Commerce did not have a legal basis to forego conducting a verification of Bharat's data before using those data in the *Final Determination*. The statute is clear — Commerce must conduct a verification. Having failed to conduct a verification, this Court should remand the *Final Determination* to Commerce to conduct a verification in accordance with the statute's mandate, and consistent with the SAA and Commerce's regulations.

Even under a *Chevron* step two analysis, Commerce has not provided a reasonable basis for this Court to accept its "questionnaire in lieu of verification" because Commerce itself disclaimed any similarity between the questionnaire and a standard verification exercise, Commerce did not create an adequate analogue to the on-site verification required by the SAA and its regulations, and Commerce did not issue a verification report as required by the SAA and its regulations. Moreover, Commerce accepted unsolicited new factual information from Bharat in response to the questionnaire despite explaining that it would not do so, which represented a departure from Commerce's regulations and its standard verification practice. Such procedural missteps rendered Commerce's *Final Determination* arbitrary and unlawful.

14

Using the "facts otherwise available" provision, Commerce attempts to fashion its own procedural failures into a sword to cut this Gordian Knot.  Specifically, after concluding that Bharat's data "cannot be verified" — precisely because Commerce failed to undertake the mandated verification — Commerce then stated that it was permitted to utilize "facts otherwise available" for this reason, only to select Bharat's unverified data as the basis for its factual findings.  Congress in no way countenanced Commerce's "heads I win, tails you lose" reading of the statute, and indeed addressed the interplay of the verification and "facts otherwise available" provisions of the statute in the SAA, setting forth only two instances in which Commerce could resort to facts otherwise available without conducting a verification.  Neither apply here, and Commerce's treatment of the "facts otherwise available" provision as an escape from its verification obligation flatly contravenes Commerce's duty to calculate an accurate antidumping margin.

Commerce additionally acted contrary to its statutory mandate by failing to support its findings with substantial evidence in the *Final Determination*.  In the supplemental questionnaire "in lieu of verification," Commerce asked Bharat to "demonstrate and explain" the validity of its cost reporting.  However, Bharat entirely failed in this task and instead submitted additional evidence (most notably, Exhibit D-71) indicating that it had understated its FEB processing costs and G&A expenses associated with MUC.  Commerce's decision to uncritically accept Bharat's unverified cost reporting — coupled with its failure to address the essence of Plaintiff's arguments — was unreasonable and unsupported by substantial evidence.

## ARGUMENT

### I.   <u>Standard of Review</u>

This Court will "hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

To determine whether Commerce's decision is supported by substantial evidence, the Court examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla" and "must into account whatever in the record fairly detracts from its weight." *Id*. at 477, 488. The substantial evidence standard also requires Commerce to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Tianjin Magnesium Int'l Co. v. United States,* 34 CIT 980,982, 722 F. Supp. 2d 1322, 1328 (2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, (1983)). In sum, substantial evidence review requires the Court to determine whether the evidence and reasonable, evidence-based inferences support Commerce's findings. *See Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

To determine whether Commerce's interpretation of a statue is "in accordance with law," the courts apply the two-step framework laid out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). Under the *Chevron* framework, a reviewing court must first examine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguous expressed intent

of Congress." *Id.* at 842-43.   If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

Finally, Commerce's *Final Determination* "must include 'an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties who are parties to the investigation or review.'" *NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009) (quoting 19 U.S.C. § 1677f(i)(3)(A)).   In situations where "the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation and explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## II.   Commerce Acted Unlawfully by Failing to Verify Data Before Such Data Were Used in the Dumping Calculation

The statute unambiguously requires that Commerce conduct a verification, 19 U.S.C. § 1677m(i), and prohibits Commerce from relying on unverified information, *id.* § 1677e(a).   The SAA and Commerce's regulations require that Commerce observe certain procedures attendant to a verification, *see* SAA at 868; 19 C.F.R. § 351.307(d) ("The Secretary will notify the government of the affected country that employees of the Department will visit with the persons listed below in order to verify the accuracy and completeness of submitted factual information."), and furthermore require the issuance of a verification report prior to promulgation of a final determination, SAA at 868; 19 C.F.R. § 351.307(c) ("The Secretary will report the methods, procedures, and results of a verification under this section prior to making a final determination in an investigation….").   Aside from these unconditional requirements, the statute does not articulate the precise requirements for what constitutes a lawful verification.

17

Thus, when conducting verification, Commerce generally has the latitude to "derive {its} verification procedures *ad hoc*" and the court reviews these procedures for abuse of discretion.[4] *Micron Tech. v. United States*, 117 F.3d 1386, 1395-96 (Fed. Cir. 1997).

However, this discretion is not absolute.  *See generally Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 1999) ("In spite of, or perhaps because of, the wide latitude given Commerce in conducting reviews and verifications, however, 'the Court must be ever vigilant of abuse of discretion by the agency.'") (quoting *Wheatland Tube Corp. v. United States*, 841 F. Supp. 1222, 1227 (Ct. Int'l Trade 1993)).  As made clear by the Supreme Court, an agency's interpretation of an ambiguous statute is only entitled to deference where it is reasonable and "based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 842-43; *see also Micron Tech*, 117 F.3d at 1397 (noting that Commerce's verification process must "comport{} with a permissible interpretation of the statutory requirement").  Here, this was not the case.

### A.   Because Commerce Failed to Conduct a Verification and Issue a Verification Report, Commerce's *Final Determination* Is Unlawful

The statute unambiguously requires Commerce to "verify all information relied upon in making a final determination in an investigation," 19 U.S.C. § 1677m(i), but Commerce plainly admits it did not conduct a verification.  *See Final Determination* at 80,004 (Appx083629) ("Commerce was unable to conduct on-site verification of the information relied upon in making

---

[4] The "abuse of discretion" standard is "not {} a discrete or more stringent standard," but rather "another guise of the statutorily-mandated substantial evidence/in-accordance-with-law test." *Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States*, 178 F. Supp. 2d 1305, 1314 (Ct. Int'l Trade 2001).  In other words, in evaluating Commerce's chosen verification methodology for abuse of discretion, the Court ensures Commerce's methodology is both: (1) not arbitrary and capricious (*i.e.*, that its decision-making is supported by substantial evidence) and (2) a reasonable effectuation of Congress's statutory purpose (*i.e.*, that it is "in accordance with law"). *See id*. at 1313-14.

its final determination in this investigation as provided for in section 782(i) or the Tariff Act of 1930, as amended (the Act).")  This, *ipso facto*, renders Commerce's *Final Determination* unlawful under the first prong of *Chevron* scrutiny, which requires Commerce, and this Court, to "give effect to the unambiguous expressed intent of Congress."  *Chevron*, 467 U.S. at 842-43.

