## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNITED STATES,<br><br>                    Defendant,<br>          and<br><br>BHARAT FORGE LIMITED,<br><br>                    Defendant-Intervenor. | Court. No. 21-00007 |

## ORDER

Upon consideration of the Rule 56.2 motion of Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons (collectively, "Plaintiffs"), all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

ORDERED that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record is granted; and it is further

ORDERED that the final determination of the U.S. Department of Commerce as set forth in *Forged Steel Fluid End Blocks from India: Final Negative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,003 (Dec. 11, 2020), and the additional determinations set forth in the *Final Results of Redetermination Pursuant to Court Remand*, ECF Doc. 29-1 (Jan. 12, 2022), is remanded for disposition in a manner consistent with the judgment of this Court.

SO ORDERED.

Date:_____    Signed:_____
       New York, New York                                    Stephen Alexander Vaden, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　　　　v.<br><br>UNITED STATES,<br><br>　　　　　　　　　　　Defendant,<br>　　　　and<br><br>BHARAT FORGE LIMITED,<br><br>　　　　　　　　Defendant-Intervenor. | Court No. 21-00007<br><br>**PUBLIC VERSION**<br><br>Business Proprietary Information<br>Removed From Brackets on Pages<br>38-46. |

### REVISED BRIEF OF PLAINTIFFS ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Jack A. Levy
Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

Dated:  March 11, 2021

1

## Table of Contents

Page

STATEMENT PURSUANT TO RULE 56.2 ................................................................. 4

I.    Administrative Determination Under Review ................................................... 4

II.   Issues Presented ............................................................................................. 4

III.  Statement of Facts .......................................................................................... 5

      A.   Faced with Unfair Trade Competition, Domestic Producers of FEBs Filed an
           Antidumping Petition for Antidumping Duties on Indian FEBs ................... 5

      B.   Because There Is No Indian Home Market for FEBs, Dumping Is Calculated by
           Comparing U.S. Prices to Constructed Normal Value .................................. 7

      C.   Because Bharat Produces Both FEBs and Other Forgings that Are Not
           Merchandise Under Consideration, Cost Allocation Is a Fundamental Issue ........ 7

      D.   Commerce's *Preliminary Determination* Ignored Substantive Concerns with
           Bharat's Reported Data ............................................................................. 9

      E.   Despite Stating an Intent to Verify "as Provided" Under the Statute, Commerce
           Failed to Conduct On-Site Verification ...................................................... 9

      F.   Commerce's Uncritical Treatment of Unsolicited Data Submitted in
           Connection with the Post-Preliminary Questionnaire Yielded a Determination
           Unsupported by Substantial Evidence ....................................................... 13

      G.   Commerce Utilized Substantial Time to Produce Uninformative Remand
           Results       .............................................................................................. 14

SUMMARY OF ARGUMENT ................................................................................ 16

ARGUMENT ......................................................................................................... 17

I.    Standard of Review ......................................................................................... 17

II.   Commerce Has Failed to Satisfy Unambiguous Statutory Mandates Concerning
      What a "Verification" Requires ........................................................................ 19

      A.   The Statute Requires that "Verification" Be On-Site and that the Verification
           Report Precede Commerce's Final Determination in an Investigation .......... 20

      B.   Commerce Did Not Conduct On-Site Verification or Issue a Timely
           Verification Report; Commerce's Rationales for these Failures Are Unlawful ......... 22

C.   Even if the Law Were Ambiguous, Commerce's Justifications for Deviating from On-Site Verification Compel the Conclusion Bharat's Data Could Not Be Verified ................................................................................................... 28

1.   Commerce's Explanations for Departing from Ordinary On-Site Verification Procedures Are Unlawful and Otherwise Underdeveloped ............. 29

2.   Commerce's Replacement for On-Site Verification Is Not Reasonable .............. 30

III.   Even Setting Aside Commerce's Procedurally Deficient Verification, Commerce's Treatment of the Information Gathered Was Contrary to Law and Unsupported by Substantial Evidence ............................................................................................ 34

A.   Commerce Acted Contrary to Law By Failing to Follow Its Own Clearly Articulated Procedures for the Submission of New Factual Information ..................... 34

B.   Commerce Further Acted Contrary to Law Because Its Verification "Findings" Were Arbitrary and Unsupported by Substantial Evidence .......................................... 37

1.   Commerce's Finding That Bharat Did Not Underreport Its FEB Processing Costs Was Erroneous and Not Supported By Substantial Evidence .................... 38

2.   Commerce's Finding That Bharat Did Not Underreport Its G&A Expenses Was Unreasonable and Not Supported By Substantial Evidence ......................... 44

CONCLUSION .................................................................................................................... 48

# Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1516a(b)(1)(B) ....................................................................................17

19 U.S.C. § 1677 ....................................................................................................20

19 U.S.C. § 1677b(e) ...............................................................................................7

19 U.S.C. § 1677e(a)(2)(D) ....................................................................................19

19 U.S.C. § 1677e(b) ..............................................................................................28

19 U.S.C. § 1677f(i)(3)(A) ......................................................................................18

19 U.S.C. § 1677m(d) .............................................................................................35

19 U.S.C. § 1677m(i) ........................................................................................ *passim*

19 U.S.C. § 1677m(i)(1) .........................................................................................10

19 U.S.C. § 3512(d) .....................................................................................18, 20, 35

Regulations

19 C.F.R. § 351.102(b)(21)(v) ................................................................................35

19 C.F.R. § 351.301(c)(1)(v) ......................................................................30, 35, 36

19 C.F.R. § 351.301(c)(5) ..................................................................................34, 36

19 C.F.R. § 351.301(d) ............................................................................................36

19 C.F.R. § 351.302(d) ............................................................................................34

19 C.F.R. § 351.307 .............................................................................................4, 21

19 C.F.R. § 351.307(b) ..........................................................................4, 16, 23, 32

19 C.F.R. § 351.307(b)(1)(i) ...................................................................................19

19 C.F.R. § 351.307(c)..................................................................................... *passim*

19 C.F.R. § 351.307(d) .................................................................................... *passim*

Court Decisions

*Albemarle Corp. v. United States*, 821 F.3d 1345 (Fed. Cir. 2016) ...............................................20

*Al-Tech Specialty Steel Corp. v. United States*, 745 F.2d 632 (Fed. Cir. 1984) .................................................................................................................................27

*Am. Alloys v. United States*, 30 F.3d 1496 (Fed. Cir. 1994) ...........................................................23

*Auer v. Robbins*, 519 U.S. 452 (1997) .................................................................................32

*Bomont Industries v. United States*, 733 F. Supp. 1507 (Ct. Int'l Trade 1990) .......................................................................................................................37

*Bonney Forge Corp. v. United States*, USCIT Slip Op. 22-8, 2022 Ct. Int'l Trade Lexis 7 (Ct. Int'l Trade Feb. 2, 2022).........................................................29

*Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195 (2011) .................................................32

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).......................................................................................................... *passim*

*Christopher v. SmithKline Beecham*, 567 U.S. 142 (2012) .........................................32

*Coal. of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) .......................................................................................................46

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020)...................................................................................................................14, 22

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) .........................................19, 46

*Goodluck India Limited v. United States*, 11 F.4th 1335 (Fed. Cir. 2021) ..................................23

*Hyundai Heavy Indus. Co., Ltd. v. United States*, 393 F. Supp. 3d 1293 (Ct. Int'l Trade 2019) .......................................................................................................46

*Industrial Quimica Del Nalon, S.A. v. United States*, 729 F. Supp. 103 (Ct. Int'l Trade 1989) .......................................................................................................27

*Ipsco, Inc. v. United States*, 899 F.2d 1192 (Fed. Cir. 1990).........................................31

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)...................................................................18, 20

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .................................................................................................................18

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) .................................. *passim*

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ........................................................................18

*Myland Indus., Ltd. v. United States*, 31 C.I.T. 1696 (2007) .......................................20

*New American Keg v. United States*, Slip Op. 21-30, 2021 Ct. Intl. Trade LEXIS 34 (Ct. Int'l Trade Mar. 23, 2021) .............................................30, 33

*NMB Sing. Ltd v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ..........................18, 46

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)...........................32

*Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338 (Ct. Int'l Trade 1999) ........................................................................25, 31

*Tai Shan City Kam Kiu Aluminium Extrusion Co. v. United States*, 125 F. Supp. 3d 1337 (Ct. Int'l Trade 2015) ..................................................19

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) .............................................32

*Thyssen Stahl AG v. AK Steel Corp.*, 1998 U.S. App. LEXIS 17064 (Fed. Cir. July 27, 1998).........................................................................24

*Timken Co. v. United States*, 852 F. Supp. 1122 (Ct. Int'l Trade 1994) .......................27

*Torrington Co. v. United States*, 82 F.3d 1039 (Fed. Cir. 1996)............................32, 36

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .....................................................32

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ...........................................18

*Wheatland Tube Corp. v. United States*, 841 F. Supp. 1222 (Ct. Int'l Trade 1993) ...........................................................................31

*Vinh Hoan Corp. v. United States*, 49 F. Supp. 3d 1285 (Ct. Int'l Trade 2015) ...........................................................................46

Administrative Determinations

*Brake Rotors From the People's Republic of China: Rescission of Second New Shipper Review and Final Results and Partial Rescission of First Antidumping Duty Administrative Review*, 64 Fed. Reg. 61,581 (Nov. 12, 1999) ...................................................................................26, 27

*Carbon and Alloy Steel Wire Rod from the United Kingdom: Final Affirmative Determination of Sales at Less Than Fair Value and Final*

*Affirmative Determination of Critical Circumstances*, 83 Fed. Reg.
13,252 (Mar. 28, 2018) .................................................................................27

*Certain Biaxial Integral Geogrid Products from the People's Republic
of China: Final Determination of Sales at Less Than Fair Value*, 82 Fed.
Reg. 3284 (Jan. 11, 2017) ..............................................................................10

*Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium,
Final Determination of Critical Circumstances, in Part*, 82 Fed. Reg.
16,378 (Apr. 4, 2017) ....................................................................................34

*Certain Carbon and Alloy Steel Cut-to-Length Plate From Italy*, 82 Fed.
Reg. 16,345 (Apr. 4, 2017) ............................................................................35

*Certain Tool Chests and Cabinets From the Socialist Republic of
Vietnam: Final Affirmative Determination of Sales at Less Than Fair
Value*, 83 Fed. Reg. 15,361 (Apr. 10, 2018) .................................................27

*Forged Steel Fluid End Blocks from India: Final Negative
Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,003
(Dec. 11, 2020) ...................................................................................... *passim*

*Forged Steel Fluid End Blocks from India: Preliminary Negative
Determination of Sales at Less Than Fair Value and Postponement of
Final Determination*, 85 Fed. Reg. 44,517 (July 23, 2020) ............... *passim*, 5, 6, 9, 10

*Forged Steel Fluid End Blocks From the Federal Republic of Germany,
India, and Italy: Initiation of Less-Than-Fair-Value Investigations*, 85
Fed. Reg. 2,394 (Jan. 15, 2020) ......................................................................5

*Notice of Final Determination of Sales at Less Than Fair Value:
Stainless Steel Bar From Italy*, 67 Fed. Reg. 3,155 (Jan. 23, 2002) .............26

*Polyethylene Terephthalate Resin From Pakistan: Final Determination
of Sales at Less Than Fair Value*, 83 Fed. Reg. 48,281 (Sep. 24, 2018) ......26

Other Legislative Materials

Statement of Administrative Action Accompanying the Uruguay Round
Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) .............................. *passim*

Trade and Tariff Act of 1984, Pub. L. 98-573, 98 Stat. 2948 ........................28

Other Administrative Materials

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,295 (May
19, 1997) ................................................................................................21, 22

Exec. Order No. 14,043, 86 Fed. Reg. 50,989 (Sept. 9, 2021) ......................29

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

|  |  |  |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Court No. 21-00007 |
| UNITED STATES, | ) ) | **PUBLIC VERSION** |
| Defendant, | ) ) | Business Proprietary Information |
| and | ) ) | Removed From Brackets on Pages 38-46. |
| BHARAT FORGE LIMITED, | ) ) | |
| Defendant-Intervenor. | ) ) ) | |

**REVISED BRIEF OF PLAINTIFFS IN SUPPORT OF THEIR RULE 56.2 MOTION**
**FOR JUDGMENT ON THE AGENCY RECORD**

Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons (collectively, "Plaintiffs" or "Petitioners") respectfully submit this revised opening brief to address Commerce's persistent refusal to conduct a statutorily compliant verification, its failure to issue a timely verification report for comment by the parties, and its reliance on incorrect cost information that did not capture the full measure of Bharat's FEB-related costs.  These errors of law and fact render Commerce's final determination in *Forged Steel Fluid End Blocks from India: Final Negative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,003 (Dec. 11, 2020), as altered by its Final Results of Redetermination Pursuant to Court Remand, ECF Doc. 29-1 (Jan. 12, 2022) at 4 ("Remand Results"), contrary to law and unsupported by substantial evidence.

