## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE

| | |
|---|---|
| ELLWOOD CITY FORGE COMPANY,<br>ELLWOOD NATIONAL STEEL COMPANY,<br>ELLWOOD QUALITY STEELS COMPANY, and<br>A. FINKL & SONS,<br><br>       Plaintiffs,<br><br>   v.<br><br>UNITED STATES,<br><br>       Defendant,<br>   and<br><br>BHARAT FORGE LIMITED,<br><br>    Defendant-Intervenor. | Court No. 21-00007<br><br>**NON-CONFIDENTIAL VERSION**<br><br>Business Proprietary Information<br>Removed from Brackets on Pages 21-22. |

## REPLY BRIEF OF PLAINTIFFS ELLWOOD CITY FORGE COMPANY, ELLWOOD QUALITY STEELS COMPANY, ELLWOOD NATIONAL STEEL COMPANY, AND A. FINKL & SONS IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Jack A. Levy
Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301

*Counsel to Ellwood City Forge Company, Ellwood National Steel Company, Ellwood Quality Steels Company, and A. Finkl & Sons*

Dated:  June 17, 2022

NON-CONFIDENTIAL VERSION

## **Table of Contents**

Page

I.   The Statute and Commerce's Regulations Mandate In-Country Verification ....................... 3

II.  The Statute and Commerce's Regulations Mandate a Timely Verification Report; Commerce's Failure to Provide One Was Not "Harmless Error" ......................................... 7

III. Defendant and Defendant-Intervenor Rely Extensively on Inapplicable Affirmative Defenses to Commerce's Failure to Conduct Verification ....................................................... 9

    A.  Plaintiffs Did Not "Agree With Commerce's Verification Methodology" or its Failure to Issue a Verification Report During the Investigation .................................. 10

    B.  Plaintiffs Exhausted Their Administrative Remedies; Bharat Confuses the Final Determination with the *Remand Redetermination* .......................................... 12

IV.  Even if this Court Reaches *Chevron* Step Two, Commerce's Verification Questionnaire Was Not a Reasonable Methodology Under the Statute .............................. 16

V.   Commerce's Rationales for Accepting Bharat's Flawed Cost Reporting Were Unsupported by Substantial Evidence .......................................................................... 19

    A.  Commerce's Acceptance of Unsolicited Information at "Verification" Was Arbitrary…................................................................................................................. 19

    B.  Commerce's Finding that Bharat Did Not Underreport FEB Processing Costs Is Unsupported by Substantial Evidence ....................................................................... 21

    C.  Commerce's Finding that Bharat's G&A Expenses Were Not Underreported Is Unsupported by Substantial Evidence ....................................................................... 23

# Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1677m(i) ................................................................................................. *passim*

19 U.S.C. § 1677m(i)(1) ...............................................................................................4, 10

19 U.S.C. §§ 1677e(a)-(b)...................................................................................................5

28 U.S.C. § 2637(d) ..........................................................................................................14

Regulations

19 C.F.R. § 351.303(f)(3)(ii) ..............................................................................................9

19 C.F.R. § 351.307(b)(1)(i) ...............................................................................................6

19 C.F.R. § 351.307(c)........................................................................................................8

19 C.F.R. § 351.307(d) ....................................................................................................6, 9

19 C.F.R. § 351.309(c)(1)(i) .............................................................................................15

19 C.F.R. § 351.309(c)(2).............................................................................................14, 15

Court Decisions

*Adams Fruit Co. v. Barrett,* 494 U.S. 638 (1990)............................................................14

*AK Steel Corp. v. United States,* 192 F.3d 1367 (Fed. Cir. 1999) ....................................8

*Am. Alloys v. United States*, 30 F.3d 1496 (Fed. Cir. 1994) ..............................................3

*Am. Farm Lines v. Black Ball Freight Serv.,* 397 U.S. 532 (1970) ...................................7

*Baroque Timber Indus. (Zhongshan) Co. v. United States,* 925 F. Supp.
2d 1332 (Ct. Int'l Trade 2013).........................................................................................14

*Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204 (1988) ...............................................16

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467
U.S. 837 (1984)........................................................................................................ *passim*

*Ellwood City Forge v. United States,* USCIT Ct. No. 21-00073, Slip Op.
22-66 (June 14, 2022)...............................................................................................2, 8, 10

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) ................................................................. *passim*

*Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States,* 25 C.I.T. 1150 (2001) ...................................................................................................3, 4

*Gleason Indus. Prods. v. United States,* 556 F. Supp. 2d 1344 (Ct. Int'l Trade 2008) .................................................................................................. 13

*Goodluck India Ltd. v. United States,* 11 F. 4th 1335 (Fed. Cir. 2021) ...................................3, 20

*Hercules, Inc. v. United States,* 11 C.I.T. 710 (1987) ..................................................................4

*Hitachi Energy USA Inc. v. United States,* Ct. No. 2020-2114, __ F.4th __ (Fed. Cir. 2022) ......................................................................................6

*Hor Liang Indus. Corp. v. United States,* 337 F. Supp. 3d 1310 (Ct. Int'l Trade 2018) ..................................................................................................14

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) .................................................................................3

*Ipsco, Inc. v. United States,* 899 F.2d 1192 (Fed. Cir. 1990) ......................................................19

*Intercargo Ins. Co. v. United States,* 83 F.3d 391 (Fed. Cir. 1996) ...........................................9

*Mabus v. Gen. Dynamics C4 Sys.,* 633 F.3d 1356 (Fed. Cir. 2011) .........................................11

*McCarthy v. Madigan,* 503 U.S. 140 (1992) ..........................................................................2

*Micron Tech., Inc. v. United States*, 117 F.3d 1386 (Fed. Cir. 1997) ...........................................3

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ...............................................................................................22

*MTZ Polyfilms, Ltd. v. United States,* 659 F. Supp. 2d 1303 (Ct. Int'l Trade 2009) ...........................................................................................10, 11, 16

*Nakornthai Strip Mill Pub. Co. v. United States,* 587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008) .............................................................................. 13

*Pam S.p.A. v. United States,* 463 F.3d 1345 (Fed. Cir. 2006) ......................................................9

*Parisi v. Davidson,* 405 U.S. 34 (1972) ..............................................................................14

*Petrella v. MGM,* 572 U.S. 663 (2014) ...............................................................................11

*Timex V.I., Inc. v. United States,* 157 F.3d 879 (Fed. Cir. 1998) ...................................................3

*Timken Co. v. United States,* 630 F. Supp. 1327 (Ct. Int'l Trade 1986) .......................................14

