UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

A-533-893
Remand:  Slip Op. 23-113
POI:  10/01/2018 – 09/30/2019
~~Business Proprietary Document~~
E&C/OI:  MAR
**PUBLIC VERSION**

***Ellwood City Forge Co. v. United States*,**
**654 F. Supp. 3d 1268 (CIT 2023)**
**Forged Steel Fluid End Blocks from India**

**FINAL RESULTS OF REDETERMINATION**
**PERSUANT TO SECOND COURT REMAND**

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of
redetermination pursuant to the opinion and *Second Remand Order* of the U.S. Court of
International Trade (the Court or CIT) issued on August 11, 2023.[1]  These final results of
redetermination concern Commerce's final negative determination in the less-than-fair-value
(LTFV) investigation of forged steel fluid end blocks (fluid end blocks) from India, as modified
by the First Remand Redetermination.[2]  The Court remanded for Commerce to comply with the
requirements of *Regents*, and to supplement the administrative record, as necessary.[3]  On
remand, Commerce has complied with the Court's instructions.  Specifically, Commerce verified
all information relied upon in making its *Final Determination*, consistent with section 782(i)(1)
of the Trade Act of 1930, as amended (the Act).  Additionally, as a result, despite certain

---

[1] *See Ellwood City Forge Company v. United States*, 654 F. Supp. 3d 1268 (CIT 2023) (*Second Remand Order*).
[2] *See Forged Steel Fluid End Blocks from India:  Final Negative Determination of Sales at Less Than Fair Value*, 85 FR 80003 (December 11, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM), as modified by *"Final Results of Redetermination Pursuant to Court Remand Order in Ellwood City Forge Company et al v. United States*, Court No. 21-00007 (CIT October 29, 2021)," dated January 12, 2022 (First Remand Redetermination)*; see also Ellwood City Forge Company v. United States*, Court No. 21-00007 (CIT October 29, 2021) (*First Remand Order*) (granting Commerce's request for a voluntary remand to reconsider the in lieu of on-site verification questionnaire (ILOVQ) and reliance on facts otherwise available).
[3] *See Second Remand Order*, 654 F. Supp. 3d at 1276-79 (citing *Department of Homeland Security. v. Regents of the University of California*, 140 S. Ct. 1891, 1907-08 (2020) (*Regents*)).

changes to Commerce's underlying margin calculations, the estimated weighted-average dumping margin for Bharat Forge Limited (Bharat) remains unchanged from that in the *Final Determination* (*i.e.*, zero percent).[4]

## II.  BACKGROUND

On December 11, 2020, Commerce issued its *Final Determination* that imports of fluid end blocks from India were not being, or were not likely to be, sold in the United States at LTFV for the period of investigation (POI), October 1, 2018, through September 30, 2019.[5]  The petitioners[6] challenged Commerce's *Final Determination*, arguing that the agency:  (1) failed to support its *Final Determination* with substantial record evidence; and (2) failed to comply with its statutory obligation to conduct on-site verification.[7]  Commerce subsequently sought, and was granted,[8] a voluntary remand to reconsider its position with respect to verification and subsequent reliance on facts available in the *Final Determination*.

In the First Remand Redetermination, Commerce reconsidered its use of the ILOVQ, and, because it was able to verify Bharat's information, determined that use of facts otherwise available (apart from certain instances) was not warranted; Commerce removed all pertinent language from the *Final Determination*.[9]

On August 11, 2023, the Court held that Commerce's *Final Determination*, as modified by the First Remand Redetermination, was not supported by substantial evidence and not in accordance with the law.[10]  The Court ordered that, on remand, Commerce explain:  (1) its

---

[4] *See Final Determination*, 85 FR at 80004.
[5] *Id.*, 85 FR at 80003.
[6] The petitioners are the FEB Fair Trade Coalition; Ellwood Group (comprised of Ellwood City Forge Company; Ellwood Quality Steels Company; and Ellwood National Steel Company); and A. Finkl & Sons, Company (collectively, the petitioners).
[7] *See Second Remand Order*, 654 F. Supp. 3d at 1270.
[8] *See First Remand Order.*
[9] *See First Remand Redetermination* at 4; *see also Final Determination* IDM at 2-3.
[10] *See Second Remand Order*, 654 F. Supp. 3d at 1278-79.

decision not to conduct on-site verification in the First Remand Redetermination; (2) the range of other alternatives considered within the ambit of on-site verification and why those alternatives were rejected in favor of a questionnaire; and (3) why the decision to use the ILOVQ did not violate any legitimate reliance interests on the petitioners' part.[11]  According to the Court, on remand, the agency is "free to reverse its position, but it may only do so by taking a new agency action" and providing new reasoning for that action.[12]

On remand, Commerce has taken action to verify all information relied upon in making its *Final Determination*, consistent with section 782(i)(1) of the Act.  To that end, Commerce consulted with parties,[13] issued cost and sales verification agendas to Bharat on October 23 and 25, 2023, respectively,[14] and completed sales and cost on-site verifications at Bharat's factory in Pune, India, between October 30 and November 7, 2023.  Commerce issued its Second Draft Results of Redetermination on December 11, 2023.[15] concurrent with the cost and sales verification reports.[16]  Bharat and the petitioners submitted comments on the Second Draft Results of Redetermination on December 26, 2023.[17]

---

[11] *Id.*

[12] *Id.*, 654 F. Supp. 3d at 1278 (citing *Regents*, 140 S. Ct. at 1907-08).

[13] *See* Memorandum, "Placement of Email on the Record – Verification Dates," dated September 11, 2023.

[14] *See* Commerce's Letters, "Sales and Cost Verification Agendas," dated October 25, 2023 (contains only the sales verification agenda); and "Cost Verification Agenda," dated October 23, 2023.

[15] *See* Draft Results of Redetermination Pursuant to Second Court Remand, 654 F. Supp. 3d 1268, dated December 11, 2023 (Second Draft Results of Redetermination).