As recounted in the Statement of Facts, *supra*, Commerce acknowledged in its *Final Determination* that pursuant to 19 U.S.C. § 1677m(i) Congress unambiguously "provided for" (*i.e.*, intended) Commerce to conduct an "on-site verification of the information relied upon in making its final determination." *Final Determination* at 80,004 (Appx083629).   As "the intent of Congress {was} clear" to Commerce, under the first step of *Chevron* that should have been "the end of the matter." *Chevron*, 467 U.S. at 842.  However, rather than finding a way to comply with its statutory obligations, Commerce instead chose to rely on unverified information submitted by Bharat in making its final determination, essentially treating Congress's clear statutory verification mandate as an optional undertaking subject to Commerce's discretion. Such an interpretation is flatly contradicted by the plain text of the statute and the SAA, and not entitled to deference.  *Chevron*, 467 U.S. at 842-43.  This Court should accordingly remand the *Final Determination* to Commerce to conduct a verification in accordance with applicable law. If remanded on this basis, the Court need not reach the specifics of Commerce's *non-verification* actions — *i.e.*, Commerce's questionnaires "in lieu of" verification — because a "verif{ication}" is what the statute, the SAA, and Commerce's regulations require, 19 U.S.C. § 1677m(i).

While the statute does not explicitly delineate what a "verification" entails, the accompanying SAA provides direction. *See generally* 19 U.S.C. § 3512(d) (requiring that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of…{the} Act in any judicial proceeding in which a question arises

concerning such interpretation or application.").  In particular, the SAA stipulates that "Commerce will verify information in a foreign country" after obtaining the consent of the respondent and notifying the foreign government concerned.  SAA at 868.  In compliance with this mandate, Commerce's regulations make clear that Commerce "will verify factual information upon which {it} relies in a final determination in a{n}…antidumping investigation," and, as part of this verification, "will notify the government of the affected country that employees of the Department will visit the persons listed below {*i.e.*, the relevant foreign producers, exporters, importers, affiliates and/or unaffiliated purchasers submitting factual information in the proceeding} in order to verify the accuracy and completeness of submitted factual information." 19 C.F.R. §§ 351.307(b)(1)(i), (d); *see also Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696, 1704 (2007) (noting that the Court, like Commerce, "interprets {the term 'verification'} to mean 'on-site' verification").

In addition to confirming the necessity of "on-site" verification, the SAA further specifies that Commerce must "report the methods, procedures, and results of the verification prior to making its final determination in an investigation." SAA at 868.  As with the "on site" requirement, this mandate was similarly incorporated into Commerce's regulations, which state that Commerce "will report the methods, procedures, and results of a verification under this section prior to making a final determination in an investigation or issuing final results in a review."  19 C.F.R. § 351.307(c).

Although possible impediments to these requirements — such as armed conflict, political instability, administrative resource constraints, and domestic or international health crises — were readily foreseeable, neither the statute nor the SAA provide an exception to these mandates for extenuating circumstances.  *See generally* 19 U.S.C. § 1677m(i); SAA at 868 (providing only

that Commerce may decline to undertake verification where the subject government and/or

respondent refuse to participate).  Commerce's regulations similarly do not contemplate any

circumstances where a verification and/or the release of a verification report are not required.

*See generally* 19 C.F.R. § 351.307.  Indeed, the Preamble to Commerce's regulations makes

clear that the verification report constitutes a critical piece of "evidence on the record that the

Department must consider in making its final determination."  *Antidumping Duties;*

*Countervailing Duties*, 62 Fed. Reg. 27,296, 27,337 (May 19, 1997).  This is why Commerce

has, in the past, found a way to conduct verification, even under exceptional circumstances.  *See,*

*e.g., Polyethylene Terephthalate Resin From Pakistan: Final Determination of Sales at Less*

*Than Fair Value*, 83 Fed. Reg. 48,281 (Sep. 24, 2018) (conducting a verification using "standard

verification procedures, including an examination of relevant accounting and production records,

and original source documents" with representatives of a Pakistani company in Washington,

D.C. when Commerce determined that travel in Pakistan was not possible due to a State

Department travel advisory); *Notice of Final Determination of Sales at Less Than Fair Value:*

*Stainless Steel Bar From Italy*, 67 Fed. Reg. 3,155 (Jan. 23, 2002) (tolling the final determination

deadline in this and companion investigations of SSB from Germany, France, the United

Kingdom, and Korea in order to conduct a modified verification that "met the {verification}

standard" in the wake of "security concerns and logistical difficulties brought about by the events

of September 11 {2001}"); *Brake Rotors From the People's Republic of China: Rescission of*

*Second New Shipper Review and Final Results and Partial Rescission of First Antidumping Duty*

*Administrative Review*, 64 Fed. Reg. 61,581 (Nov. 12, 1999) (conducting an off-site verification

at a Beijing hotel rather than on-site verification at the respondent's production facilities due to

security concerns associated with travel in China following a NATO bombing of the Chinese

Embassy in Belgrade, Yugoslavia).

Further, where Commerce could not verify, it has applied adverse facts available, *see,*

*e.g., Carbon and Alloy Steel Wire Rod from the United Kingdom: Final Affirmative*

*Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical*

*Circumstances*, 83 Fed. Reg. 13,252 (Mar. 28, 2018); *Certain Tool Chests and Cabinets from the*

*Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair*

*Value*, 83 Fed. Reg. 15,361 (Apr. 10, 2018).

This is also why, under an earlier version of the statute,[5] the Court remanded

Commerce's final determination for failure to conduct a verification.  *See Industrial Quimica Del*

*Nalon, S.A. v. United States*, 729 F. Supp. 103, 109 (Ct. Int'l Trade 1989) (surveying the

legislative history underlying the verification requirement and concluding that "the Court can

find no alternatives to requiring ITA to comply with the clear language of the statute.  The

government's action in failing to verify was not in accordance with the law."); *see also Al-Tech*

*Specialty Steel Corp. v. United States*, 745 F.2d 632, 636-640 (Fed. Cir. 1984) (concluding that

Commerce was required to conduct verifications in administrative reviews as well as in

investigations); *cf. Timken Co. v. United States*, 852 F. Supp. 1122, 1130 (Ct. Int'l Trade 1994)

("Clearly, if Commerce were conducting its third consecutive administrative review without yet

---

[5] The statutory mandate to conduct a verification predated the 1994 Uruguay Round Agreements Act ("URAA").  *See* SAA at 868 (describing the "general requirement that Commerce verify information" as having been "move{d}" "from section 776(b) of the Act to new section 782(i)," *i.e.*, 19 U.S.C. § 1677m(i)).  Prior to 1994, the most recent substantive modification to the verification subsection was effectuated by the Trade and Tariff Act of 1984, Pub. L. 98-573 § 618, 98 Stat. 2948, 3037, which provided, in relevant part, that "The administering authority shall verify all information relied upon in making—(1) a final determination in an investigation…"  This language was reproduced verbatim in 19 U.S.C. § 1677m(i).

making verification and an interested party had made a timely request for

verification…Commerce would be required to do so.").