1

Despite Commerce's request for a voluntary remand in response to Plaintiffs' original Rule 56.2 opening brief, *see* Defendant's Motion for Voluntary Remand, ECF Doc. 24 (Oct. 18, 2021), and this Court's generous allowance of 150 days for that purpose, *see* Order, ECF Doc. 28 (Oct. 29, 2021) at 5 ("Remand Order"), virtually every substantial issue that Plaintiffs originally raised remains unresolved.  Critically, Commerce rejected the Court's invitation to "perform on-site verification, which would moot all procedural issues created by the agency's decision to short-circuit verification," *see* Remand Order at 5, instead using two-and-a-half months' worth of the Court's remand allotment merely to recant Commerce's original statements that "on-site verifications" are "required under Section 782(i) of the Act" and that Commerce's use of Bharat's unverified data was an application of "facts otherwise available," *see* Remand Results at 4; Final IDM at 2 (Appx083613).  But unsaying those words from the *Final Determination* does not change what Commerce in fact did, nor could it change what the statute actually requires.

Commerce pointedly offered no explanation for refusing to undertake on-site verification during the remand proceeding, despite Plaintiffs clearly arguing on-site verification is required under the statute and providing factual information establishing its feasibility.  *See* Petitioners' Comments on Draft Remand Results (Appx087451-087520).  As noted in Plaintiffs' original Rule 56.2 Opening Brief, ECF Doc. 22 (July 19, 2021), the consequences of Commerce's continued failure to adequately verify data are amplified significantly here.  Because the United States is the only significant market for Indian FEBs, Bharat did not have usable home market FEB sales available for comparison.  As such, Commerce's dumping calculation compared U.S. prices to the constructed normal value of FEBs, which is calculated based on FEB production costs, selling, general, and administrative expenses, and profits.  As Bharat's forge produces far more products than FEBs, forge costs must be accurately allocated between FEBs and those

other products in order to accurately measure Bharat's FEB production costs.  From Bharat's perspective, however, the more costs it can allocate *away* from FEBs, the lower FEBs' constructed normal value, and the lower Bharat's dumping rate.  Given this incentive, detailed review and testing of Bharat's allocation methodology and associated costs is crucial to ensure Bharat has accurately reported constructed normal value.  Otherwise, Bharat can readily avoid a finding of dumping by presenting artificially gerrymandered costs for comparison to low U.S. prices.  That is precisely what occurred here, with Commerce's repeated failure to verify allowing Bharat to escape scrutiny and dump with impunity.

Plaintiffs hereby request this Court remand the *Final Determination* and Commerce's Remand Results, with instructions for Commerce to verify factual information as is required by law and otherwise render findings supported by substantial evidence.[1]

---

[1] This brief cites Bates numbers corresponding to the confidential joint appendix. *See* Joint Appendix Preparation in § 1581(c) Cases Assigned to Judge Vaden (Rev'd Feb. 17, 2021).

## STATEMENT PURSUANT TO RULE 56.2

### I.   <u>Administrative Determination Under Review</u>

This action concerns Commerce's final determination in *Forged Steel Fluid End Blocks from India: Final Negative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 80,003 (Dec. 11, 2020) ("*Final Determination*") (Appx083628-083630), and the accompanying unpublished Issues and Decision Memorandum ("Final IDM") (Appx083612-083627), as well as the Remand Results filed with the Court on January 12, 2022.

### II.   <u>Issues Presented</u>

A. Commerce is required by statute to "verify all information relied upon in making a final determination in an investigation." 19 U.S.C. § 1677m(i). Specifically, Commerce must perform an on-site verification and subsequently issue a verification report prior to making its final determination. *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) ("Statement of Administrative Action" or "SAA") at 868; 19 C.F.R. § 351.307. When Commerce itself acknowledged that it did not perform "on-site verifications as required under section 782(i) of the Act," Final IDM at 2 (Appx083613), and "did not issue a verification report in accordance with 19 CFR 351.307(b)-(d), Remand Results at 8-9, is Commerce's *Final Determination*, as amended by the Remand Results, lawful? (Argument Section II)

B. Commerce issued a questionnaire "in lieu of verification" and in it, instructed Bharat not to submit new factual information except where specifically requested. Did Commerce err as a matter of law by allowing unsolicited new factual

information in Bharat's responses to the questionnaire, denying Plaintiffs an

opportunity to rebut, and otherwise relying on data that did not verify? (Argument

Section III.A).

C.  To the extent Commerce sought to treat its questionnaire "in lieu of verification"

as a valid verification exercise, did Commerce err as a matter of law by failing to

support its conclusions with substantial evidence when Bharat's questionnaire

responses — most notably, Exhibit D-71 — evidenced that it had significantly

understated the processing costs and G&A expenses associated with its FEB

production?  Relatedly, where Commerce mischaracterized and failed to address

the essence of Plaintiffs' arguments concerning underreported G&A expenses, is

Commerce required to address those arguments on remand?  (Argument Section

III.B)

### III.  Statement of Facts

#### A.  Faced with Unfair Trade Competition, Domestic Producers of FEBs Filed an Antidumping Petition for Antidumping Duties on Indian FEBs

In the face of injurious unfair trade practices, Plaintiffs, along with the Forging Industry

Association and the FEB Fair Trade Coalition, filed a Petition with Commerce on December 19,

2019, alleging, *inter alia*, that FEBs from India were being sold in the United States at less than

fair value.  *Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 2,394 (Jan. 15, 2020)

(Appx080000-080005).  Commerce initiated an investigation of the imports on January 8, 2020.

*Id.* (Appx080000).  Commerce initially selected two mandatory respondents to investigate,

Bharat Forge Limited ("Bharat") and Ultra Engineers ("Ultra"), but ultimately determined that

Ultra had no in-scope sales to the United States during the period of investigation.  *See generally*

PUBLIC VERSION

*Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 85 Fed. Reg. 44,517 (July 23, 2020) ("*Preliminary Determination*") (Appx083300-083302), and accompanying IDM ("Prelim IDM") (Appx083287-083299).  On January 22, 2020, Commerce issued its initial antidumping duty questionnaire to Bharat.  *See* Commerce Letter to Bharat (Jan. 22, 2020) (Appx080006-080159).  After obtaining multiple extensions of time, Bharat responded to questions concerning production activities in India, U.S. sales, and costs to produce FEBs, *i.e.*, the merchandise under consideration ("MUC").  *See* "Bharat Forge Limited's Section A Response" (Feb. 20, 2020) (Appx080314-081118); "Bharat Forge Limited's Section C Response" (Mar. 10, 2020) (Appx081131-082308); "Bharat Forge Limited's Section D Response" (Mar. 13, 2020) (Appx082309-083116).

Plaintiffs identified various deficiencies in Bharat's responses including, *inter alia*, concerns about Bharat's incomplete and inconsistent sales and cost reporting, failure to provide an accurate and complete cost reconciliation, and under-allocation of costs to MUC.  *See* "Petitioner's Deficiency Comments Concerning Section A Questionnaire Response" (Mar. 5, 2020) (Appx081119-081130); "Petitioner's Deficiency Comments Concerning Section C Questionnaire Response" (Apr. 3, 2020) (Appx083121-083139); "Petitioner's Deficiency Comments Concerning Section D Questionnaire Response" (Apr. 7, 2020) ("Petitioners' Section D Deficiency Comments") (Appx083140-083190).  Commerce issued multiple rounds of supplemental questionnaires to Bharat to address these and other deficiencies.  *See* Commerce Letter to Bharat (Mar. 30, 2020) (Appx083117-083120); Commerce Letter to Bharat (May 4, 2020) (Appx083194-083205); Commerce Letter to Bharat (May 8, 2020) (Appx083206-083219), Commerce Letter to Bharat (June 11, 2020) (Appx083220-083222); Commerce Letter to Bharat (June 19, 2020) (Appx083223-083227); Commerce Letter to Bharat (July 2, 2020)

(Appx083284-083286).  After being granted extraordinary extensions of time to respond to Commerce's questionnaires, Bharat responded, in part.[2]

**B.   Because There Is No Indian Home Market for FEBs, Dumping Is Calculated by Comparing U.S. Prices to Constructed Normal Value**

FEBs are primarily used in producing fluid end modules for hydraulic pumps used in drilling and hydraulic fracturing.  As the United States is the only significant market for Indian FEBs, there are no sales prices for the foreign like product to use in a price-to-price dumping comparison. *See* Final IDM at 14 (Appx083625).  Under this scenario, the statute instructs Commerce to calculate dumping using constructed normal value under 19 U.S.C. § 1677b(e), which corresponds to a respondent's cost of manufacture, plus selling, general and administrative expenses, and an amount for profit.  As part of Commerce's standard cost questionnaire, Commerce requires foreign producers to report each constituent element of cost and precisely reconcile costs between their audited financial statements and submitted antidumping cost databases.  *See, e.g.*, Commerce Letter to Bharat (Jan. 22, 2020) at Section D (Appx080098-080117).  In this case, the constituent elements included items such as raw materials and processing costs (*e.g.*, forging, heat treatment, machining, etc.).  *See. e.g.,* Bharat DQR at 5-7, 33-41 (Appx082322-082324, Appx082350-082358).

**C.   Because Bharat Produces Both FEBs and Other Forgings that Are Not Merchandise Under Consideration, Cost Allocation Is a Fundamental Issue**

Generally, forgers make products from steel ingots that have been melted and poured to

---

[2] Even before Commerce's preliminary determination, Bharat had received no less than 12 extensions with generous allotments of time.  For example, Bharat received 50 days to answer Commerce's initial Section D questionnaire, another 4 days to supply missing Excel spreadsheets, and another 35 days to address widespread deficiencies from its initial response through a supplemental Section D questionnaire.  *See* "Petitioners' Comments in Advance of the Preliminary Determination" at 1-2 (Jun. 24, 2020) ("Petitioners' Pre-Prelim Comments") (Appx083228-083229)

specific chemical properties.  "Antidumping and Countervailing Duty Petitions" (Dec. 19, 2019) ("Petition") at 11-12 (Appx085926-085927); *see also* Bharat DQR at 5 (Appx082322). Forgers heat these ingots and use a large forging press to form the steel ingot into shape, thereby modifying the physical properties of the forged steel, including its microstructure, grain size, grain flow, strength, ductility, and fatigue resistance.  Petition at 12 (Appx085927).  From this stage, forgers can machine the forged steel block to impart its final physical characteristics for sale and further processing in the United States.  Petition at 12-13 (Appx085927-085928); *see also* Bharat DQR at 6-7 (Appx082323-082324).  For FEBs, that may include precision contouring and drilling bore holes for use in the production of a fluid end module.  Petition (Appx085927-085928); *see also* Bharat DQR at 6-7 (Appx082323-082324). While the precise specifications of a forged FEB are particular to the customer's drawings, forgers can use the same production assets for both FEBs and other forged products outside the investigation's scope (*i.e.*, forgings that are not merchandise under consideration or "Non-MUC").  *See* Bharat DQR at 24-25, Exhibit D-14 (Appx082341-082342, Appx082616-082666); Bharat Second Supp D QR at 24-25 (Appx083660-083661).