*Trust Chem Co. v. United States,* 791 F. Supp. 2d 1257 (Ct. Int'l Trade 2011) ..................................................................................................15

*Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ......................................6

*United States v. L.A. Tucker Truck Lines,* 344 U.S. 33 (1952) ........................12

*United States Steel Corp. v. United States,* 36 C.I.T. 534 (2012) ....................13

*U.S. Steel Grp. v. United States,* 21 C.I.T. 761 (1997) ......................................4

*Util. Air Regulatory Grp. v. EPA,* 573 U.S. 302 (2014) ....................................6

*Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353 (Fed. Cir. 2019).......................................................................................................15

<u>Administrative Determinations</u>

*Brake Rotors From the People's Republic of China,* 64 Fed. Reg. 61,581 (Nov. 12, 1999)......................................................................................................6

*Polyethylene Terephthalate Resin From Pakistan: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 48,281 (Sep. 24, 2018) ........................................6

<u>Other Legislative Materials</u>

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) .............................................. *passim*

<u>Constitution</u>

U.S. Const. Art. 1 § 1...............................................................................................6

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE STEPHEN ALEXANDER VADEN, JUDGE**

|  |  |  |
|---|---|---|
| ELLWOOD CITY FORGE COMPANY, ELLWOOD NATIONAL STEEL COMPANY, ELLWOOD QUALITY STEELS COMPANY, and A. FINKL & SONS, | ) ) ) ) ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
| v. | ) ) | Court No. 21-00007 |
| UNITED STATES, | ) | **NON-CONFIDENTIAL VERSION** |
|  | ) |  |
| Defendant, | ) ) | Business Proprietary Information Removed from Brackets on Pages 21-22. |
| and | ) |  |
| BHARAT FORGE LIMITED, | ) ) |  |
| Defendant-Intervenor. | ) ) ) ) |  |

**REPLY BRIEF OF PLAINTIFFS IN SUPPORT OF THEIR RULE 56.2 MOTION
FOR JUDGMENT ON THE AGENCY RECORD**

Ellwood City Forge Company, Ellwood Quality Steels Company, Ellwood National Steel Company, and A. Finkl & Sons (collectively, "Plaintiffs" or "Petitioners") respectfully submit this reply to the response briefs filed by the United States ("the Government"), ECF Doc. 38 (May 10, 2022) ("Govt Br."); and Bharat Forge Limited ("Bharat"), ECF Doc. 39 (May 20, 2022) ("Bharat Br.").  Neither party has identified a lawful justification for the persistent refusal of the U.S. Department of Commerce ("Commerce") to conduct a statutorily compliant verification and issue a timely verification report for comment by the parties; nor has any party identified substantial record evidence to support Commerce's reliance on Bharat's flawed cost reporting.

NON-CONFIDENTIAL VERSION

On remand, Commerce continued to give Bharat a "free pass" and allow it to skirt the rigors of on-site verification, reasoning that the Indian government's travel preferences during part of the original investigation outweighed domestic FEB producers' statutory right to relief from Bharat's injurious dumping. *See* Remand Redetermination at 9. The *de minimis* rate resulting from Commerce's abdication of this basic statutory duty allows Bharat to continue dumping with impunity. And despite this court's invitation to rectify Commerce's verification shortcomings during remand, Commerce again declined to conduct any verification and instead adopted a new rationale for reaching the same practical result.

Commerce was *required* to conduct in-country verification and issue a verification report *prior to* its final determination. In an effort to excuse Commerce's failure to follow the law, the Government and Bharat lean heavily on affirmative defenses aimed at scenarios not presently before this court. Unlike the situation recently addressed in *Ellwood City Forge Co. v. United States*, Slip Op. 22-66, this appeal returns to this court after a voluntary remand wherein Commerce sought to reconsider its approach to verification, Plaintiffs exhausted their arguments in comments on Commerce's draft remand redetermination, and Commerce responded to those comments in its *Remand Redetermination*. Thus, the "twin purposes of protecting administrative agency authority and promoting judicial efficiency," *McCarthy v. Madigan*, 503 U.S. 140, 144-45 (1992), have been fully served.

As for Commerce's reliance upon Bharat's flawed production cost and G&A expense reporting, the Government's response only underscores the necessity of further remand. Concerning Bharat's untimely submission of 25 new cost centers, the Government concedes these cost centers were in fact "additional," and conspicuously fails to address the long line of contrary agency practice and Commerce's own questionnaire instructions in this investigation.

Regarding Commerce's acceptance of underreported FEB production costs, the Government simply points to Commerce's flawed rationale and otherwise advances an entirely *post hoc* justification based on arguments from Bharat's administrative reply brief that depend upon yet more untimely factual information.  Finally, the Government's defense of Commerce's failure to adequately vet Bharat's G&A expense calculation merely confirms Commerce has been focusing on the wrong part of the equation all along, and failed to even consider Plaintiffs' actual argument.

In short, remand is required.

## I.   The Statute and Commerce's Regulations Mandate In-Country Verification

With respect to verification, Plaintiffs' primary argument is that Commerce's reliance on a mere questionnaire was unlawful because the statute and Commerce's regulations mandate in-country, on-site verification.  This requirement is unambiguous, and Commerce's violation thereof is identifiable at *Chevron* step one.  It is undisputed that the Statement of Administrative Action ("SAA") is key to interpreting the statutory language.  *See* Revised Opening Br. at 18, 20 (citing *Kisor* & SAA); Govt Br. at 6 (citing *Timex*); Govt Br. at 9-10 (citing SAA).  Implicitly recognizing the weakness of its position, the Government devotes only two paragraphs to arguing that no in-country verification requirement exists, but relies on misconstructions of precedent and the SAA.  *See* Govt Br. at 8-10.

The Government first cites several cases for the proposition that Commerce has "latitude to derive verification procedures *ad hoc*."  *Id.* at 9; *see also id.* at 19.  But none of the Government's cases treat an off-site and out-of-country exercise as a "verification" within the meaning of 19 U.S.C. § 1677m(i) and the SAA.  Indeed, in *all* of the court cases cited by the Government, Commerce conducted an on-site verification.  *See* Revised Opening Br. at 23 (addressing *Goodluck India*, *Micron Tech.*, and *Am. Alloys*); *Fujian Mach. & Equip. Imp. & Exp.*

*Corp. v. United States*, 25 C.I.T. 1150, 1151 (2001).  Thus, whatever latitude Commerce has

with respect to the minutiae of verification, no court has extended this notion to Commerce's

violation of the minimum statutory prerequisite that verification be on-site and in-country.