[16] *See* Memoranda, "Verification of the Sales Questionnaire Responses of Bharat Forge Limited in the Antidumping Duty Investigation of Forged Steel Fluid End Blocks from India," dated December 11, 2023 (Sales Verification Report); and "Verification of the Cost Response of Bharat Forge Limited in the Less-Than-Fair-Value Investigation of Forged Steel Fluid Steel Fluid End Blocks from India," dated December 11, 2023 (Cost Verification Report).

[17] *See* Petitioners' Letter, "Comments on Draft Results of Redetermination Pursuant to Second Court Remand," dated December 26, 2023 (Petitioners' Comments); *see also* Bharat's Letter, "Forged Steel Fluid End Blocks from India: Bharat Forge Limited's Comments on Commerce's Draft Results of Redetermination Pursuant to Second Remand Order," dated December 26, 2023 (Bharat's Comments).

### III.   ANALYSIS

As an initial matter, we note that verifications do not create a traditional, concrete reliance interest to one particular party or another, *e.g.*, the petitioner or the respondent.[18]  The Supreme Court in *Payne* discounted reliance interests in cases involving "procedural and evidentiary rules."[19]  Unlike cases involving individual rights, those rules do "not alter primary conduct" such that they would create reliance interests.[20]  Accordingly, they generally "do not implicate the reliance interests of private parties" at all.[21]  Regardless of the outcome of an investigation, *e.g.*, an affirmative or negative final determination, Commerce conducts verifications to confirm the accuracy of the information on the record, which in turn allows the agency to more accurately calculate an estimated weighted-average dumping margins and fairly administer U.S. trade laws.  Thus, the way in which Commerce carries out its procedural rules regarding verification does not implicate any reliance interests on behalf of the petitioners or respondent companies.  Furthermore, to the extent that any reliance interest exists, that interest was satisfied as a result of Commerce's actions on remand.

With respect to the verification methodology for these final results of redetermination, we have determined that, at this time, Commerce was able to conduct in-person on-site verifications for purposes of verifying Bharat's sales and cost information, which was relied upon in making the *Final Determination*.  Therefore, Commerce took action to conduct on-site verifications. Commerce's cost and sales verifications satisfied the statutory requirement set forth in section 782(i)(1) of the Act and 19 CFR 351.307.

---

[18] *See Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2238-39, 2346, n. 28 (2022); and *Hohn v. United States*, 524. U.S. 236, 252 (1998) (Rules of procedure do not alter primary conduct).
[19] *See Payne v. Tennessee*, 501 U.S. 808, 828 (1991) (*Payne*).
[20] *See Hohn v. United States*, 524 U.S. 236, 252 (1998).
[21] *See Alleyne v. United States*, 570 U.S. 99, 119 (2013) (Sotomayor, J., concurring).

For these final results of redetermination, certain cost verification findings resulted in revisions to Commerce's margin calculations from the *Final Determination*, as follows:

(1) Bharat provided source documents to support the net input weights used in its cost calculations.[22]  Therefore, for these final results of redetermination, as in the Second Draft Remand Redetermination, we:  (a) reversed our decision in the *Final Determination* to apply partial facts available with an adverse inference (AFA), such that we are no longer relying on the facts otherwise available; and (b) revised the adjustment of the constructed value (CV) profit ratio to [     ] percent from [     ] percent.[23]

(2) We noted at verification that Bharat did not include the cost of parts for product control number (CONNUM) [               ] and increased the direct material costs for this CONNUM by [    ] percent in the Second Draft Remand Redetermination.[24]  For these final results of  redetermination, as partial AFA, we increased the direct material costs for this CONNUM by the highest amount of parts reported for any CONNUM, *i.e.*, by [     ] percent rather than only increasing the direct martials cost by [    ] percent which accounted for only the actual cost of parts, as we did in the Second Draft Remand Redetermination.  We are selecting the highest, non-aberrational cost as partial AFA under sections 776(a)(2)(A), as Bharat withheld information requested by Commerce.[25]

(3) We noted at verification that Bharat did not include Indian rupee [          ] in POI general and administrative (G&A) costs that were recorded to direct cost centers under

---

[22] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Remand Redetermination – Bharat Forge Limited," dated December 11, 2023 (Remand Cost Calculation Memorandum), at 1.

[23] *Id.* at 1; *see also* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – Bharat Forge Limited," dated December 7, 2020 (Final Cost Calculation Memorandum), at 1 (adjustment 1).

[24] *See* Remand Cost Calculation Memorandum at 1 (adjustment 2).

[25] *See Dilinger France S.A. v. United States*, 393 F. Supp. 3d 1225 (CIT 2019) (Commerce selected the highest sales price as partial AFA, where partial AFA was called for).

other divisions in the overall cost reconciliation.[26]  Thus, for these final results of

redetermination, as in the Second Draft Remand Redetermination, we included this G&A

cost amount and increased the fiscal year G&A expense rate from [      ] percent to [      ]

percent accordingly.[27]

Additionally, certain sales verification findings resulted in revisions to Commerce's margin

calculations from the *Final Determination*, as follows:

(1) The results of the sales verification showed changes in the reporting of sales expenses for

  [   ] of [      ] sales.[28]

(2) Review of the information provided at the sales verification strengthened the application

  of partial AFA to all [   ] sales of steel grade [        ], where four mill test certificates

  related to the production of this steel grade were previously reported with non-scope

  molybdenum (*i.e.*, below 0.15 percent); these items, as corrected, indicate an in-scope

  amount of molybdenum (*i.e.*, 0.15 percent or more).[29]  Although Bharat was unable to

  explain these differences, the corrected items support the conclusion that sales of fluid

  end blocks, made of steel grade [        ], are in-scope merchandise, and we continue to

  apply partial AFA and treat them as in-scope merchandise in these final results of

  redetermination. [30]

(3) We continued to increase the direct material cost for CONNUM [                ] with

  the actual cost because the cost of parts is missing from Bharat's cost buildup for this

---

[26] *See* Remand Cost Calculation Memorandum at 2 (adjustment 3).
[27] *Id.*
[28] *See* Sales Verification Report at 4.
[29] *See* Memorandum, "Remand Redetermination Analysis Memorandum for Bharat Forge Limited," dated December 11, 2023 (Remand Sales Analysis Memorandum), at 3-4.  In the Second Draft Results of Redetermination at 5 we stated that this was [  ] sales, however, there were only [   ].  *See* Second Draft Remand Sales Analysis Memo Output from the AFA program at attachment D.
[30] *Id.*