Notably, Commerce did not even attempt to justify its procedures in this investigation as

a stand-in for the type of procedures required under law. *See Final Determination* at 80,004

(Appx083629). Quite the opposite — Commerce's reliance on 19 U.S.C. § 1677e(a)(2)(D) as

justification for using Bharat's information, discussed in Section II.C of the Argument, *infra*,

was predicated upon Commerce's conclusion that Bharat's information was unverifiable *because*

*Commerce declined to conduct verification* within the meaning of 19 U.S.C. § 1677m(i). *See*

IDM at 2 (Appx083613). Commerce characterized its supplemental questionnaire as "additional

steps in lieu of on-site verification{, *i.e.*,} request{ing} additional documentation and

information." *Id*. (Appx083613). However, at no point did Commerce explain how these

"additional steps" constituted a lawful substitute for an on-site verification. Stated differently,

Commerce openly admitted that it did not conduct a verification within the meaning of 19 U.S.C.

§ 1677m(i). *See Final Determination* at 80,004 (Appx083629) ("Commerce was unable to

conduct onsite verification of the information relied upon in making its final determination in

this investigation as provided for in section 782(i) of the Tariff Act of 1930, as amended (the

Act).").  Contrary to the requirements of the SAA and Commerce's own regulations, Commerce

also did not issue a verification report containing its verification procedures and findings, *see*

SAA at 868; 19 C.F.R. § 351.307(c), and offered no explanation for this failure. Such failures to

comply with the law governing antidumping investigations, individually or collectively,

necessitate a remand so that Commerce may undertake a proper verification, issue a verification

report, and issue a final determination that complies with the unambiguous, unconditional

requirements of the statute.

**B.** **Even if the Unconditional Mandates of the Statute, the SAA, and Commerce's Regulations Were to Permit Some Flexibility, Commerce's Alternative Procedures Are Not Entitled to Deference Because Commerce Failed to Follow Procedural Requirements and Otherwise Jettisoned Established Practice**

Assuming *arguendo* that the statute's and SAA's plain language did not necessitate a remand order for Commerce to verify the data relied upon (it does), when considering Commerce's compliance with this statutory mandate to verify factual information, the Court of Appeals for the Federal Circuit ("CAFC") directs a reviewing court to examine the lawfulness of both (1) Commerce's chosen verification methodology and (2) the results derived from that methodology. *See Micron Tech. v. United States*, 117 F.3d 1386, 1394 (Fed. Cir. 1997).

Here, neither Commerce's methodology nor its results pass muster under the law. *First*, both the SAA and Commerce's regulations make clear that such verification must be on-site and a report must furthermore be generated for comment by interested parties prior to Commerce's final determination. *See* SAA at 868; 19 C.F.R. § 351.307. The procedures employed by Commerce did not satisfy either requirement. *Second*, even to the extent Commerce's decision to ignore the law and its own regulations were a reaction to the challenges posed by the global coronavirus pandemic, Commerce's procedures were nonetheless unlawful because they were arbitrary and an unlawful departure from past practice.

Verification is a "critical aspect of Commerce's antidumping investigation." *New American Keg v. United States*, Ct. No. 20-00008, Slip Op. 21-30 at *6 (Ct. Int'l Trade Mar. 23, 2021) ("*American Keg*"). Commerce's decision to rely on the unverified factual submissions of Bharat in the *Final Determination* thus clearly breached Commerce's "statutory obligation to properly verify those facts which it finds dispositive." *See Smith Corona Corp. v. United States*, 771 F. Supp. 389, 399 (Ct. Int'l Trade 1991). Even to the extent this Court were to conclude that the ongoing coronavirus pandemic were to warrant some flexibility — within the confines of the

law — it does not provide Commerce with *carte blanche* to ignore the law completely.  In

issuing nothing more than a supplemental questionnaire (with no opportunity for factual

rebuttal), and without providing a verification report, Commerce failed to satisfy even the most

flexible interpretation of its verification requirements.

     Commerce failed to explain why alternative mechanisms of the type previously

employed, or that more closely approximated on-site verification, were not possible.  Indeed,

Commerce actually acknowledged flaws in using yet another questionnaire "in lieu of

verification," noting that the questionnaire it issued represented only "a subset of what is

typically requested in a verification outline," did not involve the types of "impromptu questions

that Commerce verifiers ask during the course of verification," and, unlike a true on-site

verification, "pertain{ed} {only} to information Bharat Forge already provided on the record."

Letter from Commerce to Bharat (Sep. 9, 2020) at 1-2 (Appx083339-083340).  In fact, the

questionnaires Commerce issued "in lieu of verification" were no more than another

supplemental questionnaire — except that Plaintiffs were stripped of the regulatory right to

submit clarifying or rebuttal information under 19 C.F.R. § 351.301(c)(1)(v).  *See* Bharat

Questionnaire in Lieu of Verification at 2 (Appx083333).

     Commerce could have, for example, arranged a virtual "on-site" verification visit with

Bharat, given Commerce's extensive use of videoconferencing during the pandemic.  Indeed,

Commerce held the hearing via videoconference.  *See* Final IDM at 2 (Appx083613); *see also*

Transcript of Public Hearing (Nov. 16, 2020) at 1 (Appx083537).  Such an approach would have

allowed Commerce to at least approximate verification insofar as it could have interviewed

company officials, observed the operation of the sales and financial systems of Bharat to better

understand the process they used to report data to Commerce and to instruct company officials to

conduct particularized probes of those systems in real time, issued follow-up requests for information with time-limited response deadlines, and conducted other additional verification exercises routinely used to assess the *credibility* of a respondent's submitted data.

As noted above, Commerce abuses its administrative discretion where, as here, its verification procedures "contravene{} statutory objectives." *Ipsco, Inc. v. United States*, 899 F.2d 1192, 1195 (Fed. Cir. 1990); *see also Wheatland Tube*, 841 F. Supp. at 1227 ("This Court has noted that it will not allow the agency, under the guise of lawful discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the statute."); *Rubberflex*, 59 F. Supp. 2d at 1346 ("{W}hile Commerce generally has discretion to schedule a review and allocate resources to a review as it sees fit, it must do so within the confines of its statutory mandates.  When its actions compromise the accuracy of dumping margins, then it has abused its discretion.").  Commerce itself disavowed any notion that its questionnaire in lieu of verification was intended to approximate verification.  Thus, Commerce abused its administrative discretion when it developed a procedural framework that contravened the statute's objectives.

Commerce's administrative discretion is additionally curtailed where, as here, Commerce has "restricted itself by clarifying the verification requirement" in its regulations.  *See Micron Tech*. 117 F.3d at 1396.  In such instances, the proper role of the court "is to determine…if Commerce fulfilled its own self-imposed obligations."  *Id*. at 1396; *see also Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) (citations omitted) ("Commerce, like other agencies, must follow its own regulations.").  A reviewing court will generally view an agency's interpretation of its own regulation as controlling unless plainly erroneous or inconsistent with the regulation.  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989); *United States v. Mead Corp.*, 533 U.S. 218, 228

(2001) ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances")).  An agency's interpretation will not be considered controlling when "there is reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'"  *Christopher v. SmithKline Beecham*, 567 U.S. 142, 143-44 (2012) (quoting *Auer*, 519 U.S. at 462 and citing *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209 (2011)).  "This might occur when the agency's interpretation conflicts with a prior interpretation. . . ." *Id*. (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994)).  Commerce's failure to apply its regulation to conduct a meaningful verification and in turn issue a verification report is unreasonable in this investigation because Commerce had ample tools at its disposal to approximate on-site verification and it had time to issue a verification report.