Early in the investigation, Plaintiffs identified the need for Commerce to obtain every constituent element of FEB production costs so that Commerce could properly identify the total reported cost of producing FEBs, add this cost to the total reported cost of producing other forged products, and tie those totals to Bharat's financial statements.  *See, e.g.,* "Deficiency Comments Concerning Section D Questionnaire Response of Bharat Forge" (Apr. 7, 2020) at 1-2, 4-5, 42-43 (Appx083140-083186).   Plaintiffs further urged Commerce to ensure that the allocations between FEBs and Non-MUC were both accurate and consistent with Bharat's books and records.  *See id.* (Appx083140-083186).

**D.   Commerce's *Preliminary Determination* Ignored Substantive Concerns with Bharat's Reported Data**

Without addressing Plaintiffs' pre-preliminary arguments concerning the accuracy of Bharat's reported data, *see generally* Petitioners' Pre-Prelim Comments (Appx083228-083283), Commerce calculated a preliminary estimated weighted-average dumping margin below *de minimis* for Bharat. *See Preliminary Determination* (Appx083300-083302); Prelim IDM (Appx083287-083299). Plaintiffs' pre-preliminary comments addressed Bharat's distorted and unreasonable allocation of costs between FEBs and non-MUC, *see* Petitioners' Pre-Prelim Comments at 11-14 (Appx083238-083241), Bharat's failure to develop product-specific costs that account for heat treatment and other control number, a.k.a., "CONNUM," characteristics, *id.* at 14-18, 20 (Appx083241-083245, Appx083247), divergent cost reporting based on factors other than physical control number characteristics, *id.* at 18-19 (Appx083245-083246), unreported costs, *id.* at 20-22 (Appx083247-083249), an erroneous G&A expense rate, *id.* at 33 (Appx083260), and numerous other failures to reconcile its data, *id.* at 23-27 (Appx083250-083254).

**E.   Despite Stating an Intent to Verify "as Provided" Under the Statute, Commerce Failed to Conduct On-Site Verification**

Before the *Preliminary Determination*, Petitioners repeatedly expressed concern that "the ability of Commerce to conduct an effective on-site verification remains very much in question." Petitioners' Section D Deficiency Comments at 2 (Appx087522); *see also id.* at 4 (Appx087524) (noting "uncertainty surrounding the ability of Commerce to conduct effective overseas verification"); Deficiency Comments on Bharat Forge Limited's Supplemental Section A Questionnaire Response (Apr. 27, 2020) at 2 ("Petitioners' Supplemental Section A Deficiency Comments") (Appx087573) ("Commerce's ability to conduct a robust overseas verification remains entirely uncertain"). Cognizant of Petitioners' concerns, Commerce's July 2020

*Preliminary Determination* stated that "Commerce intends to verify the information relied upon in making its final determination" "{a}s provided in section 782(i)(1) of the Act." *Preliminary Determination*, 85 Fed. Reg. at 44,518 (Appx083301); *see also* Prelim IDM at 5 (same) (Appx083291).

Relying upon this assurance, and given Commerce's failure to address the substantive reporting issues in the *Preliminary Determination*, *see* Section III.D, *supra*, Plaintiffs filed a post-preliminary submission that encouraged Commerce to issue a post-preliminary determination that did not rely on Bharat's specious cost allocations. *See* "Petitioners' Comments Following Preliminary Determination" (Aug. 5, 2020) at 3-23 ("Petitioners' Post-Prelim Comments") (Appx083305-083325). Plaintiffs noted that given Bharat's myriad reporting deficiencies, canceling verification altogether would be consistent with Commerce's practice. *See e.g.*, *id.* at 23 (Appx083325). Plaintiffs otherwise proposed instructions and detailed questions, consistent with Commerce's established on-site verification practice,[3] "in the event that Commerce conducts verification or issues a verification outline," *id.* at 23-25 (Appx083325-083327). Plaintiffs concluded by specifically cautioning against "giv{ing} Bharat another 'blank check' to again correct its sales and cost databases" and noting, in no uncertain terms, that "a robust on-site verification" is what is "contemplated under the statute." *See* Petitioners' Post-Prelim Comments at 26 (Appx083325-083328). Commerce subsequently received an additional letter of support from Rep. Mike Kelly, raising "serious concerns that the foreign producers' data will go unverified," noting "the law provides for audits — or 'verification' — to confirm the truth behind the foreign respondents' sales and cost," and

---

[3] *See, e.g.*, *Certain Biaxial Integral Geogrid Products from the People's Republic of China*, 82 Fed. Reg. 3284 (Jan. 11, 2017), and accompanying IDM at Comment 3 ("the verification outline listed specific instructions as to what information Taian Modern was expected to provide").

expressing alarm that "Commerce has already begun to cancel its verifications."  Letter from

Mike Kelly (Aug. 27, 2020) at 1 (Appx087614).

Despite this, on September 3, 2020, Commerce instead issued Bharat a "questionnaire in

lieu of performing an on-site verification."  *See* Letter from Commerce to Bharat (Sep. 3, 2020)

("Bharat Questionnaire in Lieu of Verification") (Appx083332-083338).  To the best of

counsel's knowledge, Commerce had never undertaken a "questionnaire in lieu of on-site

verification" in any proceeding prior to September 2020.  Nor had Commerce consulted

Petitioners beforehand.  Nevertheless, Commerce characterized its questions as "similar to those

{Commerce} would normally ask during an on-site verification," and stated that "{t}he purpose

of this questionnaire is to probe information that you have already submitted - not to obtain new

information."  *Id*. at 1 (Appx083332).  Commerce also notified parties that:

> …after an on-site verification, parties do not have an opportunity to submit factual
> information rebutting information collected by Commerce at verification.
> Accordingly, Commerce will not accept factual information from other interested
> parties to rebut your questionnaire responses.  Interested parties should address the
> information submitted in response to this request, in case and rebuttal briefs.

*Id.* at 2 (Appx083333).

It quickly became apparent that Commerce's analogy to on-site verification was utterly

hollow from a procedural standpoint.  Bharat twice requested, Petitioners twice opposed, and

Commerce nevertheless twice *granted* extensions of time.  *See* Bharat First Extension Request

(Sept. 8, 2020) (Appx0857591-087593); Petitioners' Opposition to First Extension (Sept. 8,

2020) (Appx087594-0857599); Commerce Grants First Extension (Sept. 9, 2020) (Appx083339-

083340); Bharat Second Extension Request (Sept. 10, 2020) (Appx087600-097603); Petitioners'

Opposition to Second Extension (Sept. 11, 2020) (Appx087604-087610); Commerce Grants

Second Extension (Sept. 11, 2020) (Appx087611-087612).  In opposing these extensions,

Petitioners noted that on-site verification outlines are "regularly issued a week prior to the

beginning of verification and…instruct respondents to have all requested information ready for examination on the first day of verification," Petitioners' Opposition to First Extension (Sept. 8, 2020) at 2 (Appx087595), and that Commerce's questionnaire "contains <u>significantly fewer</u> topics than complete sales and cost verification agendas," Petitioners' Opposition to Second Extension (Sept. 11, 2020) at 3-4 (Appx087606-087607).  Petitioners concluded by noting any analogy between this questionnaire and "respondent preparation pursuant to a Commerce verification outline…was only partly apt because of the myriad differences in scope…" and criticizing Commerce's extraordinary accommodation of Bharat by issuing this "pared down verification questionnaire instead of conducting robust on-site verification."  *Id.* at 4 (Appx087607).

Evidently, Bharat itself had misgivings, as it filed a letter on October 7, 2020, highlighting the differences between Commerce's *ad hoc* process and "an actual verification" and "communicat{ing Bharat's} willingness to make itself available for a teleconference with Department officials."  Bharat Virtual Verification Request (Oct. 7, 2020) at 1-2 (Appx087616-087617).  Commerce never responded to Bharat's request.

By the time case briefs were filed on October 16, 2020, the lack of on-site verification was a *fait accompli*.  As Commerce's questionnaire was issued *despite* both the *Preliminary Determination*'s assertion of Commerce's intent to verify and Plaintiffs' post-preliminary request for on-site verification.  And, as Commerce simply ignored Bharat's October 7th request for additional "virtual verification," Commerce's course of action with respect to "verification" was evidently set in stone in September.  In any event, the three weeks between Commerce's November 16th hearing on the briefs and Commerce's December 7th statutory deadline to conclude the investigation were woefully insufficient for an on-site "do-over."  Commerce itself

acknowledged as much, twice stating in September that because it needed "sufficient time to analyze and address issues raised in case briefs…before we can issue a final determination," it "*cannot* grant {Bharat's questionnaire extension} request in full."  Commerce Grants First Extension (Sept. 9, 2020) at 1 (Appx083339) (emphasis supplied); *see* Commerce Grants Second Extension (Sept. 11, 2020) at 1 (Appx087611) (materially same).  Ultimately, Commerce's Final IDM simply asserted it was "unable to conduct on-site verification" while simultaneously acknowledging that "on-site verification {i}s required under section 782(i) of the Act."  Final IDM at 2 (Appx083613).

### F.   Commerce's Uncritical Treatment of Unsolicited Data Submitted in Connection with the Post-Preliminary Questionnaire Yielded a Determination Unsupported by Substantial Evidence

At the case briefing stage, with Bharat having only filed its post-preliminary questionnaire responses on September 14, 2020, and Commerce having not yet issued the required verification report, Petitioners could only take Commerce at its word that it would treat the information gathered—whatever Commerce's underlying procedural defects—just as it would during on-site verification, *i.e.*, to "probe information that {Bharat} ha{d} already submitted – not…obtain new information."  Bharat Questionnaire in Lieu of Verification at 1 (Appx083332); *see also* Commerce Grants First Extension (Sept. 9, 2020) at 1 (Appx083339) ("Commerce's requests…pertain to information Bharat Forge already provided on the record.").  Ultimately, this trust proved misplaced, as Commerce deviated from its stated procedures.

Despite having made clear that Commerce would not accept "{u}nsolicited new factual information…or revisions of previously requested information," Bharat Questionnaire in Lieu of Verification at 1-2 (Appx083332-083333), Commerce chose to accept a revised exhibit from Bharat containing unsolicited details concerning 25 previously undisclosed Bharat cost centers— without providing Plaintiffs an opportunity to provide a new factual submission in rebuttal, *see*

13

IDM at 5-6 (Appx083616-083617).  Commerce also chose to rely on this revised cost exhibit (*i.e.*, Exhibit D-71) in the *Final Determination*, even though it clearly indicated Bharat had underreported its MUC-related costs.  *See generally* "Case Brief of Petitioner" (Oct. 19, 2020) ("Plaintiffs' Administrative CB") at 3, 11-26 (Appx083435, Appx083443-083458).

By failing to address these major issues, and relying on inaccurate and unverified data, Commerce concluded that Bharat's final estimated weighted-average dumping margin was *de minimis* and accordingly no antidumping duty order was issued for India.  *See Final Determination*, 85 Fed. Reg. at 80,004 (Appx083629).  As a result, the materially injured domestic FEB industry has not received relief from dumped FEBs from India that is promised under the antidumping statute.

This appeal ensued.

### G.   Commerce Utilized Substantial Time to Produce Uninformative Remand Results

In response to Plaintiffs' initial Rule 56.2 Opening Brief before the Court, the government requested a voluntary remand to "reconsider {Commerce}'s position…on the in lieu of on-site verification questionnaire and subsequent reliance on facts available in its final determination."  Def. Mot. For Voluntary Remand, ECF Doc. 24 (Oct. 18, 2021) at 1.  The Court granted a 150-day remand, noting Commerce's "two options" under *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020), and specifically allowing Commerce the time and discretion "to perform on-site verification, which would moot all procedural issues created by the agency's decision to short-circuit verification."  *See* Remand Order at 5.