Rather, the Government's citations merely underscore how consistently Commerce has observed

the in-country requirement.  This is also true of the dated opinions cited at the end of the

Government's legal argument.  *See* Govt Br. at 9-10.  Neither case discussed out-of-country

verification.  Both, moreover, predated the SAA.  *See U.S. Steel Grp. v. United States*, 21 C.I.T.

761 (1997) (assessing the minutiae of Commerce's comparison methodology); *Hercules, Inc. v.

United States*, 11 C.I.T. 710, 727 (1987) (describing in-country verification, addressing

challenges to other minutiae).

The only case to discuss out-of-country verification, *see* Govt Br. at 11 (citing

*Torrington*), concerned an administrative review, wherein verification was not mandatory.  *See

Torrington Co. v. United States*, 68 F.3d 1347, 1350 (Fed. Cir. 1995).  *Torrington* applied the

pre-URAA, pre-SAA statute, held that Commerce could lawfully "cancel the verifications"

altogether, and reasoned that "because" of this Commerce could conduct verifications in

Washington, D.C.  *Id.* at 1352.  *Torrington* is not instructive because Commerce has no

discretion to cancel verification in an investigation.  *See* 19 U.S.C. § 1677m(i)(1).

Next, recognizing that the SAA is key to interpreting the meaning of "verification" in 19

U.S.C. § 1677m(i), the Government sets forth an alternative reading of the SAA.  *See* Govt Br. at

9-10.  Substantively, the Government's framing mixes up sentences from different paragraphs

and simply ignores inconvenient portions.  *See id*.  For clarity, the relevant passage is

reproduced, in order, below:

> The regulations will provide that Commerce will verify information in a foreign
> country only after: (1) obtaining agreement from the persons whose information

will be examined; and (2) notifying the foreign government concerned of the details of the verification. Consistent with current practice, if the foreign government concerned or the person whose information is to be verified objects to verification, Commerce will not conduct the verification and may disregard the submitted information in favor of the facts available, pursuant to amended section 776(a)(4).

{*paragraph two, concerning advance notice and the treatment of proprietary information by non-government verifiers, is omitted*}

As under existing practice, where practicable, verification will be conducted after receipt of all questionnaire responses, and Commerce should provide advance notice as to the general nature of the information which will be requested….

The regulations also should require Commerce, consistent with its current practice, to report the methods, procedures, and results of the verification prior to making its final determination in an investigation….

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc 103-316, Vol. 1 (1994) at 868.

The Government would have this court believe that the first sentence of the first paragraph merely restricts one of innumerable options for verification, and otherwise claims, in an apparent *non sequitur*, to have complied with the first sentence of the third paragraph. *See* Govt Br. at 9-10. Regarding the latter, the Government's reliance on a mere questionnaire to "verify" is incompatible with conducting verification "*after* receipt of *all* questionnaire responses." SAA at 868 (emphasis supplied). The first paragraph, for its part, specifies notice and agreement requirements for in-country verification, but it *also* specifies consequences wherever "the foreign government concerned or the person whose information is to be verified objects"—Commerce "***will not conduct the verification***." *Id*. The Government ignores this entirely. *See* Govt Br. at 10. The SAA's mandate—that wherever the prerequisites to in-country verification are not met Commerce "will not conduct the verification"—requires that Commerce verify information in-country, or apply 19 U.S.C. §§ 1677e(a)-(b).

NON-CONFIDENTIAL VERSION

Commerce recognized the foregoing in drafting its regulations.  The Government limited its regulatory discussion exclusively to 19 C.F.R. § 351.307(b)(1)(i).  *See* Govt Br. at 9 & n.1. This misses the mark.  As Plaintiffs argued, and the Federal Circuit confirmed, per 19 C.F.R. § 351.307(d), "'{v}erification' is conducted *by visiting the foreign company's facilities* to review 'all files, records and personnel' relevant to the inquiry."  *Hitachi Energy USA Inc. v. United States*, Ct. No. 2020-2114, __ F.4th __, Slip Op. at 9 n.2 (Fed. Cir. 2022) (emphasis supplied) (internal citations omitted); *see also* Revised Opening Br. at 20-21.

Finally, the Government suggests that because Commerce has in one instance not performed in-country verification, and in another instance performed in-country, off-site "verification," it is permitted to violate the statute in perpetuity.  *See* Govt Br. at 11 (citing *PET Resin* and *Brakes Rotors*).  But Commerce's references to *its own* prior practice are fundamentally irrelevant to Plaintiffs' *Chevron* step one argument because the statutory mandate that "verification" be on-site and in-country is unambiguous.  As the Supreme Court stated, "{t}|he power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration.  *But it does not include a power to revise clear statutory terms that turn out not to work in practice.*" *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 327 (2014) (emphasis supplied); *see also* Revised Opening Br. at 20-22 (statutory argument without reference to agency practice).  The Constitution vests Congress—not Commerce—with the power to amend the antidumping statute and SAA.  *See* U.S. Const. Art. 1 § 1.  In any event, the overwhelming predominance of in-country verification is undisputed; and the validity of Commerce's approaches to "verification" in *PET Resin* and *Brake Rotors* were never addressed—much less condoned—by any court.

Accordingly, as the requirement of in-country, on-site verification is identifiable at *Chevron* step one, remand is necessary for Commerce to comply with this mandate.

## II.  The Statute and Commerce's Regulations Mandate a Timely Verification Report; Commerce's Failure to Provide One Was Not "Harmless Error"

The Government acknowledges Commerce's obligation to produce a verification report. Govt Br. at 21.  Commerce's *Remand Redetermination* forthrightly acknowledged that it "did not issue a verification report in accordance with 19 C.F.R. § 351.307(b)-(d)," Remand Redetermination at 8-9, yet the Government now claims Commerce "met this obligation," Govt Br. at 21 (citing regulation).  The Government elsewhere recites Commerce's *Remand Redetermination* rationale, without a word of response to Plaintiffs' opening arguments. *Compare* Govt Br. at 21-22, *with* Revised Opening Br. at 23-24.  As Plaintiffs explained, the constellation of documents on which the Government relies are insufficient because they are variously untimely and not from Commerce, as the SAA and Commerce's own regulations both require.  *See* Revised Opening Br. at 23-24.

Rather than explain Commerce's failure to issue a verification report, the Government devotes most of its argument on this issue to claiming that Plaintiffs suffered no harm.  *See* Govt Br. at 22-23.  The Government asserts that "substantial prejudice" to Plaintiffs must be shown to warrant remand.  *Id.* at 23.  This notion is derived from *American Farm Lines*, which states:

> it is always within the discretion of a court or an administrative agency to relax or modify its *procedural rules* adopted for the orderly transaction of business before it *when in a given case the ends of justice require it*. The action of either *in such a case* is not reviewable except upon a showing of substantial prejudice to the complaining party.

*Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) (emphasis supplied).

*American Farm Lines* makes plain that the substantial prejudice hurdle is only erected after two

prerequisites are satisfied: (1) the ends of justice required the modification; and (2) the modified rule was procedural in nature.  Neither prerequisite is satisfied here.[1]

*First*, the Government's brief makes no attempt to explain what "require{d}" Commerce not to issue a verification report.  *See* Govt Br. at 22-23.  The *Remand Redetermination* asserts generally that all verification-related procedures in this investigation were rooted in Commerce's inability to conduct on-site verification, *see* Remand Redetermination at 9, but makes no effort to explain how this "require{d}" Commerce not to prepare a timely report.  Merely reciting two unrelated facts is no explanation at all.  Unless the Supreme Court's language were merely an empty recitation, Commerce was obligated to explain what required it not to prepare a verification report.  *See* 19 C.F.R. § 351.307(c); 19 U.S.C. § 1677m(i); SAA at 868.

*Second*, Commerce's failure to issue a verification report is not merely procedural in character.  A verification report is a piece of substantive record evidence that explains the "methods, procedures, and results of a verification."  SAA at 868; 19 C.F.R. § 351.307(c).  The contents of such reports and their significance is often argued at length before Commerce and the courts in determining whether Commerce's determination is supported by substantial evidence. *See, e.g., AK Steel Corp. v. United States*, 192 F.3d 1367, 1384 (Fed. Cir. 1999) ("Although not specifically discussed in the Final Determination, we conclude that Commerce relied on record evidence, specifically the Verification Report of the Government of Korea….").  Commerce now variously claims that documents created by Bharat and documents that were unavailable until after the investigation concluded constitute a verification report.  *See* Govt Br. at 21 (pointing to, *e.g.*, Bharat's questionnaire response and Commerce's IDM).  These are not a valid substitute for

---

[1] Neither prerequisite was considered by *Ellwood City Forge Co.*, USCIT Ct. No. 21-00073, Slip Op. 22-66 (June 14, 2022) at 34 n.5.

the statutory verification report and, critically, deprived Plaintiffs the ability to advance arguments and analysis both before the agency and before the court based on Commerce's substantive findings at its so-called "verification."

For these reasons as well, if required, "substantial prejudice" exists here. "Prejudice, as used in this setting, means injury to an interest that the statute, regulation, or rule in question was designed to protect." *Intercargo Ins. Co. v. United States*, 83 F.3d 391, 396 (Fed. Cir. 1996). Here, a timely report of the "methods, procedures and results of a verification" protects parties' interest in access to substantive information concerning verification that can be used to influence agency decision-making. Unlike *Pam*, where Commerce effectively "cured" a failure to timely notify the plaintiff by subsequently granting extensions of time, *see* 463 F.3d 1345, 1349 (Fed. Cir. 2006) (assessing violation of 19 C.F.R. § 351.303(f)(3)(ii)), Commerce's "curing" action here—*i.e.,* issuing the Final IDM—was inadequate. Rather than generally reporting on the "methods, procedures, and results of a verification," 19 C.F.R. § 351.307(d), the Final IDM merely *responds* to arguments independently raised by Plaintiffs. It is impossible for Plaintiffs to know what they might have argued administratively, had an actual verification report existed. Moreover, the Final IDM came too late to have any practical relevance.

## III. Defendant and Defendant-Intervenor Rely Extensively on Inapplicable Affirmative Defenses to Commerce's Failure to Conduct Verification

The Government and Bharat would have this court believe that the administrative determination under review is Commerce's final determination. Govt Br. at 2; Bharat Br. at 1-2. This is incorrect. The administrative determination under review is, in fact, the Government's *Remand Redetermination*—which is "new agency action" that reversed Commerce's "prior reasons" with respect to verification. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907-08 (2020) ("*DHS*"); Revised Opening Br. at 14-16 (describing reversal).

Where, as here, Commerce proffers "new" reasoning on remand it "must comply with the procedural requirements for new agency action."  *See DHS*, 140 S. Ct. at 1907-08.  This includes Commerce's obligation to verify all information relied upon in "a final determination in an investigation."  19 U.S.C. § 1677m(i)(1).

This posture, which stems directly from the Government's voluntary decision to request remand on this very issue, completely changes the landscape with respect to the affirmative defenses raised by the Government and Bharat, as compared to other recent appellate actions. *See generally Ellwood City Forge v. United States*, USCIT Ct. No. 21-00073, Slip Op. 22-66 (June 14, 2022); *Ellwood City Forge v. United States*, USCIT Consol. Ct. No. 21-00077 (neither concerning remand results).  In short, the Government cannot have the benefit of proffering a new rationale in the *Remand Redetermination* without following statutory protocols.  There is no question that Plaintiffs extensively argued, and Commerce in fact considered, these verification issues during remand proceedings.  *See* Plaintiffs' Comments on Draft Remand Redetermination at 2-6 (Appx087452-087456).  As a result, neither the Government's claims regarding Plaintiffs' positions in the investigation, *see* Govt Br. at 5, 8, 15, 17, 22, nor Bharat's exhaustion arguments, *see* Bharat Br. at 3-5, have any validity or merit.

### A.   Plaintiffs Did Not "Agree With Commerce's Verification Methodology" or its Failure to Issue a Verification Report During the Investigation

The Government seeks to repurpose the record of the original investigation into what appears to be a quasi-equitable estoppel defense.  The Government, however, never uses the term "estoppel," nor does it identify *any* legal authority indicating what consequences the Government is seeking.  To the extent it can be considered an argument, it is most certainly "skeletal," and thus waived.  *See, e.g.*, *MTZ Polyfilms, Ltd. v. United States*, 659 F. Supp. 2d 1303, 1308 (Ct. Int'l Trade 2009) ("'{i}ssues adverted to in a perfunctory manner, unaccompanied by some

effort at developed argumentation, are deemed waived.  It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work…").  Nor is this court independently obligated to consider this particular matter.  *Cf.* CIT Rule 8(d) (requiring that estoppel be pled as an affirmative defense).

In any event, the Government's position is hollow.  Its examples are limited to statements made prior to Commerce's original final determination.  *See* Govt Br. at 5, 8, 15-17, 22.  *In that very determination* Commerce itself concluded that "on-site verifications a{re} required under section 782(i) of the Act."  Final IDM at 2 (Appx083613).  It is absurd for the Government to now imply that Petitioners are estopped from asserting *the very same position* that the Government itself espoused immediately after the challenged statements.