CONNUM.[31]  During the cost verification, Bharat explained that the cost we applied as partial AFA in the *Final Determination* was in fact the actual cost[32] and because this information was corrected during valid verification corrections we no longer consider this to be an application of partial AFA.  Additionally, as facts available, we continued to adjust the market price of electricity using purchases from an unaffiliated supplier.[33]  We also continued to adjust the material costs for inputs from affiliated suppliers pursuant to the major input rule.[34]  Finally, in addition to the G&A adjustment listed at (3) above, we continued to apply the adjustments that were made in the *Final Determination* to G&A expenses,[35] financial expenses,[36] and electricity expenses.[37]

After making the adjustments resulting from the sales and cost verifications, Bharat's estimated weighted-average dumping margin remains unchanged from the *Final Determination* at zero percent, and continues to support a negative determination.[38]  Further, as a result of Commerce's findings at the sales and cost verifications, there is no longer a reason for Commerce to rely on "facts otherwise available" as in its *Final Determination* outside of the specific instances where Commerce continues to apply partial facts available.  Commerce, therefore, disavows all language in the *Final Determination* stating that it was relying on "facts

---

[31] *See* Final Cost Calculation Memorandum at 2 (*i.e.*, adjustment 4).
[32] *See* Cost Verification Report at 2-3.
[33] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Determination – Bharat Forge Limited," dated July 16, 2020 (Preliminary Cost Calculation Memorandum), at 2 (*i.e.*, adjustment 3).
[34] *See* Final Cost Calculation Memorandum at 2 (*i.e.*, adjustment 2).
[35] *See* Final Cost Calculation Memorandum at 1; *see also* Preliminary Cost Calculation Memorandum at 2 (*i.e.*, adjustment 5).
[36] *See* Final Cost Calculation Memorandum at 1; *see also* Preliminary Cost Calculation Memorandum at 2 (*i.e.*, adjustment 6).
[37] *See* Final Cost Calculation Memorandum at 1; *see also* Preliminary Cost Calculation Memorandum at 2 (*i.e.*, adjustment 4).
[38] *See* Remand Sales Analysis Memorandum.

otherwise available" pursuant to section 776(a)(2)(D) of the Act because the information could not be verified.[39]

In conducting the cost and sales verifications, Commerce complied with the procedural requirements of *Regents*.[40]  Here, Commerce followed its normal verification procedures, by issuing agendas, performing on-site verifications, and issuing verification reports.  Further, Commerce incorporated those findings into these final results of redetermination by issuing new calculation and analysis memoranda, which ultimately support the same outcome as the original investigation.

In implementing the Court's instructions, we conducted on-site verifications in support of a final determination in an investigation.  At the time of this redetermination on remand, we were able to recommence travel to India for verification based on Commerce's travel policy and the changing circumstances surrounding the COVID-19 pandemic.  After conducting sales and cost verifications we issued verification reports and the Second Draft Remand Redetermination on December 11, 2023.[41]

## IV.    INTERESTED PARTY COMMENTS

We analyzed and addressed the comments received from Bharat and the petitioners.

### Issue 1:  Whether Bharat's Responses are Reliable

*Petitioners' Comments:*

- Commerce responded to the Court's procedural concerns by conducting on-site sales and cost verifications; Commerce, however, declined to examine many of the issues petitioners raised in pre-verification comments.[42]

---

[39] *See Final Determination* IDM at 2-3.
[40] *See Regents*, 140 S. Ct. at 1908.
[41] *See* Cost Verification Report and Sales Verification Report.
[42] *See* Petitioners' Comments at 3.

- Verification is a "spot check and is not intended to be an exhaustive examination of a respondent's business."[43]  "{W}hen spot checks reveal that the data sample examined at verification is replete with errors, omissions, and discrepancies, we have no confidence in the accuracy of any individual piece of {the respondent's} information not specifically examined."[44]

- The Second Draft Remand Redetermination is unsupported by substantial evidence because, although Commerce identified numerous inaccuracies and errors in its verification reports, its Second Draft Remand Redetermination undertakes no analysis of the implications of these errors and whether they indicate broader reliability concerns.[45]

- Commerce does not address the following concerns:

  - Commerce does not explain how it can be certain of the reliability of the remaining CONNUMs when Commerce identified an error in 2 of the 3 CONNUMs examined.[46]

  - Commerce does not explain why it finds Bharat's mill test certificates reliable when four of the 14 mill test certificates that were issued by the [          ] had the [     ] heat numbers as mill test certificates reported prior to verification but with [        ] amounts of [            ].  These errors are significant both because they determined whether the merchandise was in-scope merchandise or not, and because it is well understood that — in any situation involving steel

---

[43] *Id.* at 3 (citing *Oil Country Tubular Goods from the Russian Federation:  Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 87 FR 59047 (September 29, 2022), and accompanying IDM at 13 (quoting *Monsanto Co. v. United States*, 698 F. Supp. 275, 281 (CIT 1988)).

[44] *Id.* at 5 (citing *Certain Carbon and Alloy Steel Cut-To-Length Plate from Belgium:  Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 82 FR 16378 (April 4, 2017) (*CTL Plate from Belgium*), and accompanying IDM at 82).

[45] *Id.* at 2 and 4.