In sum, even if, *arguendo*, the verification mandate is more flexible than its plain text appears to indicate, Commerce needed to do more to comply with the law, including the mandates of the SAA and its own regulations.  Despite the availability of alternative techniques that would more closely approximate the mandated on-site verification, Commerce relied on a mere supplemental questionnaire, in response to which it accepted unsolicited new information from Bharat, while prohibiting the domestic industry from submitting rebuttal factual information.  This is inadequate under the law.  *Cf. American Keg*, Slip Op. 21-30 at *41 (remanding to Commerce after concluding that "Commerce unreasonably failed to verify those corrections {submitted by the respondent after the preliminary determination} and thereby abused its discretion").

It is, furthermore, unlawful for Commerce to have never issued a verification report of any kind.  At an absolute minimum, Commerce deprived the parties of a full explanation of (1)

the reasons it was unable to conduct a verification, (2) why Commerce believed the alternate

procedures it undertook were satisfactory, and (3) Commerce's own findings based on a critical

analysis of the information derived from Bharat's questionnaire responses.  Because Commerce

ignored a statutory mandate and its regulations, its *Final Determination* is not entitled to

deference, and this Court should therefore remand the determination to Commerce so that it may

verify the information submitted by Bharat and reach new findings where appropriate.

### C.   Commerce's Failure to Conduct Verification Did Not Authorize Reliance on Bharat's Unverified Information as Facts "Otherwise Available" Pursuant to 19 U.S.C. § 1677e(a)(2)(D)

Implicitly recognizing its complete disregard for 19 U.S.C. § 1677m(i), Commerce

instead pivoted to section 776(a)(2)(D) of the Act, 19 U.S.C. § 1677e(a)(2)(D), to justify its

reliance on Bharat's unverified factual submissions in the *Final Determination*.  *See* IDM at 2

(Appx083613).  Commerce recognized that 19 U.S.C. § 1677e(a)(2)(D) provides that, "where

information has been provided, but the information cannot be verified, Commerce will use 'facts

otherwise available' in reaching the applicable determination."  *Id.* (Appx083613); *see also* 19

U.S.C. § 1677e(a)(2)(D) ("when "an interested party or any other person provides…information

{that} cannot be verified as provided in section 1677m(i) of this title, {Commerce} shall…use

the facts otherwise available in reaching the applicable determination.").  Yet, in the very next

sentence Commerce turned the statute on its head, concluding that "{a}ccordingly, *we relied on

the information submitted on the record* as facts available…"  IDM at 2 (Appx083613).  To sum

up, Commerce *first* declined to conduct the statutorily mandated verification without explaining

this failure in a verification report, *next* concluded that its own decision not to conduct

verification (and nothing else) rendered Bharat's information such that it "cannot be verified,"

and *finally* relied upon that same unverified information as "facts otherwise available."

The statute cannot be read to permit Commerce's conduct, and this Court should reject Commerce's specious interpretation and denial of the protection that Congress provided to the domestic industry in the antidumping statute. *First*, whereas Bharat's information *was not* verified, it was not logically possible to conclude that it *cannot* be verified, as required by 19 U.S.C. § 1677e(a)(2)(D), without at least attempting "verification" within the meaning of 19 U.S.C. § 1677m(i). Thus, the language used in 19 U.S.C. § 1677e(a)(2)(D) — "cannot" instead of "was not" — underscores that verification under 19 U.S.C. § 1677m(i) is mandatory, not optional. This is further confirmed by the SAA, which addresses the interplay of 19 U.S.C. § 1677e(a)(2)(D) and 19 U.S.C. § 1677m(i) and empowers Commerce to "disregard the submitted information in favor of the facts available" if "the person whose information is to be verified" or "the foreign government concerned" "objects to verification." SAA at 868. The SAA contains no qualifying language such as "including" or "among others" or "for example," which, combined with the facially unconditional verification requirement of 19 U.S.C. § 1677m(i), rules out the possibility that Commerce could invoke 19 U.S.C. § 1677e(a)(2)(D) after declining to conduct verification for some reason other than outright refusal by a subject of verification. Under *Chevron* step one, Congress has therefore spoken to the precise question at issue, ending the inquiry. *See Chevron*, 467 U.S. at 842-43. Commerce stated it "was unable to conduct on-site verification," without further explanation. IDM at 2 (Appx083613); *see also* Bharat Questionnaire in Lieu of Verification at 1-2 (Appx083332-083333). Commerce did not state that Bharat refused to be verified. Therefore, Commerce's invocation of 19 U.S.C. § 1677e(a)(2)(D) was contrary to law.

Moreover, even if some form of administrative hardship could theoretically permit departure from the facially unconditional statutory verification mandate and invocation of 19

U.S.C. § 1677e(a)(2)(D) (it cannot), Commerce's chosen alternative to verification, *i.e.*, the supplemental questionnaire, was arbitrary in this investigation because Commerce failed to identify the specific hardship or explain its precise operational implications. Had Commerce (wrongly) perceived flexibility in the verification mandate, it needed to (1) devise substitute procedures that mirror statutorily mandated on-site procedures *as closely as possible*, (2) fully explain the rationale underlying those substitute procedures and why alternative substitutes that might more closely approximate the required verification were not possible, (3) permit comment *prior to implementation* of those substitute procedures, and (4) conduct the quasi-verification. Only then could Commerce logically characterize data failing such a quasi-verification as being data that "cannot" be verified. *See* IDM at 2 (Appx083613). For example, assuming *arguendo* that Commerce personnel were unable to board an India-bound airplane due to a Level 4 State Department travel advisory, that particular impediment would nevertheless leave open alternatives that more closely approximate the required in-person verification, such as real-time videoconference-based verification or in-person verification in the United States. But Commerce never explained its hardship, the rationale for issuing a mere supplemental questionnaire, or why it failed to issue a verification report. Thus, even if there were *theoretically* a lawful pathway to invoking 19 U.S.C. § 1677e(a)(2)(D) outside the specific scenarios outlined in the SAA, such a course of action was unsupported by substantial evidence here — the record does not support Commerce's apparent conclusion that it did as much as it could have done to verify Bharat's data.

      *Second*, even if it were true that information "cannot be verified" simply because no verification was attempted (it is not), the statute does not permit Commerce to use that exact unverified information as "facts otherwise available" in the antidumping calculation. Simply

put, the unverified information is not itself information "otherwise" available.  This is from the

plain meaning of the statutory text, the mandates of the SAA, and the statutory context.  Taking

each in turn, when used as an adverb, "otherwise" means "differently, or in another way."  *See*

"Otherwise, Adv.," Cambridge Online Dictionary, *dictionary.cambridge.org* (last visited July 10,

2021).   Thus, facts "otherwise" available are facts that are available "differently, or in another

way" from the information that cannot be verified.