Seven weeks later, Commerce issued draft remand results containing a single paragraph "Analysis" purporting to make two changes to Commerce's Final IDM: (1) Commerce newly claimed its post-preliminary questionnaire "satisfies the verification requirement under section

14

782(i) of the Act" and (2) consequently, Commerce found it *was* able to verify Bharat's

information (*i.e.*, through the questionnaire) and thus "there is no longer a reason for Commerce

to rely on 'facts otherwise available'," save for certain specific exceptions.  Draft Remand

Results (Dec. 6, 2021) at 4 (Appx087450).  Commerce's "Analysis" made no attempt to provide

*any* rationale for the first reversal.  *See id.* (Appx087450).

Commenting on Commerce's draft, Plaintiffs requested the missing explanation and

argued, *inter alia*, that (1) Commerce's summary reversal did nothing to address its failures to

conduct on-site verification and issue a verification report, as required by the statute, and

(2) U.S. Customs and Border Protection, the European Union, and the Government of Brazil

have all resumed in-person trade verifications, indicating it is possible to do so.  Plaintiffs

submitted factual information to substantiate the latter comments.

Commerce made no substantive change in its final remand results.  In response to

Plaintiffs' comments, Commerce stated its procedures were not "dictated or influenced by

foreign governments or other U.S. governmental agencies," but offered no explanation of its

unique inability to comply with statutory mandates.  *See* Remand Results at 10.  Commerce

discussed the impact of COVID-19 travel restrictions in late 2020, but offered no comment on its

dramatically lessened impact in the State of Maharashtra during the remand period itself.[4]  *See*

*id.* at 9.  Commerce also "disagree{d}" with the Court's statement that verification had been

"short-circuited," and concluded it had not, *see id.* at 8, an odd departure from Commerce' stance

in other January 2022 remand results that "{o}ur remand determination, including any

explanation that we may provide, must be consistent with the Court's opinion, even though we

---

[4] Per the Johns Hopkins University Center for Systems Science and Engineering, new COVID
case counts in Maharastra during November-December 2021 were very low (roughly below
1,000/day), relative to August-September 2020 (roughly ~15,000/day).

disagree with the Court's reasoning and conclusions," *SeAH Steel Corp. v. United States*, CIT Ct. No. 20-150, ECF Doc. 80-1 (Jan. 24, 2022) at 12.  Evidently here, Commerce felt no compulsion to keep its conclusions consistent with those of the court.  Commerce's explanation for reversing its view of the statutory on-site verification requirement was essentially that, contrary to its statements in the *Final Determination* and IDM, the on-site requirement is actually optional and discretionary.  *See id.* at 7-8.  Commerce acknowledged it "did not issue a verification report in accordance with 19 CFR 351.307(b)-(d)," but seemingly cast this as required only for on-site verifications.  *See id.* at 8-9.

Two-and-a-half months after obtaining a voluntary remand order, Commerce filed these Remand Results with the Court.

## SUMMARY OF ARGUMENT

The major issue in Plaintiffs' appeal presents an issue of law concerning Commerce's failure to verify information relied upon in Commerce's *Final Determination*.

The statute and Statement of Administrative Action, as well as Commerce's own regulations, unambiguously require that Commerce conduct an on-site verification and issue a timely verification report before rendering a final determination in an antidumping investigation. Thus, under *Chevron* step one, Commerce acted unlawfully by not conducting an on-site verification of Bharat's data or issuing a timely verification report before using those data in the *Final Determination*.

Even under a *Chevron* step two analysis, Commerce's departure from its ordinary on-site verification procedures is unreasonable.  Despite Plaintiffs providing factual information demonstrating the feasibility of on-site verification during the remand period, Commerce declined to do so without explanation.  Moreover, even if Commerce were permitted to depart from on-site verification during the investigation itself due to unspecified foreign "travel

restrictions," Commerce chose unreasonable substitute procedures. That is, Commerce's single questionnaire, acceptance of unsolicited new factual information, and preclusion of rebuttal submissions do not constitute an adequate procedural analogue to the on-site verification contemplated by the Statement of Administrative Action and Commerce's regulations. As for the verification report, it simply does not exist on this record, a scenario contemplated nowhere in the law. Such procedural missteps render Commerce's *Final Determination*, as amended by the Remand Results, arbitrary and unlawful.

Commerce additionally acted contrary to its statutory mandate by failing to support its findings with substantial evidence in the *Final Determination*. In the supplemental questionnaire "in lieu of verification," Commerce asked Bharat to "demonstrate and explain" the validity of its cost reporting. However, Bharat entirely failed in this task and instead submitted additional evidence — most notably, Exhibit D-71 — indicating that it had understated its FEB processing costs and G&A expenses associated with MUC. Commerce's decision to uncritically accept Bharat's unverified cost reporting — coupled with its failure to address the essence of Plaintiffs' arguments — was unreasonable and unsupported by substantial evidence.

## ARGUMENT

### I.  Standard of Review

This Court will "hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B).

To determine whether Commerce's interpretation of a statue is "in accordance with law," the court applies the two-step framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). First, a reviewing court must examine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. "If the intent

of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

effect to the unambiguous expressed intent of Congress." *Id*. at 842-43.  To discern

Congressional intent, the court must exhaust "all the traditional tools of construction," *Kisor v.*

*Wilkie*, 139 S. Ct. 2400, 2415 (2019), including the "authoritative" Statement of Administrative

Action, *see* 19 U.S.C. § 3512(d).   If "the statute is silent or ambiguous with respect to the

specific issue, the question for the court is whether the agency's answer is based on a permissible

construction of the statute."  *Chevron*, 467 U.S. at 843.  However, "genuine ambiguity" is

required before the Court may reach this second step.  *Kisor*, 139 S. Ct. at 2415.

     Next, the Court's substantial evidence review examines whether the record contains

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  Substantial evidence is "more than

a scintilla" and "must into account whatever in the record fairly detracts from its weight."  *Id*. at

477, 488.  The substantial evidence standard also requires Commerce to "articulate a satisfactory

explanation for its action, including a rational connection between the facts found and the choice

made."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S.

29, 43, (1983).  Substantial evidence review essentially requires the Court to determine whether

the evidence and reasonable, evidence-based inferences support Commerce's findings.  *See*

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

     In addition, Commerce's determination "must include 'an explanation of the basis for its

determination that addresses relevant arguments{} made by interested parties who are parties to

the investigation or review.'" *NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1320 (Fed. Cir.

2009) (quoting 19 U.S.C. § 1677f(i)(3)(A)).  Where "the agency has not considered all relevant

factors, or if the reviewing court simply cannot evaluate the challenged agency action on the

basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation and explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

Finally, "Commerce's results in its redetermination pursuant to court remand are also reviewed for 'compliance with the court's remand order.'" *Tai Shan City Kam Kiu Aluminium Extrusion Co. v. United States*, 125 F. Supp. 3d 1337, 1341 (Ct. Int'l Trade 2015).

## II.   Commerce Has Failed to Satisfy Unambiguous Statutory Mandates Concerning What a "Verification" Requires

Commerce is statutorily obligated to "verify all information relied upon in making a final determination in an investigation," 19 U.S.C. § 1677m(i); *see also* 19 C.F.R. § 351.307(b)(1)(i) (same), and is prohibited from relying on unverified information in its determinations, *id.* § 1677e(a)(2)(D).   Commerce's original Final IDM admitted to violating both mandates, stating that Commerce did not conduct "on-site verifications as required under Section 782(i) of the Act," but nevertheless "relied on the {unverified} information submitted on the record as facts available."   Final IDM at 2 (Appx083613).   Plaintiffs' original Rule 56.2 opening brief detailed the unlawfulness of Commerce's "heads I win, tails you lose" approach to using Bharat's data. *See* Original Opening Br., ECF Doc. 22 (July 19, 2021) at 28-32.   Commerce's voluntary Remand Results effectively concede this point by retroactively deeming Commerce's post-preliminary questionnaire a statutorily compliant verification, such that Bharat's information now *has* been verified. *See* Remand Results at 4.   But retracting prior admissions on a *post hoc* basis can only get Commerce so far—the Remand Results remain unlawful.   Specifically, Congress has directly spoken to irreducible statutory minimum requirements for a "verification" within the meaning of Section 782(i)—relevant here, it must be on-site, and it must be followed by a verification report before the final determination.   Although a single failure would suffice,

Commerce's post-preliminary questionnaire satisfied neither mandate, obliging this Court to

hold Commerce's Remand Results unlawful under *Chevron*'s first analytical step.  Further

remand is necessary so that Commerce can conduct a lawful verification.

## A.   The Statute Requires that "Verification" Be On-Site and that the Verification Report Precede Commerce's Final Determination in an Investigation

The text of the antidumping statute itself does not define "verification," *see, e.g.*, 19

U.S.C. §§ 1677, 1677m(i), but using "all the traditional tools of construction," *Kisor*, 139 S. Ct.

at 2415, several minimum requirements emerge.  These are established by the Statement of

Administrative Action, which "shall be regarded as an authoritative expression by the United

States concerning the interpretation and application of the Uruguay Round Agreements and this

Act in any judicial proceeding in which a question arises concerning such interpretation or

application." 19 U.S.C. § 3512(d); *see also, e.g.*, *Albemarle Corp. v. United States*, 821 F.3d

1345, 1351 (Fed. Cir. 2016) (applying the same).

The first paragraph of the relevant portion of the Statement of Administrative Action

instructs that Commerce's "regulations will provide that Commerce will verify information in a

foreign country" after obtaining the agreement of the subject of verification and notifying the

foreign government.  SAA at 868.  The paragraph concludes that if either of the foregoing

entities objects, "Commerce will not conduct the verification."  *Id.*  This establishes that

verification must be on-site.  Consistent with this mandate, Commerce's regulations state that

"{t}he Secretary will notify the government of the affected country that employees of the

Department will visit…in order to verify the accuracy and completeness of submitted factual

information."  19 C.F.R. § 351.307(d); *see also Myland Indus., Ltd. v. United States*, 31 C.I.T.

1696, 1704 (2007) (noting that the Court, like Commerce, "interprets {the term 'verification'} to

mean 'on-site' verification").  Prior to remand, Commerce's Final IDM also acknowledged that

PUBLIC VERSION

"on-site verification{ i}s required under Section 782(i) of the Act."  Final IDM at 2

(Appx083613); *see also id.* ("Commerce was unable to conduct on-site verification…as provided

for in Section 782(i) of the Act.").

　　With respect to verification reports, the Statement of Administrative Action instructs that

Commerce's regulations "also should require Commerce, consistent with its current practice, to

report the methods, procedures, and results of the verification prior to making its final

determination in an investigation…," establishing Congress' intent that Commerce issue a timely

verification report.  SAA at 868.  Cognizant of this intent, Commerce's regulations oblige

Commerce to do so, providing that "{t}he Secretary will report the methods, procedures, and

results of a verification under this section prior to making a final determination in an

investigation…."  19 C.F.R. § 351.307(c); *see also Micron Tech., Inc. v. United States*, 117 F.3d

1386, 1396 (Fed. Cir. 1997) (stating that the statute "require{es} that Commerce report, on a

case-by-case basis, the methods and procedures used to verify submitted information….").

Commerce's Final IDM did not address its failure to issue a timely verification report, nor was

this defect remedied by Commerce's Remand Results.

　　Although possible impediments to these requirements — such as armed conflict, political

instability, administrative resource constraints, and domestic or international health crises —

were readily foreseeable, neither the statute nor the Statement of Administrative Action provide

an exception to these mandates for extenuating circumstances.  *See generally* 19 U.S.C. §

1677m(i); SAA at 868 (providing only that Commerce may decline to undertake verification

where the subject government and/or respondent refuse to participate).  Commerce's regulations

similarly do not contemplate any circumstances where a verification and/or the timely release of

a verification report are not required.  *See generally* 19 C.F.R. § 351.307.  Indeed, the Preamble

to Commerce's regulations makes clear that the verification report constitutes a critical piece of "evidence on the record that the Department must consider in making its final determination." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,337 (May 19, 1997). Simply put, any process that is not on-site and followed by a timely verification report is not a "verification" within the meaning of Section 782(i).