Moreover, "{t}he gravamen of estoppel…is misleading and a consequent loss," *Petrella v. MGM*, 572 U.S. 663, 684 (2014),[2] and the record contains nothing approaching misleading conduct by Plaintiffs.  During the investigation, Plaintiffs (1) asserted that the statute required on-site verification (*e.g.*, Appx083328, Appx087607)); and (2) proposed questions for a "verification outline," consistent with Commerce's on-site practice (*e.g.*, Appx083325).

To be sure, after Commerce had promulgated its unlawful questionnaire-based alternative to verification, Plaintiffs argued for procedural strictures (*e.g.*, strict deadlines) in an effort to make the best of it (*e.g.*, Appx087594, 087604), but this hardly excuses the unlawfulness of Commerce's refusal to conduct verification on-site in the first place.  Importantly, Plaintiffs specifically criticized Commerce's extraordinary accommodation of Bharat through a "pared

---

[2] The Federal Circuit typically frames the analysis as having three steps.  *See*, *e.g.*, *Mabus v. Gen. Dynamics C4 Sys.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011).

down verification questionnaire instead of conducting robust on-site verification."  Petitioners'

Opposition to Second Extension (Sept. 11, 2020) at 4 (Appx087607).

Finally, while the Government presses a similar story in defending the absence of a

verification report, *see* Govt Br. at 22 (claiming Ellwood "approvingly discussed" Commerce's

methods), it cites part of the record with no mention of a verification report, *see* Public

Transcript at 12 (Appx083548).  Yet, *on the very next page*, Plaintiffs specifically noted that in

"an ordinary case…there would already now be on the record a scathing written cost verification

report for all to see…."  *Id.* at 13 (Appx083549).

In sum, in asserting that Plaintiffs condoned Commerce's verification questionnaire and

failure to issue a verification report without reservation, the Government simply mischaracterizes

the administrative record.

**B.  Plaintiffs Exhausted Their Administrative Remedies; Bharat Confuses the Final Determination with the *Remand Redetermination***

Bharat's exhaustion salvos are aimed at a nonexistent scenario.  *See* Bharat Br. at 3-5.

Currently before this court is Plaintiffs' challenge to Commerce's *Remand Redetermination*.

This redetermination advances entirely new reasoning in defense of Commerce's verification

procedures, thus making the redetermination "new" agency action.  *See DHS*, 140 S. Ct. at 1907-

08.  Such a redetermination "must comply with the procedural requirements for new agency

action," *see id.*, meaning that Plaintiffs' arguments with respect to Commerce's procedural

obligations to conduct an in-country, on-site verification and issue a verification report prior to

the issuance of this redetermination were properly exhausted during remand, *see* Plaintiffs'

Comments on Draft Remand Redetermination at 1-6.  In its *Remand Redetermination*,

Commerce has thus "erred against objection."  *United States v. L.A. Tucker Truck Lines*, 344

U.S. 33, 37 (1952).

NON-CONFIDENTIAL VERSION

As the CIT has held, a voluntary remand renders exhaustion arguments "moot" where Commerce "request{ed} to review new issues raised by {Plaintiff} subsequent to Commerce's original determination."[3] *Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303, 1312 (Ct. Int'l Trade 2008) (characterizing *Gleason Indus. Prods. v. United States*, 556 F. Supp. 2d 1344, 1346 n.2 (Ct. Int'l Trade 2008)); *see also United States Steel Corp. v. United States*, 36 C.I.T. 534, 538 (2012) (holding that "{e}ven though the result is the same, the remand determination replaced the original determination as a matter of law" and ordering a second remand to consider an issue Commerce had declined to consider during the first remand because the party had not argued it during the underlying review).  As in *Gleason*, during remand Plaintiffs raised and Commerce considered the very issues argued thereafter in Plaintiffs' Revised Opening Brief concerning the necessity of in-country, on-site verification and a timely verification report.  *See Nakornthai*, 587 F. Supp. 2d at 1312 (summarizing *Gleason*); Commerce Motion for Voluntary Remand at 1 (requesting remand of the matter "in its entirety to give Commerce the opportunity to reconsider its position in this investigation on the in lieu of on-site verification questionnaire and subsequent reliance on facts available in its final determination."); Plaintiffs' Comments on Draft Remand Redetermination at 1-6 (arguing issues); Remand Redetermination at 4-10 (addressing issues).

Commerce's decision to use remand proceedings to dig in its heels and refuse to verify does not extinguish Plaintiffs' right to judicial review of the lawfulness of Commerce's conduct. Quite the opposite—that Commerce *did* weigh these issues, *see* Remand Redetermination at 4-10, negates the policy considerations generally relied upon to justify exhaustion bars, *see, e.g.*,

---

[3] As explained *infra*, these issues are not in fact "new" to remand proceedings.  Nevertheless, had they been, exhaustion would be no barrier.

*Parisi v. Davidson*, 405 U.S. 34, 37 (1972) ("The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies."); *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 925 F. Supp. 2d 1332, 1340 (Ct. Int'l Trade 2013) ("because Commerce has requested voluntary remand there is little concern that the alleged failure to exhaust will deprive{} the agency of the opportunity to consider these arguments in the first instance.  Rather, remand will allow{} the agency to apply its expertise, rectify administrative mistakes, and compile a record adequate for judicial review") (internal quotations omitted); *Timken Co. v. United States*, 630 F. Supp. 1327, 1340 (Ct. Int'l Trade 1986) ("since the government itself is asking for a remand despite Timken's failure to exhaust its remedies, the significance of one of the policies underlying the exhaustion doctrine, namely, that a court should not usurp an agency's function by considering issues the agency has not first considered, is of reduced significance.").  Framed in terms of the USCIT's governing statute, even if Plaintiffs had not exhausted their administrative remedies, it would not be "appropriate" for this court to refuse to consider these issues.  *See* 28 U.S.C. § 2637(d).

Nor does 19 C.F.R. § 351.309(c)(2) bar this court from considering Plaintiffs' arguments. *See* Bharat Br. at 3-4.  *First*, "{a} precondition to deference under *Chevron* is a congressional delegation of administrative authority," *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 649 (1990), and Commerce has no power to limit this Court's scope of review; only Congress may do so. *C.f., e.g.*, *id*. (declining to defer to Department of Labor's interpretation of a statute administered by the courts); *Hor Liang Indus. Corp. v. United States*, 337 F. Supp. 3d 1310, 1318 (Ct. Int'l Trade 2018) ("*Chevron* deference does not apply to Commerce's regulatory definition {of a party to the proceeding} because Commerce does not administer the standing statute").  *Second*,

Section 351.309(c) does not govern remand proceedings.  *See* 19 C.F.R. § 351.309(c)(1)(i) ("For a *final determination* in a…antidumping investigation…") (emphasis supplied).  *Third*, even if 19 C.F.R. § 351.309(c)(2) were applied by analogy, Plaintiffs raised the relevant issues in their comments on Commerce's draft redetermination.  *See* Plaintiffs Comments on Draft Remand Redetermination at 1-6.