[46] *Id.* at 5.

products — that there should be one and only one authentic mill test certificate for a given heat.[47]

- o  Two CONNUMs were erroneously reported as [                    ], when in fact Commerce states that the products were "hardened."[48]

- o  Commerce discovered additional G&A expenses that raised the reported rate from [     ] percent to [     ] percent.  Where the sampled data reveal such errors, Commerce cannot automatically assume that other (unexamined) G&A expense data were necessarily accurate.[49]

*Bharat's Comments:*

- • Commerce's on-site cost and sales verifications of Bharat fulfilled the Court's order on the procedural requirements for a new agency action.[50]

- • Commerce's Second Draft Results of Redetermination fully implemented the Court's instructions and are in accordance with law; therefore, Commerce's draft remand results should be re-issued at the appropriate time as a final determination.[51]

**Commerce's Position:**  As explained above, we agree with Bharat that conducting the on-site verifications fulfilled the Court's order.  We disagree with Bharat that we can just reissue the Second Draft Remand Redetermination because we have made one change since the Second Draft Remand Redetermination (*i.e.*, we increased the amount of cost added for one control number with missing parts costs).  Therefore, it is necessary to recalculate the results and issue a new determination with this Second Final Remand Redetermination.  Despite the petitioners'

---

[47] *Id.* at 5.
[48] *Id.* at 5-6.
[49] *Id.* at 8.
[50] *See* Bharat's Comments at 2.
[51] *Id.*

allegation that Commerce failed to address many of the issues raised in their pre-verification comments,[52] Commerce significantly tailored its standard cost and sales verification agendas to address the petitioners' concerns regarding heat treatment cost centers, heat treatment costs, G&A expenses, physical characteristics, molybdenum content of ingots used to produce one steel grade, *etc.*[53]  We addressed each of these items in the Sales Verification Report and Cost Verification Report.  In each case the error was limited in size and application and their sum does not warrant an application of total AFA.

First, the "parts" characteristic is the last of 18 physical characteristics which makes up the CONNUM, indicating that it is the least significant physical characteristic in Commerce's definitions of like products.  Further, the parts in question that are included with the fluid end blocks are minor attachments that are not produced by Bharat, but rather are purchased at the customer's request.  Overall, these "bought out" parts represent only [     ] percent of Bharat's total cost of manufacturing fluid end blocks (Indian rupees (INR) [          ] / INR [          ]).[54]  Additionally, where this cost was missing for CONNUM [          ], we included it.

We also disagree with the petitioners' allegation that two thirds of the CONNUMs examined have been incorrectly reported.  Due to the nature of the cost calculations, we examined the cost calculations for all fluid end blocks produced during the POI.  Because Bharat does not calculate and maintain product-specific costs in its normal books and records, Bharat had to develop a cost allocation methodology for reporting purposes.[55]  Thus, Bharat allocated

---

[52] *See generally* Petitioners' Comments.
[53] *See* Cost Verification Report and Sales Verification Report.
[54] *See* Cost Verification Report at 14 and 19.
[55] *See* Bharat's Letter, "Submission of Bharat Forge Limited's Section D Response," dated March 13, 2020, at 18, ("Bharat Forge, in the normal course of business, does not maintain a cost accounting system," and "Bharat Forge [                              ].")

the cost of production of all fluid end blocks on the same calculation worksheets.[56]  In fact,

CONNUM [                    ], one of the two CONNUMs in which Commerce found an error in

Bharat's parts reporting, was not a CONNUM selected prior to verification.[57]  Rather, at

verification, Commerce examined the part costs reported for all CONNUMs and found errors in

two of the 15 reported CONNUMs.[58]  Thus, when we consider these factors *in toto*, we

determined the complete universe of errors with regard to the parts costs are minor, and we do

not find that the errors in Bharat's parts reporting to be significant or indicate that the response is

"replete with errors, omissions, and discrepancies," such that "we have no confidence in the

accuracy of any individual piece of the {the respondent's} information not specifically

examined" as argued by the petitioners.[59]

      Second, the molybdenum content of the mill test certificates for the [        ] used to

produce steel grade [          ] that were submitted during on-site verification all indicate in-scope

amounts of molybdenum.  Four of the 14 mill test certificates for this producer and CONNUM

combination were previously reported with non-scope molybdenum content.  This problem was

only found with respect to steel grade [        ]; therefore, no adjustments were applied to the

other steel grades.  We reviewed mill test certificates for other steel grades and did not find this

problem with respect to ingots used in the production of the other steel grades.[60]  We treated all

[   ] sales of steel grade [        ] as in-scope merchandise and assigned the highest individual

dumping margin calculated for Bharat's other U.S. sales to these [   ] sales as partial AFA.  These

---

[56] *See, e.g.*, Cost Verification Report at 3 ("we examined the cost buildup worksheets that Bharat Forge used to prepare the reported costs for all {fluid end blocks} including the selected CONNUM{s}").
[57] *Id.* at 2-3.
[58] *Id.* at 2, 3, and 18.
[59] *See* Petitioners' Comments at 5 (citing *CTL Plate from Belgium*).
[60] *See, e.g.,* Sales Verification Report at Exhibit 4 (grade S45000); *see also* Sales Verification Report at Exhibit 6 (4330V Modified).

[   ] sales only amount to [      ] percent of volume (by unit) of Bharat's U.S. sales during the POI.[61]

Third, as an initial matter, below we list our understanding of the various heat treatments that are separate physical characteristics and those that are performed by Bharat on the reported products.

Commerce's physical characteristics include the following types of heat treatment:  (1) normalizing (forged steel is heated above upper critical temperature and air cooled); (2) austenitizing (bar is heated above temperature that changes crystal structure from ferrite to austinite); (3) annealing (forged steel is heated above its recrystallization temperature and control cooled); (4) solution annealing (forged steel is heated and rapidly cooled); (5) tempering (forged steel is heated below critical point temperature and cooled); (6) age hardening (forged steel is exposed to prolonged low temperature heat); and, (7) quenching (forged steel is heated and rapidly cooled).  We found that Bharat Forge reported two combinations of heat treatments for fluid end blocks:  (1) products that were solution annealed and age hardened; and (2) products that were normalized, austenitized, tempered, and quenched.  Bharat explained that the two heat treatment combinations are related to whether the fluid end block was produced from stainless steel or alloy steel.[62]

We disagree with the petitioners' contention that Bharat reported an incorrect heat treatment code in its CONNUMs because we stated that "CONNUM 3 was solution annealed

---

[61] The quantity of steel grade [        ] [  ] units / [       ] total = [  ] percent.
[62] *See* Cost Verification Report at 7.

and CONNUM 1 was hardened in the same furnace (F9)."[63]  In our Cost Verification Report, we explain that CONNUM 1 was "heated to 850 degrees Celsius and rapidly cooled in a polymer and water mixture (quenching or hardening)…."[64]  Thus, CONNUM 1 was subjected to a hardening process; however, it was reported under the quenching physical characteristic and not the age hardened physical characteristic.  As described above, when a product is "age hardened" it is exposed to a prolonged low temperature heat (after being recrystallized and rapidly cooled during solution annealing), while products that are "quenched" are rapidly cooled from their recrystallization temperature.  Both types of heat treatment are considered hardening processes.[65]  Thus, contrary to the petitioners' arguments, Bharat correctly reported CONNUM 1 under the quenching physical characteristic based on the hardening process used.  Further, the fact that the same furnace was used does not indicate that the same type of heat treatment was applied.