This reading is bolstered by the SAA, which underscores that the shortcoming triggering

reliance on facts otherwise available renders the unverified information unusable.  SAA at 869

("{19 U.S.C. § 1677e(a)} requires Commerce…to make determinations on the basis of the facts

available where requested information…*cannot be used* because, for example…Commerce could

not verify the information.") (emphasis supplied).  As to the universe of information acceptable

for use as "facts otherwise available," the SAA provides that Commerce "will be required…to

consider information requested from interested parties that: (1) is on the record; (2) was filed

within the applicable deadlines; and (3) can be verified."  *Id.*  That excludes Bharat's unverified

submissions, but would permit Commerce to rely on, for example, the information in Plaintiffs'

antidumping petition.

This approach is necessary to preserve the logic of the broader statute which, as

discussed, *supra*, requires Commerce to "verify all information relied upon in making a final

determination in an investigation," without exception.  *See* 19 U.S.C. § 1677m(i)(1).  This

verification requirement would be rendered meaningless if, as here, Commerce were free to

ignore its statutory verification obligations and still rely on a party's unverified submission as

"facts otherwise available."  *See Delarosa v. Peake*, 515 F.3d 1319, 1322 (Fed. Cir. 2008)

(quoting *Princess Cruises, Inc. v. United States*, 201 F.3d 1352, 1362 (Fed. Cir. 2000) ("It is a

long-held tenet of statutory interpretation that one section of a law should not be interpreted so as to render another section meaningless.")).  This Court should not sustain Commerce's disregard for the guardrails provided by Congress to ensure that only reliable information is used in the antidumping calculation.

**D.  Commerce Additionally Acted Contrary to Law By Failing to Follow Its Own Clearly Articulated Procedures for the Submission of New Factual Information**

Although Commerce explicitly disclaimed that its questionnaire was a "verification" within the meaning of 19 U.S.C. § 1677m(i), Commerce nevertheless included instructions in its questionnaire that mimic some (not all) verification procedures, *e.g.*, (1) "probe information that you have already submitted," (2) "not to obtain new information," (3) "revisions of previously requested information{} may be rejected," and (4) "Commerce will not accept factual information from other interested parties to rebut your questionnaire responses."  *See* Bharat Questionnaire in Lieu of Verification at 1-2 (Appx083332-083333).  Notwithstanding these mere recitations, Commerce unreasonably departed from its standard verification practice, its regulations, and the procedures it established for this investigation.

In its questionnaire "in lieu of verification," Commerce stated that in conformance with its normal procedures in an on-site verification, it would not accept any "{u}nsolicited new factual information (*i.e.*, information beyond that which we are requesting)."  *See id*. (Appx083332-083333).  This restriction was consistent with Commerce's regulatory deadlines for adding factual information to the record.  *See* 19 C.F.R. § 351.301(c)(5) (specifying that the deadline for filing unsolicited new factual information is 14 days before verification); 19 C.F.R. § 351.302(d) (noting that Commerce will reject untimely filed and unsolicited factual information).  It was furthermore consistent with Commerce's longstanding practice to reject unsolicited information newly provided at verification.  *See, e.g.*, *Certain Carbon and Alloy Steel*

*Cut-To-Length Plate From Belgium*, 82 Fed. Reg. 16,378 (Apr. 4, 2017), and accompanying IDM at Comment 9 ("Although NLMK Belgium attempted to provide corrected information in a supplemental questionnaire and during verification, we did not accept it because the changes: 1) constituted untimely-submitted new factual information; and 2) were not minor."); *Certain Carbon and Alloy Steel Cut-to-Length Plate From Italy*, 82 Fed. Reg. 16,345 (Apr. 4, 2017) at IDM at Comment 3 ("the Department's rejection of NVR's weight corrections at verification was correct, given that this information was new factual information within the meaning of 19 CFR 351.102(b)(21)(v) which was untimely-offered under 19 CFR 351.301(c){1}(v)."). As Commerce was ostensibly not accepting factual information in response to the questionnaire beyond what was expressly and specifically requested, Commerce also made clear that it would "not accept factual information from {Plaintiffs or} other interested parties to rebut {Bharat's} questionnaire responses." *See* Bharat Questionnaire in Lieu of Verification at 1-2 (Appx083332-083333).

Despite these clear admonitions, Commerce nonetheless accepted significant new and unsolicited factual information from Bharat, demonstrating that Commerce treated the questionnaire "in lieu of verification" as just another supplemental questionnaire issued pursuant to 19 U.S.C. § 1677m(d), rather than a "verification" pursuant to 19 U.S.C. § 1677m(i) — the only exception being that Plaintiffs were nonetheless barred from submitting information in rebuttal. *See* 19 C.F.R. § 351.301(c)(1)(v) (providing interested parties an opportunity to submit factual information to rebut, clarify, or correct a supplemental questionnaire response). For example, Commerce asked Bharat to "provide a revised version of Exhibit D-29 that: (1) includes full descriptions of the cost centers without truncating the narrative text, and (2) adds a column in the spreadsheet that identifies the total cost accumulated in each cost center

during the POI." Bharat Questionnaire in Lieu of Verification at 4 (Appx083337). Rather than limiting its edits to the changes specifically requested by Commerce, Bharat instead submitted a substantively enhanced version of Exhibit D-29 — *i.e.*, Exhibit D-71 — that, among other unsolicited changes, added 25 new and previously undisclosed cost centers. *See* Plaintiffs' Administrative CB at 3, 10-11, Attachment B (Appx083435, Appx083442-083443, Appx083491-083492).

According to Commerce's questionnaire instructions, its regulations, and its past verification practice, Exhibit D-71 should have been rejected because it contained new, unsolicited factual details. Commerce chose to ignore its regulations, its past practice, and the clear ground rules it established for the proceeding by accepting Bharat's exhibit *in toto*. *See* 19 C.F.R. § 351.301(c)(5); 19 C.F.R. § 351.301(d); Bharat Questionnaire in Lieu of Verification at 1-2 (Appx083332-083333) (making clear that Commerce would reject "{u}nsolicited new factual information (*i.e.*, information beyond that which we are requesting), or revisions of previously requested information."). Commerce then compounded its error by denying Plaintiffs an opportunity to rebut, clarify, or correct Bharat's unsolicited new factual information, as required under 19 C.F.R. § 351.301(c)(1)(v). Commerce must not be allowed to circumvent the clear rules it created and administer a mechanism for respondents to "pad the record" unchallenged. Accordingly, this Court should remand the *Final Determination* to Commerce to undertake a verification that comports with the statute, Commerce's own regulations, and its past verification practice. *See generally Torrington* 82 F.3d at 1049 ("Commerce, like other agencies, must follow its own regulations.") (citations omitted).