### B.    Commerce Did Not Conduct On-Site Verification or Issue a Timely Verification Report; Commerce's Rationales for these Failures Are Unlawful

Despite Congress' clear intent that verification be on-site and be followed by a timely verification report—as recognized by Commerce in both its own regulations and the Final IDM––Commerce's Remand Results newly claim both mandates are discretionary.  As an initial matter, because Commerce's Remand Results provide a new legal rationale to justify Commerce's prior calculations, the Remand Results constitute new agency action. *See DHS*, 140 S. Ct. at 1907 ("When an agency's initial explanation 'indicate{s} the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) but may not provide new ones."); *see also id.* at 1909 ("The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted.").  Confusingly, Commerce speaks in terms of "rescinding" certain language from the Final IDM, *see* Remand Results at 4, but Commerce's rationale for doing so is entirely new to the remand proceeding.  Indeed, it is the direct opposite of Commerce's prior position.

In response to Plaintiffs' comments on Commerce's new position, Commerce offered the following rationale in its defense.  *First*, Commerce asserts that the "statute gives Commerce wide latitude in its verification procedures; in fact, Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc."  Remand Results at 7. Commerce cites a number of opinions in support, *see id.* at 7 n.27, but none are on point.  All

offer variations on the same theme—that Congress did not detail every methodology and procedure involved in a "verification," leaving Commerce to fill in those blanks.  *See, e.g.*, *Goodluck India Limited v. United States*, 11 F.4th 1335, 1344 (Fed. Cir. 2021) (after on-site verification, concerning acceptance of alterations as minor); *Micron Tech.*, 117 F.3d at 1396 (after on-site verification, concerning Commerce's ability to conduct spot checks rather than "trace through every number of the response"); *Am. Alloys v. United States*, 30 F.3d 1496, 1475 (Fed. Cir. 1994) (after on-site verification, concerning Commerce's method of verifying the addition of pass-through taxes to home market prices).  Unlike the foregoing cases, Plaintiffs here are not arguing that Commerce filled a gap improperly, but rather that *no such gap exists* with respect to the necessity of conducting verification on-site and issuing a timely verification report.  These requirements are clear, and Commerce has violated them.

On the legal point of whether the statute and Statement of Administrative Action require on-site verification, Commerce "disagrees," but offers no supporting analysis whatsoever.  *See* Remand Results at 8.  As for whether a timely verification report is legally required, Commerce acknowledges that it "did not issue a verification report in accordance with 19 CFR 351.307(b)-(d)," but claims that its "methods, procedures, and results" were adequately reported in its "questionnaires and responses, the Final Sales Analysis Memorandum and the Final Cost Calculation Memorandum, the *Final Determination* IDM, and these final results of redetermination."  *Id.* at 8-9.  Of all these documents, however, only the "questionnaires and responses" were part of the administrative record "*prior to* making a final determination," as is expressly required by both the Statement of Administrative Action and 19 C.F.R. § 351.307(c).  Moreover, both the Statement of Administrative Action and 19 C.F.R. § 351.307(c) require *Commerce* to issue the report in question, meaning Bharat's "responses" could not possibly

satisfy this requirement.  Indeed, Commerce's suggestion that Bharat's "responses" are themselves a verification report only lends further credence to Plaintiffs' point that Commerce uncritically accepted whatever Bharat provided.  *See* Section III, *infra*.  That leaves the "questionnaire" itself, which obviously could not report on the "results" of verification, nor does it provide any indication of how Commerce derived the off-site "methods" it utilized. Commerce's new explanation thus fails to satisfy the statute or Commerce's own regulation.

Cognizant of its untenable legal positions, Commerce resorts to casting aspersions on Petitioners, misrepresenting the administrative record by claiming that "petitioner…requested a questionnaire in lieu of on-site verification," citing Petitioners' August 5, 2020, post-prelim comments.  *See* Remand Results at 7 & n.28.  But Petitioner could not have possibly requested a "questionnaire in lieu of on-site verification" on August 5th because, to the best of counsel's knowledge, no such procedure existed *until* Commerce invented it in the earliest days of September 2020.  And even if Petitioners had requested a "questionnaire in lieu of on-site verification" — (they never did) — Commerce would still be bound by the statute, Statement of Administrative Action, and its own regulations to reject such a request as incompatible with the governing law.

Commerce is also wrong as a factual matter.  From early in the investigation, Petitioners repeatedly voiced concerns about Commerce's ability to conduct *on-site* verification.  *See* Petitioners' Section D Deficiency Comments at 2, 4 (Appx087522, Appx087524); Petitioners' Supplemental Section A Deficiency Comments at 2 (Appx087573).  Petitioners' post-preliminary comments proposed detailed verification questions, as is typical of the lead-up to an on-site verification, "in the event that Commerce conducts verification or issues a verification outline."  Petitioners' Post-Prelim Comments at 23-25 (Appx083325-083327).  For the

avoidance of doubt, "verification outline" is a longstanding term of art that refers to the document Commerce issues to a respondent roughly one week before an *on-site* verification, outlining the various source material that Commerce intends to review.  *See, e.g.*, *Thyssen Stahl AG v. AK Steel Corp.*, 1998 U.S. App. LEXIS 17064, at *12 (Fed. Cir. July 27, 1998) (discussing contents of "verification outline"); *Rubberflex Sdn. Bhd. v. United States*, 59 F. Supp. 2d 1338, 1346 (Ct. Int'l Trade 1999) (holding Commerce abused its discretion by issuing verification outline two days before the start of on-site verification).  Commerce itself recognized the distinction between a "verification outline" and Commerce's "request for information" here, stating "{n}ormally, Commerce provides respondents a verification outline one week in advance…Here, Bharat Forge has already been provided the equivalent of one week to prepare and submit information that amounts to *a subset of* what is typically requested in a verification outline."  Commerce Grants First Extension (Sept. 9, 2020) at 1 (Appx083339) (emphasis supplied).  Commerce cannot credibly support its actions by equating the two *post hoc*.

In any event, Petitioners concluded their post-preliminary comments by stating, in no uncertain terms, that "a robust on-site verification" is what is "contemplated under the statute." *See id.* at 26 (Appx083328).  Nothing on the record indicates that Commerce actually consulted Petitioners before Commerce subsequently issued the post-preliminary questionnaire, much less that Petitioners assented thereto.  After Commerce issued its questionnaire, Petitioners criticized Commerce's approach as "contain{ing} significantly fewer topics than complete sales and cost verification agendas," and relying on a "pared down verification questionnaire instead of conducting robust on-site verification."  Petitioners' Opposition to Second Extension (Sept. 11, 2020) at 3-4 (Appx087606-087607).  Commerce nevertheless suggests Petitioners are somehow to blame for referring to Commerce's process as "in effect a virtual verification" during the

administrative hearing, *see* Remand Results at 7-8, but Petitioners did not request a "virtual verification," nor did Petitioners characterize Commerce's approach as satisfying the statutory mandate.  Regardless, Petitioners' phraseology in November 2020 is no evidence of Commerce's rationale for adopting this particular course of action two months earlier.  In Commerce's own telling, it was far too late for Commerce to organize and conduct on-site verification in mid-November 2020.  *See* Commerce Grants First Extension (Sept. 9, 2020) at 1 (Appx083339) (stating that Commerce "*cannot* grant {Bharat's questionnaire extension} request in full" because Commerce "require{s} sufficient time to analyze and address issues…before we can issue a final determination"); Commerce Grants Second Extension (Sept. 11, 2020) at 1 (Appx087611) (same).

Furthermore, while past practice cannot rewrite the clear legal mandates described in Argument Section II.A, *supra*, it bears mentioning that here, Commerce made no attempt to conduct of on-site verification, even in an imperfect form.  Commerce even rejected Bharat's offer to conduct a more extensive virtual verification.  *See* Bharat Virtual Verification Request (Oct. 7, 2020) at 1-2 (Appx087616-087617).  This contrasts with Commerce's past practice under difficult circumstances.  *See, e.g., Polyethylene Terephthalate Resin From Pakistan: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 48,281 (Sep. 24, 2018) (conducting a verification using "standard verification procedures, including an examination of relevant accounting and production records, and original source documents" with representatives of a Pakistani company in Washington, D.C. when Commerce determined that travel in Pakistan was not possible due to a State Department travel advisory); *Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Bar From Italy*, 67 Fed. Reg. 3,155 (Jan. 23, 2002) (tolling the final determination deadline in this and companion investigations of SSB from

Germany, France, the United Kingdom, and Korea in order to conduct a modified verification that "met the {verification} standard" in the wake of "security concerns and logistical difficulties brought about by the events of September 11 {2001}"); *Brake Rotors From the People's Republic of China: Rescission of Second New Shipper Review and Final Results and Partial Rescission of First Antidumping Duty Administrative Review*, 64 Fed. Reg. 61,581 (Nov. 12, 1999) (conducting verification at a Beijing hotel rather than at the respondent's production facilities due to security concerns associated with travel in China following a NATO bombing of the Chinese Embassy in Belgrade, Yugoslavia).[5]  Further, where Commerce could not verify, it has applied adverse facts available.  *See, e.g., Carbon and Alloy Steel Wire Rod from the United Kingdom: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 83 Fed. Reg. 13,252 (Mar. 28, 2018); *Certain Tool Chests and Cabinets from the Socialist Republic of Vietnam: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 15,361 (Apr. 10, 2018).

In the past, this Court has remanded Commerce's final determination for failure to conduct a "verification."  *See Industrial Quimica Del Nalon, S.A. v. United States*, 729 F. Supp. 103, 109 (Ct. Int'l Trade 1989) (surveying the legislative history underlying the verification requirement and concluding that "the Court can find no alternatives to requiring ITA to comply with the clear language of the statute.  The government's action in failing to verify was not in accordance with the law."); *see also Al-Tech Specialty Steel Corp. v. United States*, 745 F.2d 632, 636-640 (Fed. Cir. 1984) (concluding that Commerce was required to conduct verifications

---

[5] Plaintiffs take no position at this time as to whether the procedures described in these examples would constitute "on-site" verification.  However, it is evident that (unlike here) Commerce was *trying* to hew as closely as possible to the statutory requirement.  If these procedures did not satisfy the statute, that does not change the law itself, as the "on-site" requirement is not discretionary.

in administrative reviews as well as in investigations); *cf. Timken Co. v. United States*, 852 F. Supp. 1122, 1130 (Ct. Int'l Trade 1994) ("Clearly, if Commerce were conducting its third consecutive administrative review without yet making verification and an interested party had made a timely request for verification…Commerce would be required to do so.").[6]

In short, a remand is likewise necessary here to address Commerce's failure to verify and issue a timely verification report, as the law requires.

### C.   Even if the Law Were Ambiguous, Commerce's Justifications for Deviating from On-Site Verification Compel the Conclusion Bharat's Data Could Not Be Verified

Commerce's on-site and verification reporting obligations are discernible under *Chevron* Step One, rendering it unnecessary for this Court to reach *Chevron* Step Two.  Nevertheless, were this Court to reach Step Two, Commerce's approach would fail.  When reviewing Commerce's *ad hoc* verification methodologies, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") directs a reviewing court to examine the lawfulness of both (1) Commerce's chosen verification methodology and (2) the results derived from that methodology. *See Micron Tech. v. United States*, 117 F.3d at 1394.  Here, neither Commerce's methodology nor its results pass muster under the law.  Moreover, even if Commerce's approach could satisfy the statute *in theory* (it cannot), Commerce has failed to explain its approach.

---

[6] These occurred under an earlier version of the statute with materially identical language.  The statutory mandate to conduct a verification predated the 1994 Uruguay Round Agreements Act ("URAA").  *See* SAA at 868 (describing the "general requirement that Commerce verify information" as having been "move{d}" "from section 776(b) of the Act to new section 782(i)," *i.e.*, 19 U.S.C. § 1677m(i)).  Prior to 1994, the most recent substantive modification to the verification subsection was effectuated by the Trade and Tariff Act of 1984, Pub. L. 98-573 § 618, 98 Stat. 2948, 3037, which provided, in relevant part, that "The administering authority shall verify all information relied upon in making—(1) a final determination in an investigation…"  This language was reproduced verbatim in 19 U.S.C. § 1677m(i).