As for the original investigation, Plaintiffs argued that "a robust on-site verification" is what is "contemplated under the statute," Petitioners' Post-Prelim Comments at 26 (Appx083328); *see also* Plaintiffs' Opposition to Second Extension at 4 (Appx087607), and even Bharat contrasted Commerce's *ad hoc* process with "an actual verification," *see* Bharat Virtual Verification Request at 1-2 (Appx087616-087617).  Ultimately, Commerce itself recognized that "on-site verifications a{re} required under section 782(i) of the Act," demonstrating that it was both "put on notice of" and in fact considered the issue.  Final IDM at 2 (Appx083613); *Trust Chem Co. v. United States*, 791 F. Supp. 2d 1257, 1268 n.27 (Ct. Int'l Trade 2011).  The issue was therefore exhausted in the first instance.  Even if it were not, the widely recognized "pure question of law" exception to the exhaustion doctrine would clearly apply to Plaintiffs' interpretation of 19 U.S.C. § 1677m(i).  *See, e.g.*, *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1363 (Fed. Cir. 2019) ("{T}he requirement to exhaust administrative remedies under § 2637(d) is not jurisdictional," but rather should be employed only "where appropriate."); Sections I-II, *supra* (advancing *Chevron* step one arguments).

As a final matter, Bharat failed to raise this affirmative defense with respect to Plaintiffs' arguments concerning Commerce's failure to issue a timely verification report.  Although Bharat mentions a "verification report" in one clause in its Summary of Argument, *see* Bharat Br. at 3, merely "mention{ing} a possible argument in the most skeletal way" does not suffice to raise

that argument for the court's consideration, *MTZ Polyfilms*, 659 F. Supp. 2d at 1308. The relevant portion of Bharat's Argument makes no mention of a "report" of any kind. *See* Bharat Br. at 3-5. In any event, Plaintiffs fully argued that Commerce was obligated to issue a verification report for comment prior to its final redetermination, *see* Plaintiffs Comments on Draft Remand Redetermination at 3, and even raised this issue during the administrative hearing, *see* Public Transcript at 13 (Appx083549).

## IV. Even if this Court Reaches *Chevron* Step Two, Commerce's Verification Questionnaire Was Not a Reasonable Methodology Under the Statute

The Government devotes most of its argument to the notion that Commerce's verification methodology was reasonable under *Chevron* step two. *See* Govt Br. at 10-21. The court need not address these arguments, because the statute is unambiguous, resolving this question at *Chevron* step one. But even under *Chevron* step two, the verification questionnaire was not a reasonable verification methodology. Notably, the Government makes no *Chevron* step two argument whatsoever concerning Commerce's failure to issue a verification report. *See id.* at 21-23.

As an initial matter, in weighing the Government's SAA arguments in the context of *Chevron* step two, none are due deference under *Chevron*, because the *Remand Redetermination* itself never articulates any particular interpretation of the SAA. *See* Revised Opening Br. at 23; Remand Redetermination at 8-9; *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) ("{W}e have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question, on the ground that Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.") (internal quotation marks omitted).

With respect to verification, the Government focuses on Commerce's discretion to sample certain data, how it structured some aspects of its questionnaire to mimic on-site verification, and how it subjectively considered the verification questionnaire to be a verification. *See* Govt Br. at 10-21. In other words, rather than advance a narrative aimed at the governing statute and regulations, the Government instead highlights a series of points that fail to address, much less establish, the reasonableness of Commerce's approach by reference to any rationale elucidated in the *Remand Redetermination* itself. As Plaintiffs detailed, neither the *Remand Redetermination* nor Commerce's Final IDM address *why* Commerce deemed a mere supplemental questionnaire—out of the universe of other options—to be a reasonable verification methodology in both September 2020 (during the investigation) and in November-December 2021 (during remand). *See* Plaintiffs' Revised Opening Br. at 28-30.

The Government makes no effort to defend Commerce's reliance on a mere questionnaire during the remand period, merely asserting in a conclusory fashion that Commerce's questionnaire complied with the statute. *See* Govt Br. at 21. Were this "rationale" sufficient, then literally anything could constitute "verification." The absence of meaningful explanation is all the more glaring in light of the fact Commerce has completely reversed its position from the original administrative proceeding. *Compare* Final IDM at 2 (Appx083613) (concluding on-site verification was required and relying on "facts otherwise available" for want of a statutorily compliant verification), *with* Remand Redetermination at 3.

This court's remand order provided ample time and specific encouragement for Commerce to undertake a proper verification to correct this deficiency. *See* Order, ECF Doc. 28 (Oct. 29, 2021) at 5 ("the Court grants the Motion, allowing an initial period of 150 days for Commerce to issue any redetermination. This remand will allow Commerce, at its discretion, to

perform onsite verification, which would moot all procedural issues created by the agency's decision to short-circuit verification."). Notably, this remand proceeding was *voluntary*—at Commerce's request. *See id.* As Plaintiffs explained, however, even accepting *arguendo* Commerce's characterization of the barriers it faced during the original investigation, conditions during remand were conducive to in-country, on-site verification procedures. *See* Plaintiffs' Revised Opening Br. at 29-30. During remand, Commerce had the opportunity to conduct an in-country, on-site verification in the lead-up to its "new agency action," *see DHS*, 140 S. Ct. at 1907-08, and could not reasonably continue to rely on a mere questionnaire solely by asserting Commerce had not been able to conduct in-country verification over a year prior. This is a historical footnote, not a coherent rationale.