For the same reasons, the petitioners' arguments regarding [

], a product examined during the sales verification, also fails.  Record evidence demonstrates that the product was hardened under the quenching process and not the age hardening process.[66]  As detailed above, Bharat reported two types of heat treatments that harden steel – age hardening and quenching.[67]  This product was hardened through the quenching process and, accordingly, reported as "quenched" and not "age hardened."

Fourth, we disagree with the petitioners that the additional G&A expenses discovered call into question Bharat's entire reporting methodology.  During our test work on G&A expenses at verification, we examined the "Admin" and "G&A" cost centers that were excluded from the

---

[63] *Id.* at 8.
[64] *Id.*
[65] *Id.*; *see also* Bharat's Letter, "Submission of Bharat Forge Limited's Post-Preliminary Response," dated September 14, 2020 (September 14, 2020 QR), at 13.
[66] *See* Sales Verification Report at 10.
[67] *See, e.g.*, September 14, 2020 QR; Cost Verification Report at 8; and Sales Verification at 10 (referring to quenching as hardening).

reported costs as part of the divisions that produced non-subject merchandise.  As we explained in our Cost Verification Report:

> To ascertain whether there were additional G&A expenses recorded in the production costs for other divisions, we requested a list of all cost centers designated as Admin and excluded as non-MUC, along with a description of the expenses accumulated in each cost center.  We examined the list with company officials noting that the expenses were related to new designs in the automotive, component, defense, and aerospace divisions.  The list also captured selling expenses that were included in the sales responses.  We selected the largest cost center ([      ]) and requested additional details related to what was described as a research and development project at Mundhwa.  We examined general ledger accounts for consumables and machining charges under the cost center and traced selected transactions to supporting documentation.  We found that the costs were related to trials of the forged [
>
>                                                   ].[68]

Thus, based on our review of the excluded "Admin" cost centers, we found no additional expenses that should have been reported as G&A expenses.  For the G&A cost centers, we found that these cost centers accumulated payroll related expenses, *e.g.*, employee benefit expenses, *etc.*[69]  All other G&A expenses were recorded directly to the general ledger and were not assigned to cost centers in Bharat's normal books and records.[70]  In our review of the overall cost reconciliation, we confirmed that Bharat included the amounts from these G&A general ledger

---

[68] *See* Cost Verification Report at 25.
[69] *Id.* at 26.
[70] *Id.*

accounts in its reported G&A expenses.[71]  Therefore, to confirm that Bharat also included all G&A expenses that were accumulated in the G&A cost centers, we compared the company-wide costs from the G&A cost centers (*i.e.*, INR [          ]) to the total employee benefit and directors/chairmen expenses that were included in the calculation of the G&A expense rate, *i.e.*, INR [          ].[72]  We determined that the entire difference between the two amounts should be included in the G&A expense rate calculation.  Accordingly, we included the difference as additional G&A expenses in our recalculations.[73]  Thus, there are no additional G&A cost centers to be considered in the calculation of the G&A expense rate.  Moreover, while our finding increased the reported G&A expense rate from [     ] percent to [     ] percent, it can hardly be considered a significant finding or one that "impugn{s} the overall reliability of a party's information."[74]  Further, Bharat's reported information is not "replete" with errors as in *CTL Plate from Belgium*.  We have not found that Bharat's responses are "replete" or filled with errors, rather we have found some errors that are limited in scope, *e.g.*, missing parts costs for [   ] of [   ] sales, [   ] of which required the addition of only [     ] percent of cost.  As for the issue with the mill test certificates from [          ], although the error is larger than determined by Bharat's response to our ILOVQ, the scope of the error is limited – applies to [   ] of [     ] sales.  Moreover, the error has no impact on the net sale prices or production costs reported for these [   ] sales.

---

[71] *Id.* at 11.
[72] *Id.* at 26.
[73] *See* Remand Cost Calculation Memorandum at 2 (adjustment 3).
[74] *See* Petitioners' Comments at 9.

**Issue 2:  Commerce's Application of Partial Facts Available With An Adverse Inference**

*Petitioners' Comments*

- Molybdenum Content:  Commerce purports to have applied partial AFA concerning Bharat's erroneous mill test certificates, treating all [   ] sales of steel grade [      ] as in-scope merchandise and applying the highest average-to-average dumping margin to the corresponding CONNUMs however, every one of the mill test certificates indicates [

].[75]  It is hardly an adverse inference considering that: (1) the merchandise is in-scope already and (2) the highest individual average-to-average dumping margin is insufficient to result in a non-zero estimated weighted-average dumping margin.[76]

- Heat Treatments:  Bharat failed to report CONNUM-specific costs pertaining to heat treatment to the best of its ability.  In response to the ILOVQ, Bharat claimed that "there is no accurate way for Bharat Forge to identify the cost associated with each individual process of [

]" and that "{f}or example it might be possible that some of the hardening cost is recorded with tempering cost."[77]  But at verification, Commerce discovered that Bharat's statements were misleading; considering that Bharat had at its disposal detailed information with which it could have complied with Commerce's reporting instructions for proper CONNUM coding based on each of

---

[75] *Id.* at 11 (citing Sales Verification Exhibit MINCORR 2).
[76] *Id.*
[77] *Id.* (citing Bharat's Letter, "Bharat Forge Response to Questionnaire in Lieu of Verification," dated September 14, 2020, at 14 and 16).