34

**E.   Commerce Further Acted Contrary to Law Because Its Verification "Findings" Were Arbitrary and Unsupported by Substantial Evidence**

If this Court were somehow to determine that Commerce's "verification procedures" —

that is, the issuance of an additional supplemental questionnaire — complied with Commerce's

statutory duty under 19 U.S.C. § 1677m(i), as further explicated by the SAA and Commerce's

regulations, this Court must then examine whether the conclusions Commerce reached after

applying those procedures, and the explanations thereof, were supported by substantial evidence.

Under this standard, the Court considers "whether a reasonable mind might accept the relevant

evidence in the record as adequate to support the results of Commerce's verification." *Micron*

*Tech.*, 117 F.3d at 1397 (internal citations omitted).  Here, this is not the case.

As this Court has previously explained, "verification is like an audit, the purpose of

which is to test information provided by a party for accuracy and completeness." *Bomont Indus.*

*v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990).   Plaintiffs' post-prelim

comments raised significant concerns that Bharat had under-allocated costs to MUC and urged

Commerce to further probe the accuracy of Bharat's cost reporting.  *See* Petitioners' Post-Prelim

Comments at 4-8 (Appx083306-083310).  Commerce accordingly asked Bharat to provide

additional details to "{d}emonstrate and explain" how costs from its MUC-related cost centers

were included in its reported costs and otherwise explain why its cost allocation methodology

was reasonable.  *See* Bharat Questionnaire in Lieu of Verification at 4 (Appx083337).  The

purpose of this request was to test the accuracy of Bharat's cost allocations and the integrity of

Bharat's cost reporting generally.

But Bharat failed in this task, as discussed below.  *First*, Bharat's response showed that it

failed to report costs associated with cost centers that Bharat identified as relating solely to

MUC, such that its total FEB costs were significantly understated.  *See* Petitioners'

Administrative CB at 11-18 (Appx083443-083450).  *Second*, by failing to include certain cost

centers that cumulate employee costs, Bharat understated its G&A expenses.  *See id.* at 18-26

(Appx083450-083458).   As discussed below, to the extent that Commerce addressed Petitioners'

arguments at all, its "findings" were unsupported by substantial evidence.[6]

### 1. Commerce's Finding That Bharat Did Not Underreport Its FEB Processing Costs Was Erroneous and Not Supported By Substantial Evidence

By way of background, during the course of the investigation, Bharat reported in Exhibit

D-29 a complete list of manufacturing cost centers which it identified as covering either:

(1) "MUC" (*i.e.*, relating to merchandise under consideration); (2) "Non MUC" or "NMUC"

---

[6] Although not the focus of this brief, Commerce relied upon aberrant, unverified data from Bharat in other areas as well.  For example, the mill test certificates that Bharat provided to substantiate the accuracy of its product coding included the *same* mill test certificate twice, each with *different* [                ] values.  This stunning discrepancy indicated that one or both of the certificates contained falsified information.  *See* Petitioners' Administrative CB at 6-10 (Appx083438-083442).  But without the benefit of a valid verification procedure, Commerce considered only the discrepant certificates to be unreliable, and then arbitrarily assumed that the integrity of all other mill certificates were beyond reproach, consistent with its "facts otherwise available" approach to the record.  *See* Final IDM at 10-12 (Appx083621-083623) (stating that Bharat "did not explain the method used by its supplier to generate two mill certificates with different results," but "{b}ecause this information was provided in response to a questionnaire in lieu of verification, we were unable to request additional information concerning the supplier's reporting methods," and concluding that "in general, we find that Bharat accurately reported the physical characteristics of the MUC" because "we relied on the information submitted on the record as facts available").

Moreover, as noted previously, Bharat's Exhibit D-71 — the single most important cost exhibit — added 25 unsolicited cost center records in contravention of Commerce's statement that it would reject would reject "{u}nsolicited new factual information (*i.e.*, information beyond that which we are requesting), or revisions of previously requested information."  Petitioners' Administrative CB at 10-11 (Appx083442-083443).  Commerce arbitrarily accepted such new factual information because, for example, it "related to merchandise not under consideration," *see* Final IDM at 6 (Appx083617), even though the original Exhibit D-29 was already supposed to be a complete and accurate digest of *all cost centers*, including *all* MUC and *all* non-MUC cost centers, *see* Bharat Second Supp D QR at 8 (Appx083644) (stating that Exhibit D-29 reports data for "all manufacturing divisions of Bharat Forge along with respective plant codes and cost centers"), and the finding that it "related to merchandise not under consideration" was itself based on new, unsolicited, and unverified factual information.

(*i.e.*, not relating to merchandise under consideration); or (3) "Non MUC and MUC" (*i.e.*, relating to *both* non-MUC *and* MUC).  *See* Bharat Second Supp D QR at Exhibit D-29 (Appx083702-083708).  When these cost centers were grouped into Subdivisions that related to MUC (either in whole or in part), the result was the following [     ] lines:

| Location / Division | Sub Division | Classification |
|---|---|---|
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |

*See* Petitioners' Administrative CB at 13 (Appx083445).

As can be observed from the foregoing list, Bharat reported that the first [     ] lines — (involving [                    ]) — included Subdivisions that related to *both* MUC and Non-MUC.  By contrast, Bharat reported that the other [     ] lines — (involving [                ]) — included Subdivisions purely related to MUC.  Notably absent from Exhibit D-29 were any cost *amounts*, so Commerce could not readily observe whether the aggregation of relevant Exhibit D-29 cost centers reconciled with the total FEB processing costs reported by Bharat in Exhibit 32.2.

In its questionnaire "in lieu of verification," Commerce posed the following questions to Bharat:

**19.** In Exhibit D-29 you reported [     ] lines for Location/Division/Subdivision that related in whole or in part to MUC.  ***Demonstrate and explain where the costs for each of these locations were included in your reported costs.***

**25.**  In your June 11 supplemental response, you include Exhibit D-29, which purports to be a list of all manufacturing divisions of Bharat along with respective plant codes and cost centers.  ***Provide a revised version of Exhibit D-29 that: (1)***

37

***includes full descriptions of cost centers without truncating the narrative text, and (2) adds a column in the spreadsheet that identifies the total cost accumulated in each cost center during the POI.***  For the 5 largest cost center items, provide a screen shot from your [     ] system to corroborate the reported amounts.

Bharat Questionnaire in Lieu of Verification at 3-4 (Appx083336-083337) (emphasis added).

In response to Question 19, Bharat failed to "{d}emonstrate and explain where the costs for *each* of these locations were included in your reported costs."  *Id.* at 3 (Appx083336) (emphasis added).  Instead, Bharat only provided an explanation for *one* of the [     ] lines — *i.e.*. the line relating to the [                              ] subdivision.  *See* Bharat Response to Questionnaire in Lieu of Verification (Sep. 15, 2020) at 6 (Appx087373).  Bharat's explanation showed that the constituent cost centers associated with that line were purely MUC processing costs, and that [

].  *See id.* at 6-7 (Appx087373-087374).  Importantly, however, Bharat failed to provide the required demonstration and explanation in relation to the other [     ] lines relating to FEB [          ] costs.  *See id.* (Appx087373-087374).