1.   **Commerce's Explanations for Departing from Ordinary On-Site Verification Procedures Are Unlawful and Otherwise Underdeveloped**

Setting aside the parties' disagreement as to what the law mandates, no party disagrees (or could credibly do so) that Commerce's normal, decades-long practice is to conduct on-site verification.  Here, Commerce justified its resort to a questionnaire by vaguely stating that during the investigation, "India…imposed strict travel restrictions on U.S. travelers due to the Covid-19 pandemic, regardless of vaccination status."  Remand Results at 9.  Commerce cited no particular restriction(s).  *See id.*  Nor did Commerce mention, *e.g.*, U.S. travel restrictions or health concerns among Commerce personnel.  *See id.* at 7-10.  As for conditions during remand proceedings, Commerce's sole comment is that its "verification procedures are not dictated or influenced by foreign governments or other U.S. government agencies."  *Id.* at 10.

Commerce's claim that others do not "dictate" its verification procedures, *see* Remand Results at 10, is no explanation for Commerce's lack of on-site verification during the remand period.  Relative to the original investigation, COVID-19 case counts in the relevant Indian state were very low during November-December 2021.  *See* note 4, *supra*.  Enough Commerce personnel were (presumably) fully vaccinated.  *See* Exec. Order No. 14,043, 86 Fed. Reg. 50989 (Sept. 9, 2021).  Other governments and U.S. government agencies were conducting analogous on-site trade verification operations.  *See* Petitioners' Comments on Draft Remand Results at Exs. 1-3 (Appx087460-087517).  And U.S. officials had resumed discretionary travel to India, evidencing that Indian government travel restrictions were no longer prohibitive.  *See Bonney Forge Corp. v. United States*, USCIT Slip Op. 22-8, 2022 Ct. Int'l Trade Lexis 7 at *22-23 (Ct. Int'l Trade Feb. 2, 2022) (noting resumption of discretionary travel to India).  In effect, Commerce's position is: "you can't tell me what to do."  But Commerce provided no reason for what it *did* do, notwithstanding the apparent absence during remand of the single impediment

Commerce identified as preventing on-site verification during the investigation itself (*i.e.*, foreign travel restrictions).  Commerce's decision is thus arbitrary.  Further remand is necessary, at minimum, for Commerce to explain why, under current circumstances, it still refuses to conduct an on-site verification.

### 2.   Commerce's Replacement for On-Site Verification Is Not Reasonable

Even if the Court were to find Commerce's explanation for its departure from normal on-site verification procedures to be reasonable, Commerce's alternative procedures are not reasonable.  *Chevron* Step Two does not give Commerce *carte blanche* to ignore the law.  Verification is a "critical aspect of Commerce's antidumping investigation."  *New American Keg v. United States*, Ct. No. 20-00008, Slip Op. 21-30 at *6 (Ct. Int'l Trade Mar. 23, 2021) ("*American Keg*").  In issuing nothing more than a supplemental questionnaire absent any prior consultation, precluding factual rebuttal, and providing no timely verification report, Commerce failed to satisfy even the most flexible interpretation of its verification obligations.

Commerce failed to explain why alternative mechanisms of the type previously employed, or more closely approximating on-site verification, were not possible.  Indeed, Commerce actually acknowledged flaws in using yet another questionnaire "in lieu of verification," noting that the questionnaire it issued represented only "a subset of what is typically requested in a verification outline," did not involve the types of "impromptu questions that Commerce verifiers ask during the course of verification," and, unlike a true on-site verification, "pertain{ed} {only} to information Bharat Forge already provided on the record." Commerce Grants First Extension (Sept. 9, 2020) at 1-2 (Appx083339-083340).  In fact, the questionnaires Commerce issued "in lieu of verification" were no more than another supplemental questionnaire — except that Plaintiffs were stripped of the regulatory right to

submit clarifying or rebuttal information under 19 C.F.R. § 351.301(c)(1)(v). *See* Bharat

Questionnaire in Lieu of Verification at 2 (Appx083333).

As Bharat offered, Commerce could have, for example, arranged a virtual "on-site"

verification visit with Bharat, given Commerce's extensive use of videoconferencing during the

pandemic. *See* Bharat Virtual Verification Request (Oct. 7, 2020) at 1-2 (Appx087616-

087617).[7]  Indeed, Commerce held the hearing via videoconference. *See* Final IDM at 2

(Appx083613); *see also* Transcript of Public Hearing (Nov. 16, 2020) at 1 (Appx083537).  Such

an approach would have allowed Commerce to at least approximate on-site verification insofar

as it could have interviewed company officials, observed the operation of the sales and financial

systems of Bharat to better understand the process they used to report data to Commerce and to

instruct company officials to conduct particularized probes of those systems in real time, issued

follow-up requests for information with time-limited response deadlines, and conducted other

additional verification exercises routinely used to assess the *credibility* of a respondent's

submitted data.

Commerce abuses its administrative discretion where, as here, its verification procedures

"contravene{} statutory objectives." *Ipsco, Inc. v. United States*, 899 F.2d 1192, 1195 (Fed. Cir.

1990); *see also Wheatland Tube Corp. v. United States*, 841 F. Supp. 1222, 1227 (Ct. Int'l Trade

1993) ("This Court has noted that it will not allow the agency, under the guise of lawful

discretion, to contravene or ignore the intent of the legislature or the guiding purpose of the

statute."); *Rubberflex*, 59 F. Supp. 2d at 1346 ("{W}hile Commerce generally has discretion to

schedule a review and allocate resources to a review as it sees fit, it must do so within the

---

[7] Plaintiffs do not endorse Bharat's particular proposal, but rather mention it as an example, albeit a limited one.

confines of its statutory mandates.  When its actions compromise the accuracy of dumping

margins, then it has abused its discretion.").  Commerce abused its administrative discretion

when it developed a procedural framework that contravened the statute's objectives by

minimizing its examination of Bharat's reporting, despite the availability of more robust

alternatives.

Commerce's administrative discretion is additionally curtailed where, as here, Commerce

has "restricted itself by clarifying the verification requirement" in its regulations.  *See Micron*

*Tech*. 117 F.3d at 1396.  In such instances, the proper role of the court "is to determine…if

Commerce fulfilled its own self-imposed obligations."  *Id*. at 1396; *see also Torrington Co. v.*

*United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) (citations omitted) ("Commerce, like other

agencies, must follow its own regulations.").  A reviewing court will generally view an agency's

interpretation of its own regulation as controlling unless plainly erroneous or inconsistent with

the regulation.  *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (quoting *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 359 (1989); *United States v. Mead Corp.*, 533 U.S. 218, 228

(2001) ("The fair measure of deference to an agency administering its own statute has been

understood to vary with circumstances")).  An agency's interpretation will not be considered

controlling when "there is reason to suspect that the agency's interpretation 'does not reflect the

agency's fair and considered judgment on the matter in question.'"  *Christopher v. SmithKline*

*Beecham*, 567 U.S. 142, 143-44 (2012) (quoting *Auer*, 519 U.S. at 462 and citing *Chase Bank*

*USA, N.A. v. McCoy*, 562 U.S. 195, 209 (2011)).  "This might occur when the agency's

interpretation conflicts with a prior interpretation. . . ."  *Id*. (citing *Thomas Jefferson Univ. v.*

*Shalala*, 512 U.S. 504, 515 (1994)).  With respect to the verification report, Commerce's

Remand Results admit that it "did not issue a verification report in accordance with 19 CFR

351.307(b)-(d)." Remand Results at 9.  And insofar as Commerce originally interpreted the statute to require on-site verification, *see* Final IDM at 2 (Appx083613), this necessarily implies that Commerce viewed its regulations in a consistent manner, *see* 19 C.F.R. § 351.307(d). Commerce's failure to apply its regulation to conduct a meaningful verification and in turn issue a verification report is unreasonable in this investigation because Commerce had ample tools at its disposal to—at minimum—approximate on-site verification and it had time to issue a verification report.

In sum, even if, *arguendo*, the on-site verification mandate were more flexible than its plain text indicates, Commerce needed to do more to comply with the law, including the mandates of the Statement of Administrative Action and its own regulations.  Despite the availability of alternative techniques that would more closely approximate the mandated on-site verification, Commerce relied on a mere supplemental questionnaire, in response to which it accepted unsolicited new information from Bharat, while prohibiting the domestic industry from submitting rebuttal factual information.  This is inadequate under the law.  *Cf. American Keg*, Slip Op. 21-30 at *41 (remanding to Commerce after concluding that "Commerce unreasonably failed to verify those corrections {submitted by the respondent} and thereby abused its discretion").

It is, furthermore, unlawful for Commerce to have never issued a verification report of any kind prior to its *Final Determination*.  At an absolute minimum, Commerce deprived the parties of a contemporaneous explanation of (1) the reasons it was unable to conduct a verification, (2) why Commerce believed the alternate procedures it undertook were satisfactory, and (3) Commerce's own findings based on a critical analysis of the information derived from Bharat's questionnaire responses.  Because Commerce ignored a statutory mandate and its

regulations, its determinations are not entitled to deference, and this Court should therefore

remand the matter to Commerce so that it may verify the information submitted by Bharat and

reach new findings where appropriate.

### III. Even Setting Aside Commerce's Procedurally Deficient Verification, Commerce's Treatment of the Information Gathered Was Contrary to Law and Unsupported by Substantial Evidence

### A. Commerce Acted Contrary to Law By Failing to Follow Its Own Clearly Articulated Procedures for the Submission of New Factual Information

Although Commerce originally explicitly disclaimed that its questionnaire was a

"verification" within the meaning of 19 U.S.C. § 1677m(i), Commerce nevertheless included

instructions in its questionnaire that mimic some (not all) verification procedures, *e.g.*, (1) "probe

information that you have already submitted," (2) "not to obtain new information," (3) "revisions

of previously requested information{} may be rejected," and (4) "Commerce will not accept

factual information from other interested parties to rebut your questionnaire responses." *See*

Bharat Questionnaire in Lieu of Verification at 1-2 (Appx083332-083333).  Notwithstanding

these mere recitations, Commerce unreasonably departed from its standard verification practice,

its regulations, and the procedures it established for this investigation.

In its questionnaire "in lieu of verification," Commerce stated that in conformance with

its normal procedures in an on-site verification, it would not accept any "{u}nsolicited new

factual information (*i.e.*, information beyond that which we are requesting)." *See id.*

(Appx083332-083333).  This restriction was consistent with Commerce's regulatory deadlines

for adding factual information to the record.  *See* 19 C.F.R. § 351.301(c)(5) (specifying that the

deadline for filing unsolicited new factual information is 14 days before verification); 19 C.F.R.

§ 351.302(d) (noting that Commerce will reject untimely filed and unsolicited factual

information).  It was furthermore consistent with Commerce's longstanding practice to reject

unsolicited information newly provided at verification.  *See, e.g.*, *Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium*, 82 Fed. Reg. 16,378 (Apr. 4, 2017), and accompanying IDM at Comment 9 ("Although NLMK Belgium attempted to provide corrected information in a supplemental questionnaire and during verification, we did not accept it because the changes: 1) constituted untimely-submitted new factual information; and 2) were not minor."); *Certain Carbon and Alloy Steel Cut-to-Length Plate From Italy*, 82 Fed. Reg. 16,345 (Apr. 4, 2017) at IDM at Comment 3 ("the Department's rejection of NVR's weight corrections at verification was correct, given that this information was new factual information within the meaning of 19 CFR 351.102(b)(21)(v) which was untimely-offered under 19 CFR 351.301(c){1}(v).").  As Commerce was ostensibly not accepting factual information in response to the questionnaire beyond what was expressly and specifically requested, Commerce also made clear that it would "not accept factual information from {Plaintiffs or} other interested parties to rebut {Bharat's} questionnaire responses."  *See* Bharat Questionnaire in Lieu of Verification at 1-2 (Appx083332-083333).