As for the original investigation, the Government asserts that in-country, on-site verification was "unfeasible" because the Indian government had "strict travel restrictions on U.S. travelers" in place during the relevant time period. *See* Govt Br. at 21. The government thus agrees that in-country verification was Commerce's starting point. *See id.* But Commerce identifies nothing in the *Remand Redetermination* (or Final IDM) establishing that reliance on a mere questionnaire was reasonable, given the other alternatives available. *See* Plaintiffs' Comments on Remand Redetermination at 4-5 (noting alternatives). Tellingly, the aspect of Commerce's questionnaire that was "consistent" with on-site verification and which Commerce *actually enforced* was a *disadvantage* to petitioners, *viz.*, precluding rebuttal information. *See* Govt Br. at 18. Other "consistent" aspects, such as preventing Bharat from submitting "new" information or asking questions similar to on-site inquiries, *see id.*, were either not enforced (as Commerce accepted unsolicited new information) or were a hollow substitute (Commerce's questions concerned a mere subset of what it would normally ask). *See* Section V, *infra*; Revised

Opening Br. at 34-36; Petitioners' Objection to Second Extension Request at 3-4 (Appx087606-087607).  Commerce's one-sided methodology for its so-called verification "contravene{d} statutory objectives" to ensure the accuracy of its calculations, *Ipsco, Inc. v. United States*, 899 F.2d 1192, 1195 (Fed. Cir. 1990); *see also* Revised Opening Br. at 31-32, and is wholly inconsistent with Commerce's own regulatory mandate to verify in-country, *see* Revised Opening Br. at 32-33.  Given the alternatives available, including several used by Commerce itself in the past—even if one *were* to accept that in-country, on-site verification is not required––Commerce's reliance upon a mere questionnaire remains arbitrary, unreasonable, and antithetical to the statutory goal of accurate margin calculation.

## V.   Commerce's Rationales for Accepting Bharat's Flawed Cost Reporting Were Unsupported by Substantial Evidence

### A.   Commerce's Acceptance of Unsolicited Information at "Verification" Was Arbitrary

Exhibit D-71 of Bharat's response to Commerce's "verification" questionnaire newly reported 25 additional cost centers.  *None* of these 25 new cost account numbers are found *anywhere* on the record prior to Bharat's "verification" questionnaire response—thus, the various exhibits Bharat had submitted prior to "verification" were incomplete.  *See* Petitioners' Admin. Case Brief at 11, Attach. B (Appx083443, Appx083491-083492).  Commerce's "verification" questionnaire never asked Bharat to provide additional cost account numbers, and Commerce's instructions (consistent with established practice) stated that unsolicited revisions would be rejected.  Yet, Commerce arbitrarily accepted this new factual information.

The Government's defense begins by inaccurately claiming Bharat's 25 new cost centers were not in fact "new."  *See* Govt Br. at 28.  But even the Government refers to them as "*additional* cost centers" consisting of "duplicate{s}" and "breaking major cost centers into subsections."  *Id.* (emphasis supplied).  As in the IDM, the Government's reasoning distorts the

concept of "supporting" prior reporting to something limited only by a respondent's creativity—here, including Bharat *fixing* deficient reporting by belatedly providing *missing* information. *See id.*; Final IDM at Appx083617. Nor does the Government suggest that adding 25 cost centers could be considered a "minor" correction. *See* Govt Br. at 28-30; Final IDM at 6 (Appx083617). Glaringly, the Government makes no attempt to explain Commerce's *ad hoc* re-writing of its rules concerning acceptance of new information at verification by reference to prior practice. *Compare* Govt Br. at 28-30, *with* Revised Opening Br. at 34-35. As Plaintiffs explained, Commerce's consistent practice—as affirmed by the Federal Circuit—has been to reject respondents' attempts to fix incomplete reporting by providing the missing information at verification. *See* Revised Opening Br. at 34-35 (citing examples); *Goodluck India Ltd. v. United States*, 11 F. 4th 1335, 1342-43 (Fed. Cir. 2021) ("Commerce's typical practice is to accept corrective information at verification only for minor corrections to information *already on the record*. A minor correction is one that rectifies minor mistakes in addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, {or} minor classification errors.") (internal quotation marks omitted) (emphasis supplied).

Furthermore, the Government makes no attempt to explain how the 25 new cost centers could be considered responsive to the *actual questions* posed by Commerce's "verification" questionnaire. *See* Govt Br. at 29-30. Commerce instructed Bharat to complete the truncated text descriptions associated with the cost center numbers *in "Exhibit D-29"* and identify the total cost accumulated in each "*Exhibit D-29*" cost center. Commerce Post-Prelim. Questionnaire at Q.25 (Appx083337). Yet, Exhibit D-71 included 25 *new* cost centers that did *not* appear in Exhibit D-29. *See* Revised Opening Br. at 34-36; Govt Br. at 28; Final IDM at 6 (Appx083617)

(both characterizing them as "additional cost centers").  This exceeded the scope of Commerce's question.  Commerce did not ask for this information; Commerce stated it would not accept unrequested information or revisions—*yet that is precisely what Commerce did*.  *See* Final IDM at 6 (Appx083617).  This unexplained and therefore arbitrary departure from Commerce's instructions in this investigation and its past practice in other proceedings warrants remand.

### B.   Commerce's Finding that Bharat Did Not Underreport FEB Processing Costs Is Unsupported by Substantial Evidence

Bharat failed to report costs associated with cost centers that Bharat identified as relating solely to MUC.  *See* Revised Opening Br. at 37-44.  The Government simply repeats Commerce's flawed assertion that the disconnect between Bharat's cost reconciliation and its cost center report is immaterial because the "{Exhibit D-71} cost center report includes costs of both {MUC and non-MUC}, and thus reasonably reports greater costs than those in the {Exhibit D-32.2} cost reconciliation, which reports only the total cost of the MUC."  Govt Br. at 29; *see also* Final IDM at 6 (Appx083617).  This assertion misses the point entirely.  The *cost centers at issue relate solely to MUC*, rendering any disparity grounded in non-MUC costs irrelevant.  *See* Revised Opening Br. at 41-44.  For example, Subdivision [          ] contains solely MUC [                    ] cost centers and yet the reported total for *these specific MUC-only cost centers* in Exhibit D-71 vastly exceeds the reported total for Subdivision [          ] in Exhibit D-32.2.  *See id.* at 41-42.  Commerce's reasoning fails to support its conclusion, requiring remand.

As for the specific examples highlighted in Plaintiffs' administrative and appellate briefs, *see* Revised Opening Br. at 41-44 ([         ] Subdivision, [                       ] Subdivision, and overall FEB [              ] costs); Plaintiffs' Admin. Case Br. at 11-18 (same) (Appx083443-083450), Commerce never engaged with these discrepancies, *see* Final IDM at 6 (Appx083617).  As such, the Government's defense relies exclusively on *post hoc* rationale.  *See* Govt Br. at 30

(bootstrapping Commerce's passing citation of Exhibit D-72 into an analysis).  As "an agency's action must be upheld, if at all, on the basis articulated by the agency itself," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983), the Government's inability to identify any rationale articulated by Commerce administratively renders Commerce's rejection of Plaintiffs' arguments arbitrary and necessitates remand.