the discrete type(s) of heat treatment, including detailed records from log books and spreadsheets.[78]

- Number of Heat Treatment Cost Centers:  Bharat provided inconsistent information about the number of heat treatment cost centers.  Commerce identifies seven heat treatment cost centers[79], while Bharat identifies [   ] heat treatment cost center in one situation[80] and [   ] in another.[81]  This inconsistency evinces Bhart's failure to cooperate to the best of its ability.  The [   ] cost centers roll up into [       ] "profit centers."  The data in the logbooks are so specific that Bharat could have easily created product-specific costs based on the [   ] cost centers, instead of its crude and distorted methodology based on the [  ] profit centers.[82]

*Bharat did not submit comments regarding this issue.*

**Commerce's Position:**  We relied on partial AFA because of the minor inconsistencies that applied in limited circumstances.  We address the petitioners' arguments in support of total AFA, in turn, below.  As we discuss in response to Issue 3 below, we do not find the application of adverse facts available appropriate in any other instances beyond where we have applied partial facts available as described below.

Molybdenum Content:  The merchandise is in-scope and is included in the margin calculation.  For CONNUM [                    ], the partial AFA increases [   ] of [  ] transactions from a [     ] percent dumping margin to a [     ] percent dumping margin (and represented the

---

[78] *Id.* at 12 (citing Cost Verification Report at 6 and 8).
[79] *Id.* at 13 (citing Cost Verification Report at 8).
[80] *Id.* (citing Bharat Forge Cost Verification Exhibit 4).
[81] *Id.* (citing Petitioners' Letter, "Forged Steel Fluid End Blocks from India Case Brief of Petitioners," dated October 16, 2020 (Petitioners' Case Brief), at 33-36).
[82] *Id.* at 14 (citing Petitioners' Case Brief at 30-39 (summarizing how Bharat Forge could have used available information to more accurately reporting CONNUM-specific costs for various types of heat treatment).

only non-zero dumping margins found).[83]  For CONNUM [                    ], the partial AFA

increases the dumping margin for [     ] transactions from [     ] to [    ] percent.[84]  We

disagree that the inconsistencies in [     ] of [   ] related mill test certificates impugns all mill

test certificates or other reporting by Bharat.  Bharat never claimed that these sales were out-of-

scope, but rather reported them with its other sales.[85]  When we found inconsistencies, Bharat

continued to claim that the sales should be included.[86]  These are not the actions of a non-

cooperating party working to hide the only transactions upon which we found a dumping

margin.[87]  The problematic records are from an [                                              ]

and while Bharat was unable to provide an explanation as to how Bharat turned over inconsistent

versions of the mill test certificates for the same heat numbers for [       ] heats, they still

possessed the records and turned them over when queried.

Heat Treatment:  We disagree that Bharat's reporting of heat treatment costs is

unreasonable.  Bharat relied on the heat treatment hours from its detailed production records to

allocate the total heat treatment costs.  The petitioners imply that the company should be able to

break out the costs related to each heat treatment type and only allocate those costs to the

products that were heat treated in that specific manner.  However, based on our overview of the

heat treatment processes and the factory, there was much overlap among these processes.[88]  We

also noted an overlap in the costs recorded to the heat treatment cost centers, *i.e.*, not solely

related to one type of heat treatment.[89]  In fact, we found that certain types of heat treatments

---

[83] *See* Final Remand Sales Analysis Memorandum at Attachment D.
[84] *Id.* (The remaining [     ] U.S. sales transactions have between a [     ], and [     ] margins).
[85] *See* Bharat's Letter, "Forged Steel Fluid End Blocks from India:  Submission of Bharat Forge Limited's 2nd Supplemental Sections A & C Response," dated May 20, 2020, at 15.
[86] *See* Bharat's Letter, "Forged Steel Fluid End Blocks from India:  Submission of Bharat Forge Limited's Rebuttal Case Brief," dated October 29, 2020, at 2-3.
[87] *See* Final Remand Sales Analysis Memorandum at Attachment D.
[88] *See* Cost Verification Report at 8 and 22-23.
[89] *Id.* at 8.

could be performed in the same furnaces.[90]  Thus, we concluded that Bharat's reporting methodology, whereby the heat treatment costs from each specific heat treatment location were allocated to the products heat treated there based on the tons processed and the heat treatment processing times, was a reasonable methodology for allocating the associated costs.[91]

Heat treatment Cost Centers:  We disagree that Bharat inconsistently identified its heat treatment cost centers.  The seven cost centers identified by Commerce on page 8 of the Cost Verification Report are the cost centers within the HFD I and II divisions at the Mundhwa factory.  However, the list at cost verification exhibit (CVE) 4 identifies the company-wide heat treatment cost centers (*i.e.*, including the heat treatment cost centers at both the Baramati and Mundhwa factories).  Finally, we disagree that Exhibit D-32.2 of Bharat's section D response excludes the heat treatment cost center [      ] for power consumption.  We were able to locate cost center [      ] at row 28 of the Exhibit D-32.2 spreadsheet.[92]  Thus, we disagree that Bharat was inconsistent in its reporting of the heat treatment cost centers and this "evinces a failure of Bharat Forge to cooperate to the best of its ability" as argued by the petitioners.[93]

**Issue 3:  Commerce's Decision Not To Apply Total Adverse Facts Available**

*Petitioner's Comments*

- One of the goals of applying an adverse inference when relying on adverse facts available is "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully.  In employing adverse inferences, one factor {Commerce}

---

[90] *Id*.
[91] *Id.* at 8 and 22-23.
[92] *See* Bharat's Letter, "Submission of 2nd Supplemental Section D Response," dated June 11, 2020, at Exhibit D-32.2.
[93] *See* Petitioners' Comments at 14.

will consider is the extent to which a party may benefit from its own lack of cooperation."[94]

- The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) has affirmed Commerce's ability, when selecting an AFA rate, to consider whether the rate is sufficient to induce cooperation and states, "Commerce's consideration of the deterrent effect of its determination reflects the law's expectation."[95]

- Commerce's application of partial AFA in several instances indicates that Commerce finds that Bharat failed to cooperate to the best of its ability; however, Commerce has continued to assume that nearly all of Bharat's information is reliable and calculate a zero percent estimated weighted-average dumping margin. This is inconsistent with the *Nippon Steel* standard, which "does not condone inattentiveness, carelessness, or inadequate recordkeeping,"[96] and the purpose of applying adverse inferences as outlined in the SAA.[97]

- Here, Commerce's application of AFA is inconsistent with this legal standard because Commerce has nevertheless calculated a zero percent estimated weighted-average dumping margin, which is the best possible outcome for Bharat and, therefore, does nothing to induce cooperation.