In response to Question 25, Bharat submitted a new exhibit — Exhibit D-71 —which restated the cost center detail from Exhibit D-29 and added a new field for the *amount* of cost accumulated in each cost center.  *See id.* at Exhibit D-71 (Appx087385-087389).  Exhibit D-71 also included a new field titled "Cost element where such cost is reported to DOC," where Bharat identified the cost as either: (1) [                              ]; (2) [                    ]; or (3) [                ].  With this additional information, Exhibit D-71 constituted an essential piece of evidence for assessing whether the FEB costs that Bharat reported in Exhibit 32.2 were, in fact, understated.  *See id.* (Appx087385-087389).

Citing to this record evidence, Petitioners argued in their case brief that Bharat understated its reported FEB [          ] costs to a significant degree.  *See* Petitioners'

38

Administrative CB at 11-18 (Appx083443-083450).  Petitioners provided two specific examples

— involving the lines for the [          ] and [                    ] Subdivisions — and also

provided an aggregate assessment of the underreporting across all Subdivisions.  *See id.*

(Appx083443-083450).  But in its *Final Determination*, Commerce rejected Petitioners analysis,

stating in relevant part:

> {R}ecord evidence shows that Bharat did include the costs in question in the
> calculation of its reported in the calculation of its reported costs…. The petitioners
> compare the total costs from the cost center report {*i.e.*, Exhibit D-71} to the total
> cost of the MUC from the cost reconciliation {*i.e.*, Exhibit D-31}, and conclude
> that the costs for the MUC are underreported.  However, this analysis is flawed
> because the cost center report includes costs of both merchandise under
> consideration and merchandise not under consideration, and, thus, reasonably
> reports greater costs than those in the cost reconciliation, which reports only the
> total cost of the MUC.

Final IDM at 6 (Appx083617).  As discussed below, these "findings" by Commerce were

unsupported by substantial evidence.

   *First*, with respect to the example involving the [          ] Subdivision, Exhibit D-71

makes clear that this line aggregates data for [     ] cost centers that contained cost amounts —

*i.e.*, [

                                                                                ].  *See* Bharat

Response to Questionnaire in Lieu of Verification at Exhibit D-71  (Appx087385-087389).

Notably, for each of these [     ] cost centers reported in Exhibit D-71, Bharat classified the cost

center as "MUC" and, in the field titled "Cost element where such cost is reported to DOC,"

Bharat described the item as [                         ].[7]  *See id.* (Appx087385-087389).

Thus, the evidence in Exhibit D-71 indicated that *all* of the [                 ] costs from the [     ]

_____

[7] In its response to Commerce's questionnaire "in lieu of verification," Bharat indicated that
[                                                                              ].  *See* Bharat
Response to Questionnaire in Lieu of Verification at 6 (Appx087373).

39

cost centers were purely related to MUC, and were *not* a combination of both MUC and non-MUC.

Importantly, Petitioners' case brief demonstrated that the total amount of MUC-related costs for the [      ] Subdivision (*i.e.*, [                ]), as shown in Exhibit D-71, is significantly larger than the total FEB cost amount reported by Bharat for that Subdivision in Exhibit D-32.2 (*i.e.*, [              ]).  *See* Petitioners' Administrative CB at 16-17 (Appx083448-083449).  Commerce's "finding" that this difference can be explained by the fact that these [    ] cost centers also contain non-MUC costs is entirely unsupported by the substantial evidence.  In fact, it is belied entirely by the details disclosed in Exhibit D-71, which makes clear that these [    ] cost centers contain only MUC, and indicates a significant underreporting of FEB processing costs.

*Second*, with respect to the example involving the [              ] Subdivision, Exhibit D-71 makes clear that this line aggregates data for [    ] cost centers that contained cost amounts — *i.e.*, [                              ].  *See* Bharat Response to Questionnaire in Lieu of Verification at Exhibit D-71 (Appx087385-087389).  Notably, for each of these [    ] cost centers reported in Exhibit D-71, Bharat classified the cost center as "MUC" and, in the field titled "Cost element where such cost is reported to DOC," Bharat described the item as [              ]  *See id.* (Appx087385-087389).  Here again, the evidence in Exhibit D-71 indicated that *all* of the [        ] costs from the [  ] cost centers were purely related to MUC, and were *not* a combination of both MUC and non-MUC.  *See id.* (Appx087385-087389).

Importantly, Petitioners' case brief demonstrates that the total amount of MUC-related costs for the [              ] Subdivision (*i.e.*, [            ]), as shown in Exhibit D-

71, is significantly larger than the total FEB cost amount reported by Bharat for that Subdivision in Exhibit D-32.2 (*i.e.*, [                ]).  *See* Petitioners' Administrative CB at 15-16 (Appx083447-083448).  Here again, Commerce's "finding" that this difference can be explained by the fact that these [   ] cost centers also contain non-MUC costs is entirely unsupported by substantial evidence.  In fact, it is belied entirely by the details disclosed in Exhibit D-71, which makes clear that these [   ] cost centers contain only MUC, and again indicates a significant underreporting of FEB processing costs.

    *Finally*, Petitioners' case brief provided an aggregate analysis, showing that Bharat's total reported FEB [             ] cost (per its cost reconciliation in Exhibit D-31) was only [                  ], while the aggregation of all [                    ] (per the field titled "Cost element where such cost is reported to DOC") was significantly higher at [                ].  *See id.* at 17-18 (Appx083448-083449).  On this point, Commerce's "finding" was partially correct, but only insofar as there were indeed instances where the field titled "Cost element where such cost is reported to DOC" [                        ] and [                                ].  *See* Bharat Response to Questionnaire in Lieu of Verification at Exhibit D-71 (Appx087385-087389).  Assuming *arguendo* that Commerce should have accepted the totality of Exhibit D-71 at face value, the more accurate comparison may therefore have been between (1) the total reported FEB processing cost per Bharat's cost reconciliation in Exhibit D-31 (*i.e.*, [                ]), and (2) those cost centers in Exhibit D-71 where *both* [                                    ] *and* [

                                ]

(*i.e.*, [                ]).  *See id.* (Appx087385-087389).  But under this analysis, there is

again no substantial evidence for Commerce to find that Bharat reported all FEB processing

costs for the calculation of its dumping margin.  To the contrary, there is still an understatement

of *[      ] percent*.

In sum, Commerce's dismissal of these massive discrepancies — and the resulting

understatement of Bharat's FEB processing costs — was based on a readily discernable error of

fact.  Commerce's factual error would have been blatantly obvious in the context of any valid

verification where Commerce engaged with the record evidence and reasonably probed the

accuracy of Bharat's reported data.  But having failed to follow such procedures, Commerce's

findings were unsupported by substantial evidence and a remand is therefore required.