Despite these clear admonitions, Commerce nonetheless accepted significant new and unsolicited factual information from Bharat, demonstrating that Commerce treated the questionnaire "in lieu of verification" as just another supplemental questionnaire issued pursuant to 19 U.S.C. § 1677m(d), rather than a "verification" pursuant to 19 U.S.C. § 1677m(i) — the only exception being that Plaintiffs were nonetheless barred from submitting information in rebuttal.  *See* 19 C.F.R. § 351.301(c)(1)(v) (providing interested parties an opportunity to submit factual information to rebut, clarify, or correct a supplemental questionnaire response).  For example, Commerce asked Bharat to "provide a revised version of Exhibit D-29 that: (1) includes full descriptions of the cost centers without truncating the narrative text, and

(2) adds a column in the spreadsheet that identifies the total cost accumulated in each cost center during the POI."  Bharat Questionnaire in Lieu of Verification at 4 (Appx083337).  Rather than limiting its edits to the changes specifically requested by Commerce, Bharat instead submitted a substantively enhanced version of Exhibit D-29 — *i.e.*, Exhibit D-71 — that, among other unsolicited changes, added 25 new and previously undisclosed cost centers.  *See* Plaintiffs' Administrative CB at 3, 10-11, Attachment B (Appx083435, Appx083442-083443, Appx083491-083492).

According to Commerce's questionnaire instructions, its regulations, and its past verification practice, Exhibit D-71 should have been rejected because it contained new, unsolicited factual details.  Commerce chose to ignore its regulations, its past practice, and the clear ground rules it established for the proceeding by accepting Bharat's exhibit *in toto*.  *See* 19 C.F.R. § 351.301(c)(5); 19 C.F.R. § 351.301(d); Bharat Questionnaire in Lieu of Verification at 1-2 (Appx083332-083333) (making clear that Commerce would reject "{u}nsolicited new factual information (*i.e.*, information beyond that which we are requesting), or revisions of previously requested information.").  Commerce then compounded its error by denying Plaintiffs an opportunity to rebut, clarify, or correct Bharat's unsolicited new factual information, as required under 19 C.F.R. § 351.301(c)(1)(v).  Commerce must not be allowed to circumvent the clear rules it created and administer a mechanism for respondents to "pad the record" unchallenged.  Accordingly, this Court should remand the *Final Determination* to Commerce to undertake a verification that comports with the statute, Commerce's own regulations, and its past verification practice.  *See generally Torrington* 82 F.3d at 1049 ("Commerce, like other agencies, must follow its own regulations.") (citations omitted).

**B.   Commerce Further Acted Contrary to Law Because Its Verification "Findings" Were Arbitrary and Unsupported by Substantial Evidence**

If this Court were somehow to determine that Commerce's "verification procedures" —

that is, the issuance of an additional supplemental questionnaire — complied with Commerce's

statutory duty under 19 U.S.C. § 1677m(i), as further explicated by the Statement of

Administrative Action and Commerce's regulations, this Court must then examine whether the

conclusions Commerce reached after applying those procedures, and the explanations thereof,

were supported by substantial evidence.  Under this standard, the Court considers "whether a

reasonable mind might accept the relevant evidence in the record as adequate to support the

results of Commerce's verification."  *Micron Tech.*, 117 F.3d at 1397 (internal citations omitted).

Here, this is not the case.

As this Court has previously explained, "verification is like an audit, the purpose of

which is to test information provided by a party for accuracy and completeness."  *Bomont Indus.

v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990) (cited in *Micron Tech.*, 117 F.3d

at 1396).   Plaintiffs' post-prelim comments raised significant concerns that Bharat had under-

allocated costs to MUC and urged Commerce to further probe the accuracy of Bharat's cost

reporting.  *See* Petitioners' Post-Prelim Comments at 4-8 (Appx083306-083310).  Commerce

accordingly asked Bharat to provide additional details to "{d}emonstrate and explain" how costs

from its MUC-related cost centers were included in its reported costs and otherwise explain why

its cost allocation methodology was reasonable.  *See* Bharat Questionnaire in Lieu of

Verification at 4 (Appx083337).  The purpose of this request was to test the accuracy of Bharat's

cost allocations and the integrity of Bharat's cost reporting generally.

But Bharat failed in this task, as discussed below.  *First*, Bharat's response showed that it

failed to report costs associated with cost centers that Bharat identified as relating solely to

37

MUC, such that its total FEB costs were significantly understated.  *See* Petitioners'
Administrative CB at 11-18 (Appx083443-083450).  *Second*, by failing to include certain cost
centers that cumulate employee costs, Bharat understated its G&A expenses.  *See id.* at 18-26
(Appx083450-083458).  As discussed below, to the extent that Commerce addressed Petitioners'
arguments at all, its "findings" were unsupported by substantial evidence.[8]

> **1.  Commerce's Finding That Bharat Did Not Underreport Its FEB Processing
> Costs Was Erroneous and Not Supported By Substantial Evidence**

By way of background, during the course of the investigation, Bharat reported in Exhibit
D-29 a complete list of manufacturing cost centers which it identified as covering either:

---

[8] Although not the focus of this brief, Commerce relied upon aberrant, unverified data from
Bharat in other areas as well.  For example, the mill test certificates that Bharat provided to
substantiate the accuracy of its product coding included the *same* mill test certificate twice, each
with *different* [                    ] values.  This stunning discrepancy indicated that one or both of
the certificates contained falsified information.  *See* Petitioners' Administrative CB at 6-10
(Appx083438-083442).  But without the benefit of a valid verification procedure, Commerce
considered only the discrepant certificates to be unreliable, and then arbitrarily assumed that the
integrity of all other mill certificates were beyond reproach, consistent with its (then) "facts
otherwise available" approach to the record.  *See* Final IDM at 10-12 (Appx083621-083623)
(stating that Bharat "did not explain the method used by its supplier to generate two mill
certificates with different results," but "{b}ecause this information was provided in response to a
questionnaire in lieu of verification, we were unable to request additional information concerning
the supplier's reporting methods," and concluding that "in general, we find that Bharat
accurately reported the physical characteristics of the MUC" because "we relied on the
information submitted on the record as facts available").

Moreover, as noted previously, Bharat's Exhibit D-71 — the single most important cost exhibit
— added 25 unsolicited cost center records in contravention of Commerce's statement that it
would reject would reject "{u}nsolicited new factual information (*i.e.*, information beyond that
which we are requesting), or revisions of previously requested information."  Petitioners'
Administrative CB at 10-11 (Appx083442-083443).  Commerce arbitrarily accepted such new
factual information because, for example, it "related to merchandise not under consideration,"
*see* Final IDM at 6 (Appx083617), even though the original Exhibit D-29 was already supposed
to be a complete and accurate digest of *all cost centers*, including *all* MUC and *all* non-MUC
cost centers, *see* Bharat Second Supp D QR at 8 (Appx083644) (stating that Exhibit D-29 reports
data for "all manufacturing divisions of Bharat Forge along with respective plant codes and cost
centers"), and the finding that it "related to merchandise not under consideration" was itself
based on new, unsolicited, and unverified factual information.

(1) "MUC" (*i.e.*, relating to merchandise under consideration); (2) "Non MUC" or "NMUC"

(*i.e.*, not relating to merchandise under consideration); or (3) "Non MUC and MUC" (*i.e.*,

relating to *both* non-MUC *and* MUC).  *See* Bharat Second Supp D QR at Exhibit D-29

(Appx083702-083708).  When these cost centers were grouped into Subdivisions that related to

MUC (either in whole or in part), the result was the following [     ] lines:

| Location / Division | Sub Division | Classification |
|---|---|---|


*See* Petitioners' Administrative CB at 13 (Appx083445).

As can be observed from the foregoing list, Bharat reported that the first [     ] lines —

(involving [                    ]) — included Subdivisions that related to *both* MUC and Non-

MUC.  By contrast, Bharat reported that the other [     ] lines — (involving [                    ])

— included Subdivisions purely related to MUC.  Notably absent from Exhibit D-29 were any

cost *amounts*, so Commerce could not readily observe whether the aggregation of relevant

Exhibit D-29 cost centers reconciled with the total FEB processing costs reported by Bharat in

Exhibit 32.2.

In its questionnaire "in lieu of verification," Commerce posed the following questions to

Bharat:

**19.** In Exhibit D-29 you reported [     ] lines for Location/Division/Subdivision that related in whole or in part to MUC.  ***Demonstrate and explain where the costs for each of these locations were included in your reported costs.***

**25.**  In your June 11 supplemental response, you include Exhibit D-29, which purports to be a list of all manufacturing divisions of Bharat along with respective

plant codes and cost centers.  ***Provide a revised version of Exhibit D-29 that: (1)***

***includes full descriptions of cost centers without truncating the narrative text, and (2) adds a column in the spreadsheet that identifies the total cost accumulated in each cost center during the POI.***  For the 5 largest cost center items, provide a screen shot from your [        ] system to corroborate the reported amounts.

Bharat Questionnaire in Lieu of Verification at 3-4 (Appx083336-083337) (emphasis added).

In response to Question 19, Bharat failed to "{d}emonstrate and explain where the costs

for *each* of these locations were included in your reported costs."  *Id.* at 3 (Appx083336)

(emphasis added).  Instead, Bharat only provided an explanation for *one* of the [    ] lines — *i.e.*.

the line relating to the [                                        ] subdivision.  *See* Bharat Response

to Questionnaire in Lieu of Verification (Sep. 15, 2020) at 6 (Appx087373).  Bharat's

explanation showed that the constituent cost centers associated with that line were purely MUC

processing costs, and that [

                    ].  *See id.* at 6-7 (Appx087373-087374).  Importantly, however, Bharat

failed to provide the required demonstration and explanation in relation to the other [    ] lines

relating to FEB [            ] costs.  *See id.* (Appx087373-087374).

In response to Question 25, Bharat submitted a new exhibit — Exhibit D-71 —which

restated the cost center detail from Exhibit D-29 and added a new field for the *amount* of cost

accumulated in each cost center.  *See id.* at Exhibit D-71 (Appx087385-087389).  Exhibit D-71

also included a new field titled "Cost element where such cost is reported to DOC," where

Bharat identified the cost as either: (1) [                                    ];

(2) [                    ]; or (3) [                ].  With this additional information, Exhibit

D-71 constituted an essential piece of evidence for assessing whether the FEB costs that Bharat

reported in Exhibit 32.2 were, in fact, understated.  *See id.* (Appx087385-087389).

Citing to this record evidence, Petitioners argued in their administrative case brief that

Bharat understated its reported FEB [          ] costs to a significant degree.  *See* Petitioners'

Administrative CB at 11-18 (Appx083443-083450).  Petitioners provided two specific examples

— involving the lines for the [        ] and [                    ] Subdivisions — and also

provided an aggregate assessment of the underreporting across all Subdivisions.  *See id.*

(Appx083443-083450).  But in its *Final Determination*, Commerce rejected Petitioners'

analysis, stating in relevant part:

> {R}ecord evidence shows that Bharat did include the costs in question in the
> calculation of its reported in the calculation of its reported costs…. The petitioners
> compare the total costs from the cost center report {*i.e.*, Exhibit D-71} to the total
> cost of the MUC from the cost reconciliation {*i.e.*, Exhibit D-31}, and conclude
> that the costs for the MUC are underreported.  However, this analysis is flawed
> because the cost center report includes costs of both merchandise under
> consideration and merchandise not under consideration, and, thus, reasonably
> reports greater costs than those in the cost reconciliation, which reports only the
> total cost of the MUC.

Final IDM at 6 (Appx083617).  As discussed below, these "findings" by Commerce were

unsupported by substantial evidence.

*First*, with respect to the example involving the [        ] Subdivision, Exhibit D-71

makes clear that this line aggregates data for [      ] cost centers that contained cost amounts —

*i.e.*, [

                                                                            ].  *See* Bharat

Response to Questionnaire in Lieu of Verification at Exhibit D-71  (Appx087385-087389).