Even the Government's *post hoc* rationale, lifted directly from Bharat's Administrative Rebuttal Brief, is unsupported by substantial record evidence.  *See* Govt Br. at 30.  Concerning Subdivision [      ], as Plaintiffs alleged administratively, Bharat's Administrative Rebuttal depends upon on untimely new factual information—*i.e.*, Bharat's reclassification of the [      ] cost center at issue, [      ], as relating partly to non-MUC—whereas Exhibits D-29 and D-71 both identified this cost center as relating exclusively to MUC.  *Compare id.* (citing Bharat Administrative Rebuttal Br. at 5-7 (Appx090024-090026)), *with* Petitioners' Request to Reject at 5-6 (Appx090055-090056); *see also* Bharat's "Verification" QR at Ex. D-71 (Appx087388); Bharat's 2d Supp. DQR at Ex. D-29 (Appx083706).  Neither Commerce nor the Government address the untimeliness of Bharat's attempt to rewrite the record.

The scenario is the same for the [      ] Subdivision, with the Government belatedly crediting Bharat's administrative rebuttal that cost centers comprising this subdivision related to both MUC and non-MUC.  *See* Govt Br. at 30 (citing Bharat Administrative Rebuttal Br. at Ex. CB-2 (Appx090042-090043)).  The record tells a different story, as Exhibits D-29 and D-71 report all [   ] cost centers as *exclusively* related to MUC [      ] costs.  *See* Revised Opening Br. at 42-43; Bharat's "Verification" QR at Ex. D-71 (Appx087389); Bharat's 2d Supp. DQR at Ex. D-29 (Appx083706).  The Government never addresses Plaintiffs' third example, concerning Bharat's aggregate FEB [      ] costs.  *Compare* Revised Opening

Br. at 43-44, *with* Govt Br. at 30.  In sum, even the Government's *post hoc* rationale directly contradicts the record, and remand is required.

**C.    Commerce's Finding that Bharat's G&A Expenses Were Not Underreported Is Unsupported by Substantial Evidence**

Bharat understated its <u>G&A allocation ratio</u> by failing to include certain cost centers that cumulate employee cost in the numerator.  *See* Revised Opening Br. at 44-47.  Bharat's G&A expense rate calculation can be summarized as follows:

*Step One*:

$$\frac{POI\ Employee\ \&\ Benefits\ Costs\ Allocated\ to\ G\&A}{Total\ POI\ Employee\ \&\ Benefits\ Costs} = G\&A\ Allocation\ Ratio$$

*Step Two*:

$$G\&A\ Allocation\ Ratio \times Total\ Fiscal\ Year\ Employee\ \&\ Benefits\ Costs = Fiscal\ Year\ Employee\ \&\ Benefits\ G\&A\ Expense\ Amount$$

*Step Three*:

$$Fiscal\ Year\ Employee\ \&\ Benefits\ G\&A\ Expense\ Amount + Other\ Fiscal\ Year\ G\&A\ Expenses = Total\ Fiscal\ Year\ G\&A\ Expenses$$

*Step Four*:

$$\frac{Total\ Fiscal\ Year\ G\&A\ Expenses}{Total\ Fiscal\ Year\ Cost\ of\ Goods\ Sold} = Fiscal\ Year\ G\&A\ Financial\ Ratio$$

Plaintiffs assert that Step One's numerator is understated, leading to a distortedly low G&A Allocation Ratio, which in turn depresses the calculations at the subsequent steps, ultimately understating constructed normal value.  *See* Revised Opening Br. at 44-47; Plaintiffs' Administrative Case Br. at 20-23 (Appx083452-083455).  The Government is simply wrong in characterizing Plaintiffs' argument as "that Commerce should have somehow incorporated actual expenses into the G&A allocation ratio."  Govt Br. at 26.  Evidently, the Government is constrained by Commerce's fundamental failure to grasp this issue.

The remainder of the Government's defense is as non-responsive as Commerce's Final IDM.  The Government describes Step One and Step Two, but tellingly cites Plaintiffs' Revised Opening Brief for support.  *See* Govt Br. at 27.  After all, Commerce's Final IDM makes no mention of the G&A allocation ratio (Step One).  *See, e.g.*, Final IDM at 6-7 (Appx083617-083618).  Next, whereas Plaintiffs' arguments focus on cost centers omitted at Step One, *see* Revised Opening Br. at 44-47, the Government generalizes Plaintiffs' argument as whether "total G&A expenses were underreported" (Step Four).  Govt Br. at 27.  To address this vague generalization, in the Government's telling, Commerce engaged in a mismatched "compar{ison of} the reported {fiscal year} G&A expense ratio {(Step Four)} to a calculated *period of investigation* G&A expense ratio using the cost center costs referred to by the petitioners and found that this ratio was actually lower than the {fiscal year} G&A expense ratio that was reported by Bharat."  *See id.*  (emphasis supplied).  Stated as an equation:

$$\frac{\textit{Revised POI G\&A Expenses}}{\textit{Total POI Cost of Goods Sold}} < \textit{Fiscal Year G\&A Financial Ratio as Reported}$$

*See id.*; Final IDM at 6-7 (Appx083617-083618).

This exercise completely misses the point.  POI values do not equal fiscal year values, and their respective ratios are bound to differ.  The ultimate question is whether the reported Fiscal Year G&A Financial Ratio (Step Four) itself should have been *higher*.  Given how the Fiscal Year G&A Financial Ratio was calculated (Steps One to Four), determining whether the *G&A Allocation Ratio* (Step One) was depressed by the improper omission of certain POI employee & benefits costs is *required* to answer this question.  Commerce's irrelevant apples-to-oranges comparison fails to engage with this.  Consequently, Commerce's ultimate conclusion that the product of Step Four was correct is unsupported by substantial evidence, requiring remand.

\*      \*      \*

Respectfully submitted,

/s/ Jack A. Levy
Jack A. Levy
Thomas M. Beline
Myles S. Getlan
James E. Ransdell
Nicole Brunda

CASSIDY LEVY KENT (USA) LLP
900 19th Street, N.W.
Suite 400
Washington, D.C. 20006
Phone: (202) 567-2313
Fax: (202) 567-2301
jlevy@cassidylevy.com

*Counsel to Ellwood City Forge Company, Ellwood
National Steel Company, Ellwood Quality Steels
Company, and A. Finkl & Sons*

NON-CONFIDENTIAL VERSION

## <u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 6,981 words, exclusive of the caption block, table of contents, table of authorities, square braces ("[ ]"), signature block, and certificates of counsel, and therefore complies with the maximum 7,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:     <u>/s/ Jack A. Levy</u>
          Jack A. Levy