- Commerce acts arbitrarily when it treats similarly situated parties differently without explanation.[98] To be sure, Commerce has broad discretion to fashion its verification procedures. The issue is not with the verification procedures as such, but rather with

---

[94] *Id.* at 10 (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. 1 (1994) (SAA), at 870).
[95] *Id.* (citing *Nan Ya Plastics Corp., Ltd. v. United States*, 810 F.3d 1333, 1348 (Fed. Cir. 2016)).
[96] *Id.* (citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (*Nippon Steel*)).
[97] *Id.* (citing SAA at 870).
[98] *Id.* at 14 (citing, *e.g.*, *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002)).

Commerce's implicit (and unexplained) determination that the errors identified at verification do not impugn the overall reliability of Bharat's reporting.

- Commerce has departed from its past practice by endorsing Bharat's reporting despite identifying significant errors in verification spot checks. In prior proceedings, Commerce has consistently found that errors identified in spot checks call into question the overall reliability of a respondent's reporting.[99]

- The CIT has sustained Commerce's determination that errors uncovered in spot checks undermine the reliability of data more broadly. "While the impact of the discovered errors, taken alone, on the proposed foreign currency adjustment may be small, Commerce could reasonably infer that there may remain other errors."[100]

- Here, Commerce does not explain how or why it believes the remainder of Bharat's reported information is reliable when Commerce identified errors in a large portion of Bharat's data that Commerce actually examined in detail.[101]

*Bharat did not submit comments regarding this issue.*

**Commerce's Position:** As a result of conducting on-site verifications we are now applying partial AFA in two, rather than three, instances where Commerce applied partial AFA in the *Final Determination*, and the application of one of these instances has been limited to a single CONNUM instead of applying to two CONNUMs as in the Second Draft Remand Redetermination. We were able to verify the net input weights and are, therefore, no longer

---

[99] *Id.* at 15 (citing, *e.g.*, *Emulsion Styrene-Butadiene Rubber from the Russian Federation: Final Affirmative Determination of Sales at Less Than Fair Value and Classification of the Russian Federation as a Non-Market Economy*, 87 FR 69002 (November 17, 2022) (*Rubber from Russia*), and accompanying IDM at 32; and *CTL Plate from Belgium* IDM at 82.)

[100] *Id.* (citing *Government of Québec v. United States*, 567 F. Supp. 3d 1273, 1286 (CIT 2022) (*Government of Québec*)).

[101] *Id.*

relying on partial AFA in this instance, as there is no information missing from the record and the information on the record has been verified.  However, we are still applying partial AFA with respect to [          ] molybdenum content for heats of steel grade [        ], and we are now applying the highest parts cost as partial AFA to the part costs of one CONNUM.  We are applying facts available based on section 776(a)(2)(D) (provides unverifiable information) with respect to sales of steel grade [        ] where an interested party provides information that cannot be verified.  In this situation, the information is from [

          ] and we cannot verify [                                                ] is accurate for [        ] heats.  We are also applying facts available based on section 776(a)(2)(A) (withholding requested information) with respect to missing costs for parts for two CONNUMs. In both instances, we applied adverse inferences because we find that Bharat "failed to cooperate by not acting to the best of its ability to comply with a request for information" under section 776(b) of the Act.  We have not expanded the application of AFA to all of Bharat's reported information because the molybdenum content only applies to [      ] percent of volume (by unit) and there were only incomplete parts cost information for one of fifteen CONNUMs amounting to [     ] percent by volume (by unit) after accepting a minor correction during the cost verification which determined that a prior adjustment was indeed the actual cost.  The latter change as a result of verification only resulted in a change of a negligible [       ] percent of the total cost of manufacture.[102]

---

[102] *See* Remand Cost Calculation Memorandum at 1 (we increased the cost of CONNUM [                        ] by [      ] percent) where there were [    ] sales of this CONNUM; *see also* Cost Verification Report at 15; and Final Remand Cost Calculation Memorandum at Attachment 1 (([        ] INR parts cost per unit * [    ] units = [         ] INR part costs / [              ] INR total cost of manufacturing = [      ] percent of the total cost of manufacturing).

We disagree with the petitioners and do not find it appropriate to apply total AFA to Bharat to determine its estimated weighted-average dumping margin.  Section 776 of the Act provides the following:

(a) IN GENERAL.—If—

(1) necessary information is not available on the record, or

(2) an interested party or any other person—

(A) withholds information that has been requested by the administering authority or the Commission under this title,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782,

(C) significantly impedes a proceeding under this title, or

(D) provides such information but the information cannot be verified as provided in section 782(i), the administering authority and the Commission shall, subject to section 782(d), use the facts otherwise available.

(b) ADVERSE INFERENCES.—

(1) IN GENERAL.—If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this title—

(A) may use an inference that is adverse to the interests of that party in

selecting from among the facts otherwise available.

With the limited exception of the missing costs for parts for one CONNUM, Bharat did

not withhold information that we requested.[103]  Bharat provided requested information in a

timely manner in the form and manner requested.[104]  Bharat did not impede the investigation or

the redetermination segments.[105]  Through the in-person, on-site cost and sales verifications, we

found that Bharat did provide requested information, however, certain information that it

provided could not be verified.[106]  Because the information could not be verified, this also means

that there is no information on the record that can substantiate the information that could not be

verified in the in-person verifications.[107]  Therefore, our application of partial AFA is in

accordance with sections 776(a)(1) and (2)(D) of the Act, where we found that information was

missing or unverifiable, and in accordance with sections 776(a)(1) and (2)(B) of the Act where

we found that Bharat had failed to provide missing information that had been requested.