### 2. Commerce's Finding That Bharat Did Not Underreport Its G&A Expenses Was Unreasonable and Not Supported By Substantial Evidence

As for Bharat's G&A reporting, Commerce grossly mischaracterized Plaintiff's argument

and then rendered a "finding" that was not supported by substantial evidence.  *First*, in its *Final*

*Determination*, Commerce mischaracterized Petitioners' argument as being that "Bharat

underreported its G&A expenses by not including certain cost centers from Bharat's cost center

report {*i.e.*, Exhibit D-71,} in the calculation of costs for employee benefits which is included in

the numerator of the *G&A expense ratio*."  Final IDM at 6 (Appx083617) (emphasis added).  But

to be clear, Petitioners argued that "*Bharat understated the G&A allocation ratio by failing to*

*include in the numerator certain cost centers that cumulate employee cost*."  Petitioners'

Administrative CB at 23 (Appx083455) (emphasis in original).  Clearly, in the *Final*

*Determination*, Commerce confused the critical distinction between (1) the "G&A allocation

ratio," which "determines the share of employee benefit expenses reported in the profit and loss

statement which are treated as G&A and contribute to the G&A financial ratio…applied in the

cost tape," *see id.* at 21 (Appx083453), and (2) the "G&A expense ratio" (aka the "G&A

financial ratio"), which is the ratio that gets multiplied by a respondent's cost of manufacture to calculate the amount of G&A expenses.

Commerce then went on to mischaracterize the specifics of Petitioners' argument, erroneously suggesting that Petitioners somehow expected that *all* of the omitted cost centers must have included employee benefits.  On this point, Commerce's *Final Determination* stated: "Contrary to petitioners' assertion, all of the cost centers from the cost center report may not include employee benefits, so it is expected that some of the cost centers from the cost center report may not be included in the calculation of employee benefit cost."  Final IDM at 6 (Appx083617)*.*  But Commerce's analysis was arbitrary and unreasonable, as it failed to understand and address what Plaintiffs actually argued.

To be clear, Petitioners never suggested that *all* of the unreported cost centers must have included employee benefit costs and, therefore, needed to be included in the numerator of the *G&A expense ratio*.  *See* Petitioners' Administrative CB at 18-26 (Appx083450-083458).  Rather, Petitioners argued that *certain* of the unreported cost centers appeared to include employee benefit costs and, therefore, needed to be included in the numerator of Bharat's *G&A allocation ratio*.  *See id.* (Appx083450-083458).

For example, as detailed in Petitioners' case brief, Bharat generally reported administrative costs relating to both the [          ] and [          ] locations.  Bharat included cost center [          ], which relates to [                    ], but then glaringly omitted cost center [          ], which relates to [                    ].  Similarly, Bharat included cost center [          ], which relates to [                    ], but then glaringly omitted cost center [          ], which relates to [                    ].  Petitioners therefore observed that *certain* cost centers — such as [                    ] and [

] — clearly involved "employee costs and should therefore have been included in the calculation of the numerator of the G&A allocation ratio."  *See id.* at 23-25 (Appx083455-083457).

In mischaracterizing Petitioners' argument, Commerce failed to address these essential points and rendered a decision that was unreasonable and unsupported by substantial record evidence.  Consistent with the standards delineated by the Federal Circuit and the U.S. Supreme Court, *see NMB Sing.*, 557 F.3d at 1320; *Fla. Power*, 470 U.S. at 744, this Court has regularly remanded determinations where Commerce has failed to adequately address significant arguments raised administratively.  *See, e.g.*, *Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1352-1353, 1355 (Ct. Int'l Trade 2020) ("Commerce did not address information raised that may cast doubt on the reasonableness of a position taken by the agency. Therefore, the agency's explanation does not illustrate whether Commerce accounted for and rejected the questions raised by the logo provision or entirely failed to consider an important aspect of the problem.") (internal citations omitted); *Hyundai Heavy Indus. Co., Ltd. v. United States*, 393 F. Supp. 3d 1293, 1319 n.31 (Ct. Int'l Trade 2019) ("Although HHI presented several arguments with respect to Commerce's preliminary affiliation finding, Commerce did not analyze those arguments….Commerce must address those arguments upon reconsideration on remand.") (internal citations omitted); *Vinh Hoan Corp. v. United States*, 49 F. Supp. 3d 1285, 1315 (Ct. Int'l Trade 2015) (ordering remand where Commerce's "explanation is unresponsive to the argument that Plainitffs are making" leaving it "not clear to the court how Commerce has addressed {Plaintiff's} argument" and requiring that Commerce "should address this argument on remand").

Had Commerce conducted a valid verification, it presumably would have been immersed in the record and been better positioned to engage on the facts and address Plaintiffs' arguments concerning Bharat's underreported G&A expenses. But without any valid verification procedures, it instead casually dismissed Plaintiff's arguments without properly understanding and addressing them. Commerce's "findings" concerning the accuracy of Bharat's reported G&A expenses were unsupported by substantial evidence. And given Commerce's failure to analyze the arguments raised by Petitioners in its *Final Determination*, the Court should instruct Commerce to address these points on remand.

*        *        *

In sum, Bharat's response to Commerce's questionnaire "in lieu of" verification in no way "{d}emonstrate{d} or explain{ed}" the validity of its cost reporting, nor did it demonstrate that Bharat's cost allocation methodology was reasonable. *See* Bharat Questionnaire in Lieu of Verification at 4 (Appx083337). To the contrary, Bharat's response to that questionnaire — and, in particular, Exhibit D-71 — provided direct evidence that Bharat had understated both its processing costs and its G&A expenses associated with its FEB production. *See generally* Plaintiffs' Administrative CB at 11-26 (Appx083443-083458). Commerce's decision to uncritically accept Bharat's unverified cost reporting as "facts otherwise available," as well as its failure to specifically address Plaintiffs' arguments, constituted unreasonable agency action unsupported by substantial evidence. *See Micron Tech.*, 117 F.3d. at 1397. Accordingly, the Court should remand to Commerce for further consideration and fact-finding through lawful verification procedures.

**CONCLUSION**

Plaintiffs engaged early and often with Commerce to ensure the development of a complete administrative record in order to guard against Bharat being able to allocate away costs

45

from subject FEBs, thereby masking the extent of its dumping.  In spite of Plaintiffs' oft-repeated concerns, Commerce unlawfully failed to conduct a verification as required under the law.  Commerce further failed to support its conclusions with substantial evidence because it did not meaningfully engage with the record — or address certain of Plaintiffs' arguments — in considering whether the data it was relying upon were accurate and correct.  Accordingly, this Court should remand the *Final Determination* to Commerce with instructions that Commerce verify Bharat's responses and make new factual findings where appropriate.

*        *        *

Respectfully submitted,


/s/ Jack A. Levy_____
Jack A. Levy
Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301
jlevy@cassidylevy.com

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

### Certificate of Compliance with Chambers Procedures 2(B)(1)

The undersigned hereby certifies that the foregoing brief contains 13,206 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:    /s/ Jack A. Levy
                Jack A. Levy