Notably, for each of these [      ] cost centers reported in Exhibit D-71, Bharat classified the cost

center as "MUC" and, in the field titled "Cost element where such cost is reported to DOC,"

Bharat described the item as [                                    ].[9]  *See id.* (Appx087385-087389).

Thus, the evidence in Exhibit D-71 indicated that *all* of the [          ] costs from the [      ]

cost centers were purely related to MUC, and were *not* a combination of both MUC and non-

MUC.

 Importantly, Petitioners' administrative case brief demonstrated that the total amount of

MUC-related costs for the [          ] Subdivision (*i.e.*, [                    ]), as shown in

Exhibit D-71, is significantly larger than the total FEB cost amount reported by Bharat for that

Subdivision in Exhibit D-32.2 (*i.e.*, [                    ]).  *See* Petitioners' Administrative CB at

16-17 (Appx083448-083449).  Commerce's "finding" that this difference can be explained by

the fact that these [    ] cost centers also contain non-MUC costs is unsupported by substantial

evidence.  In fact, it is belied entirely by the details disclosed in Exhibit D-71, which makes clear

that these [      ] cost centers relate only to MUC, and indicates a significant underreporting of

FEB processing costs.

 *Second*, with respect to the example involving the [                    ] Subdivision,

Exhibit D-71 makes clear that this line aggregates data for [    ] cost centers that contained cost

amounts — *i.e.*, [                                        ].  *See* Bharat Response to

Questionnaire in Lieu of Verification at Exhibit D-71 (Appx087385-087389).  Notably, for each

of these [    ] cost centers reported in Exhibit D-71, Bharat classified the cost center as "MUC"

and, in the field titled "Cost element where such cost is reported to DOC," Bharat described the

item as [                        ]  *See id.* (Appx087385-087389).  Here again, the evidence

in Exhibit D-71 indicated that *all* of the [              ] costs from the [    ] cost centers were

---

[9] In its response to Commerce's questionnaire "in lieu of verification," Bharat indicated that
[                                                                      ].  *See* Bharat
Response to Questionnaire in Lieu of Verification at 6 (Appx087373).

purely related to MUC, and were *not* a combination of both MUC and non-MUC.  *See id.*

(Appx087385-087389).

Importantly, Petitioners' case brief demonstrates that the total amount of MUC-related

costs for the [                              ] Subdivision (*i.e.*, [                              ]), as shown in Exhibit D-

71, is significantly larger than the total FEB cost amount reported by Bharat for that Subdivision

in Exhibit D-32.2 (*i.e.*, [                              ]).  *See* Petitioners' Administrative CB at 15-16

(Appx083447-083448).  Here again, Commerce's "finding" that this difference can be explained

by the fact that these [   ] cost centers also contain non-MUC costs is unsupported by substantial

evidence.  In fact, it is belied entirely by the details disclosed in Exhibit D-71, which makes clear

that these [   ] cost centers relate only to MUC, and again indicates a significant underreporting

of FEB processing costs.

*Finally*, Petitioners' administrative case brief provided an aggregate analysis, showing

that Bharat's total reported FEB [                              ] cost (per its cost reconciliation in Exhibit D-31)

was only [                              ], while the aggregation of all [                              ] (per the

field titled "Cost element where such cost is reported to DOC") was significantly higher at

[                              ].  *See id.* at 17-18 (Appx083448-083449).  On this point, Commerce's

"finding" was partially correct, but only insofar as there were indeed instances where the field

titled "Cost element where such cost is reported to DOC" [                              ] and

[                              ].  *See*

Bharat Response to Questionnaire in Lieu of Verification at Exhibit D-71 (Appx087385-

087389).  Assuming *arguendo* that Commerce should have accepted the totality of Exhibit D-71

at face value, the more accurate comparison may therefore have been between (1) the total

reported FEB processing cost per Bharat's cost reconciliation in Exhibit D-31 (*i.e.*,

[                    ]), and (2) those cost centers in Exhibit D-71 where *both* [

                                                                    ] *and* [

                                                                    ]

(*i.e.*, [                    ]).  *See id.* (Appx087385-087389).  But under this analysis, there is

again no substantial evidence for Commerce to find that Bharat reported all FEB processing

costs for the calculation of its dumping margin.  To the contrary, there is still an understatement

of [      ] *percent*.

  In sum, Commerce's dismissal of these massive discrepancies — and the resulting

understatement of Bharat's FEB processing costs — was based on a readily discernable error of

fact.  Commerce's factual error would have been blatantly obvious in the context of any valid

verification where Commerce engaged with the record evidence and reasonably probed the

accuracy of Bharat's reported data.  But having failed to follow such procedures, Commerce's

findings were unsupported by substantial evidence and a remand is therefore required.

  **2.** **Commerce's Finding That Bharat Did Not Underreport Its G&A Expenses Was Unreasonable and Not Supported By Substantial Evidence**

  As for Bharat's G&A reporting, Commerce grossly mischaracterized Plaintiffs' argument

and then rendered a "finding" that was not supported by substantial evidence.  *First*, in its *Final*

*Determination*, Commerce mischaracterized Petitioners' argument as being that "Bharat

underreported its G&A expenses by not including certain cost centers from Bharat's cost center

report {*i.e.*, Exhibit D-71,} in the calculation of costs for employee benefits which is included in

the numerator of the *G&A expense ratio*."  Final IDM at 6 (Appx083617) (emphasis added).  But

to be clear, Petitioners argued that "*Bharat understated the G&A allocation ratio by failing to*

*include in the numerator certain cost centers that cumulate employee cost*."  Petitioners'

Administrative CB at 23 (Appx083455) (emphasis in original).  Clearly, in the *Final*

*Determination*, Commerce confused the critical distinction between (1) the "G&A allocation ratio," which "determines the share of employee benefit expenses reported in the profit and loss statement which are treated as G&A and contribute to the G&A financial ratio…applied in the cost tape," *see id.* at 21 (Appx083453), and (2) the "G&A expense ratio" (aka the "G&A financial ratio"), which is the ratio that gets multiplied by a respondent's cost of manufacture to calculate the amount of G&A expenses.

Commerce then went on to mischaracterize the specifics of Petitioners' argument, erroneously suggesting that Petitioners somehow expected that *all* of the omitted cost centers must have included employee benefits.  On this point, Commerce's *Final Determination* stated: "Contrary to petitioners' assertion, all of the cost centers from the cost center report may not include employee benefits, so it is expected that some of the cost centers from the cost center report may not be included in the calculation of employee benefit cost."  Final IDM at 6 (Appx083617).  But Commerce's analysis was arbitrary and unreasonable, as it failed to understand and address what Plaintiffs actually argued.

To be clear, Petitioners never suggested that *all* of the unreported cost centers must have included employee benefit costs and, therefore, needed to be included in the numerator of the *G&A expense ratio*.  *See* Petitioners' Administrative CB at 18-26 (Appx083450-083458).  Rather, Petitioners argued that *certain* of the unreported cost centers appeared to include employee benefit costs and, therefore, needed to be included in the numerator of Bharat's *G&A allocation ratio*.  *See id.* (Appx083450-083458).

For example, as detailed in Petitioners' administrative case brief, Bharat generally reported administrative costs relating to both the [        ] and [          ] locations.  Bharat included cost center [        ], which relates to [                    ], but then glaringly

omitted cost center [          ], which relates to [                              ].  Similarly, Bharat

included cost center [          ], which relates to [                              ], but then

glaringly omitted cost center [          ], which relates to [                              ].

Petitioners therefore observed that *certain* cost centers — such as [                    ] and

[                              ] — clearly involved "employee costs and should therefore have

been included in the calculation of the numerator of the G&A allocation ratio."  *See id.* at 23-25

(Appx083455-083457).

In mischaracterizing Petitioners' argument, Commerce failed to address these essential

points and rendered a decision that was unreasonable and unsupported by substantial record

evidence.  Consistent with the standards delineated by the Federal Circuit and the U.S. Supreme

Court, *see NMB Sing.*, 557 F.3d at 1320; *Fla. Power*, 470 U.S. at 744, this Court has regularly

remanded determinations where Commerce has failed to adequately address significant

arguments raised administratively.  *See, e.g.*, *Coal. of Am. Flange Producers v. United States*,

448 F. Supp. 3d 1340, 1352-1353, 1355 (Ct. Int'l Trade 2020) ("Commerce did not address

information raised that may cast doubt on the reasonableness of a position taken by the agency.

Therefore, the agency's explanation does not illustrate whether Commerce accounted for and

rejected the questions raised by the logo provision or entirely failed to consider an important

aspect of the problem.") (internal citations omitted); *Hyundai Heavy Indus. Co., Ltd. v. United

States*, 393 F. Supp. 3d 1293, 1319 n.31 (Ct. Int'l Trade 2019) ("Although HHI presented several

arguments with respect to Commerce's preliminary affiliation finding, Commerce did not

analyze those arguments….Commerce must address those arguments upon reconsideration on

remand.") (internal citations omitted); *Vinh Hoan Corp. v. United States*, 49 F. Supp. 3d 1285,

1315 (Ct. Int'l Trade 2015) (ordering remand where Commerce's "explanation is unresponsive

PUBLIC VERSION

to the argument that Plaintiffs are making" leaving it "not clear to the court how Commerce has addressed {Plaintiff's} argument" and requiring that Commerce "should address this argument on remand").

Had Commerce conducted a valid verification, it presumably would have been immersed in the record and better positioned to engage on the facts and address Plaintiffs' arguments concerning Bharat's underreported G&A expenses. But without any valid verification procedures, it instead casually dismissed Plaintiffs' arguments without properly understanding and addressing them. Commerce's "findings" concerning the accuracy of Bharat's reported G&A expenses were unsupported by substantial evidence. And given Commerce's failure to analyze the arguments raised by Petitioners in its *Final Determination*, the Court should instruct Commerce to address these points on remand.

\*          \*          \*

In sum, Bharat's response to Commerce's questionnaire "in lieu of" verification in no way "{d}emonstrate{d} or explain{ed}" the validity of its cost reporting, nor did it demonstrate that Bharat's cost allocation methodology was reasonable. *See* Bharat Questionnaire in Lieu of Verification at 4 (Appx083337). To the contrary, Bharat's response to that questionnaire — and, in particular, Exhibit D-71 — provided direct evidence that Bharat had understated both its processing costs and its G&A expenses associated with its FEB production. *See generally* Plaintiffs' Administrative CB at 11-26 (Appx083443-083458). Commerce's decision to uncritically accept Bharat's unverified cost reporting, whether as "facts otherwise available" or otherwise, as well as Commerce's failure to specifically address Plaintiffs' arguments, constituted unreasonable agency action unsupported by substantial evidence. *See Micron Tech*.,

117 F.3d. at 1397.  Accordingly, the Court should remand to Commerce for further consideration and fact-finding through lawful verification procedures.

## CONCLUSION

Plaintiffs engaged early and often with Commerce to ensure the development of a complete, verified administrative record in order to guard against Bharat being able to allocate away costs from subject FEBs, thereby masking the extent of its dumping.  Commerce unlawfully failed to conduct a verification as required under the law.  Commerce further failed to support its conclusions with substantial evidence because it did not meaningfully engage with the record — or address certain of Plaintiffs' arguments — in considering whether the data relied upon were accurate and correct.  Accordingly, this Court should remand the *Final Determination* and the *Final Results of Redetermination Pursuant to Court Remand* back to Commerce with instructions that Commerce verify Bharat's responses and make new factual findings where appropriate.

\*       \*       \*

Respectfully submitted,

/s/ Jack A. Levy ___
Jack A. Levy
Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301
jlevy@cassidylevy.com

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

PUBLIC VERSION

### Certificate of Compliance with Chambers Procedures 2(B)(1)

The undersigned hereby certifies that the foregoing brief contains 13,939 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:   /s/ Jack A. Levy
           Jack A. Levy