As explained above and in the Sales Verification Report and the Cost Verification

Report, information that we found to be withheld or unverifiable in this in-person verification is

limited.  It does not extend to, or otherwise affect, the information that Bharat timely provided in

the form and manner requested, and that we verified in the in-person verifications.[108]  We do not

find that "a reliability-undermining effect" extends to outside the withheld or unverified

information to which we applied partial AFA.[109]  Substantial evidence does not support an

---

[103] *See* section 776(a)(2)(A) of the Act.
[104] *See* section 776(a)(2)(B) of the Act.
[105] *See* section 776(a)(2)(C) of the Act.
[106] *See* section 776(a)(2)(D) of the Act.
[107] *See* section 776(a)(1) of the Act.
[108] *See generally* Sales Verification Report and Cost Verification Report.
[109] *See Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351, 1366 (Fed. Cir.2021) (*Diamond Sawblades*).

overreach of applying AFA to verified information, or an application of total AFA to Bharat.[110]

Where the record is complete, no information is missing from the record, and that information is

not unverifiable, there is no reason to apply facts available, let alone adverse facts available.  In

*Diamond Sawblades*, the court upheld Commerce's application of partial AFA where a single

instance affected 2.5 percent of sales by volume.  Here, the two instances where information is

unverifiable affect [   ] percent of sales by volume.[111]  As the Federal Circuit explained in

*Diamond Sawblades*, where the errors identified are "limited in their reliability undermining

effect" to a defined subset of merchandise, then "there is no substantial evidence to support" a

determination that all of the supplied information is unreliable.[112]  In *Diamond Sawblades* the

Federal Circuit distinguished cases under section 776(a)(1) of the Act from cases under sections

776(a)(2)(A), (B), and (C) when applying total AFA based on potential concerns regarding a

"policy of cooperation with Commerce."[113]  The Federal Circuit has further elaborated that the

purpose of AFA under the statute "is to provide respondents with an incentive to cooperate, not

to impose punitive, aberrational, or uncorroborated margins."[114]  Here, there is no factual or legal

basis to apply facts available to the remainder of the record, let alone use an adverse inference in

selecting from among those facts.  Consequently, contrary to the petitioners' claim, there is no

---

[110] *Id.* at 1365 ("{Section 776(a) of the Act} pertains to situations 'where requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the information,' and when needed information is missing, Commerce 'must make {its} determinations based on all evidence of record, weighing the record evidence to determine that which is most probative of the issue under consideration'  That explanation, on its own, suggests an information-specific consideration of probativeness rather than any blanket disregard of all information supplied by a person whenever some of the information supplied by that person is unreliable.  (Internal citations omitted.)").

[111] *Id.* at 1360.

[112] *Id.* at 1355.

[113] *Id.* at 1365.

[114] *See F.lli de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

basis for revising our determination of sales at less than fair value from negative to affirmative as argued for by the petitioners; to do otherwise is unsupported by the facts and unlawful.[115]

We further find that *Rubber from Russia* and *CTL Plate from Belgium* relied on by the petitioners are inapposite.  Both cases involve the application of total AFA after verification findings that the respondents' multiple, significant reporting errors and withholding of requested information made the entire home market and U.S. sales data unreliable and therefore significantly impeded the investigations.[116]  In *Rubber from Russia*, the respondent's withholding of requested information made Commerce unable to segregate prime and non-prime merchandise and significantly impeded the investigation.[117]  In *CTL Plate from Belgium*, one respondent made multiple significant reporting errors that made the respondent's data unusable.[118]  Bharat's withholding of requested information and reporting of unverifiable information are not as extensive as in either *Rubber from Russia* or *CTL Plate from Belgium.*

Similarly, we find that the petitioners' reliance on the *Government of Québec* as support for the argument that all of Bharat's data is unreliable is without merit.[119]  The *Government of Québec* concerns partial facts available without an adverse inference, and contrary to the arguments made by the petitioners, Commerce's actions in that case support Commerce's decision *not* to apply total AFA, here.[120]  In the *Government of Québec*, Commerce "explained

---

[115] *See Diamond Sawblades*, 986 F.3d at 1365, quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("We have explained that '{a}n overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.' (Internal citation omitted.)").
[116] *See Rubber from Russia* IDM at Comment 3 and *CTL Plate from Belgium* IDM at Comments 8-11.
[117] *See Rubber from Russia* IDM at Comment 3.
[118] *See CTL Plate from Belgium* IDM at Comment 8 ("In particular, NLMK Belgium failed to report the correct U.S. date of sale for approximately 15 percent of its U.S. sales database (leading, as a result, to the omission of a significant portion of its reportable U.S. sales transactions and errors in any currency conversions performed for the reported ones); incorrectly determined the product characteristics (and, by extension, the control numbers) for approximately 33 percent of its home market and U.S. sales; and it misreported the sales and cost data reported for Manage (and, by extension, failed to substantiate its claims that Manage's sales do not match to any of NLMK Clabecq's U.S. sales).").
[119] *See Petitioners' Comments* at 15 (citing *Government of Québec*, 567 F. Supp. 3d at 1286).
[120] *See Government of Québec*, 567 F. Supp. 3d at 1284-86.

found that "the vast majority of the sales-related and other tests Commerce performed throughout the verification uncovered no other errors."[122]  Consistent with Commerce's determination in that case, here, we find that the vast majority of the information verified and tests Commerce performed throughout the verification did not uncover errors sufficient to justify the application of total facts available, much less total facts available with an adverse inference.

## V.     FINAL RESULTS OF REDETERMINATION

Consistent with the Court's *Second Remand Order*, and after considering comments from interested parties, on remand, we find that Bharat's estimated weighted-average dumping margin of zero percent from the *Final Determination* continues to be unchanged in these final results of redetermination.  Upon a final and conclusive decision in this litigation, as appropriate, Commerce will instruct U.S. Customs and Border Protection to liquidate all entries without regard to antidumping duties, consistent with the final results of redetermination.

2/6/2024

X 

Signed by: RYAN MAJERUS

Ryan Majerus
Performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[122] *Id.*